**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACCELERATION BAY, LLC, a | ) | |
| Delaware Limited Liability Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-904-RGA-SRF |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| AMAZON WEB SERVICES, INC., a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF ACCELERATION BAY, LLC'S
OPENING SUMMARY JUDGMENT AND *DAUBERT* BRIEF**

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
James Hannah
Kristopher Kastens
Michael Lee
Christina M. Finn
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
(650) 752-1700

Aaron M. Frankel
Marcus A. Colucci
Cristina Martinez
Pooja P. Parekh
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Date: May 31, 2024
Public version dated: June 7, 2024

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

*Attorneys for Plaintiff
Acceleration Bay, LLC*

## **TABLE OF CONTENTS**

**Page**

I.      NATURE AND STAGE OF THE CASE .................................................................... 1

II.     SUMMARY OF ARGUMENT ................................................................................. 1

III.    ARGUMENT ........................................................................................................... 2

        A.      AWS' Transit Gateway is M-Regular and Incomplete ............................... 2

                1.      Overview: Transit Gateway is Critical to AWS' Ability to Provide
                        Scalable Computer Services ........................................................... 3

                2.      Transit Gateway is M-Regular and Incomplete ............................... 6

                        (a)      ████████████████ is Configured to Be M-Regular and
                                 Incomplete ........................................................................... 7

                        (b)      Health Layer is Configured to Be M-Regular and Incomplete ...... 9

                        (c)      Multicast is Configured to Be M-Regular and Incomplete ........... 10

                3.      AWS Has Not Established any Genuine Factual Disputes ...................... 10

        B.      Mr. Greene's Deficient Invalidity Opinions Should Be Excluded and
                Summary Judgment of Validity Should Be Granted .................................... 12

                1.      Summary Judgment of No Anticipation is Warranted Because Mr.
                        Greene Does Not Offer Any Specific Anticipation Opinion .................... 13

                2.      Mr. Greene's Unsupported Reliance on Inherency for Every Claim
                        Element Should Be Excluded as Unreliable ............................................. 15

                3.      Summary Judgment of No Obviousness and Exclusion of Mr.
                        Greene's Obviousness Opinions is Warranted Because He Relies on
                        Improper Hindsight .................................................................................. 17

        C.      The Opinions of AWS' Experts on Non-Infringing Alternatives Should Be
                Excluded and Summary Judgment Should Be Granted That There are No
                Non-Infringing Alternatives .................................................................... 22

                1.      Ms. Sultanik's Opinions on Non-Infringing Alternatives are
                        Unsupported and Unreliable .................................................................... 22

                2.      Ms. Kindler's NIA Opinion Depends on Ms. Sultanik's Deficient
                        Opinion and Lacks Any Independent Analysis ........................................ 26

D.     Ms. Kindler's Unreliable Damages Opinions Should Be Excluded ..................... 28

1.     Ms. Kindler's Damages Opinions Are Arbitrary and Untethered to the Facts of the Case ................................................................................ 28

2.     Ms. Kindler's Damages Opinions Fail to Assume Infringement.............. 35

IV.     CONCLUSION.............................................................................................................. 38

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)........................................................................18, 21

*Adasa Inc. v. Avery Dennison Corp.*,
   No. 6:17-cv-01685-MK, 2020 WL 5518184 (D. Or. Sept. 14, 2020), *aff'd in
   part*, *rev'd in part* on other grounds, 55 F.4th 900 (Fed. Cir. 2022) .......................................21

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys.*,
   101 F. Supp. 2d 1257 (N.D. Cal. 1999) ......................................................................19, 21

*ATD Corp. v. Lydall, Inc.*,
   159 F.3d 534 (Fed. Cir. 1998)........................................................................19

*Bowling v. Hasbro, Inc.*,
   No. 05-229S, 2008 WL 717741 (D.R.I. Mar. 17, 2008)........................................................26

*Conceptus, Inc. v. Hologic, Inc.*,
   771 F. Supp. 2d 1164 (N.D. Cal. 2010) .......................................................................23

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)........................................................................1, 26, 28

*Elder v. Tanner*,
   205 F.R.D. 190 (E.D. Tex. 2001)........................................................................15

*Endo Pharms. Sols., Inc. v. Custopharm Inc.*,
   894 F.3d 1374 (Fed. Cir. 2018)........................................................................16

*Extang Corp. v. Truck Accessories Grp., LLC*,
   No. CV 19-923 (KAJ), 2022 WL 610451 (D. Del. Feb. 18, 2022) .......................................13

*Fortinet, Inc. v. Sophos, Inc.*,
   No. 13-cv-05831-EMC, 2015 WL 6513655 (N.D. Cal. Oct. 28, 2015) ....................................3

*Gen. Elec. Co. v. Joiner*,
   118 S. Ct. 512 (1997)........................................................................16

*GPNE Corp. v. Apple, Inc.*,
   No. 12-cv-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ...........................25, 30

*Grain-Processing Corp. v. Am. Maize-Prod. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999)........................................................................23

*Hitkansut LLC v. United States*,
   130 Fed. Cl. 353 (2017), *aff'd*, 721 F. App'x 992 (Fed. Cir. 2018) .......................................19

*Innogenetics, N.V. v. Abbott Lab'ys*,
   512 F.3d 1363 (Fed. Cir. 2008)...........................................................................................21

*Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*,
   No. CV 15-819-LPS-CJB, 2018 WL 1785033 (D. Del. Apr. 4, 2018)................................16

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
   751 F.3d 1327 (Fed. Cir. 2014).........................................................................................20

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
   140 F. App'x 236 (Fed. Cir. 2005) ......................................................................................12

*Juniper Networks, Inc. v. Palo Alto Networks, Inc.*,
   15 F. Supp. 3d 499 (D. Del. 2014)........................................................................................3

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
   381 F.3d 1142 (Fed. Cir. 2004).....................................................................................14, 22

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..............................................................................................................26

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
   No. 2:06-CV-348, 2011 WL 197869 (E.D. Tex. Jan. 20, 2011) ...........................................23

*Lucent Techs. Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)...........................................................................................35

*Mars, Inc. v. Coin Acceptors, Inc.*,
   527 F.3d 1359 (Fed. Cir. 2008)...........................................................................................28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................................3

*Microsoft Corp. v. i4i Ltd.*,
   131 S.Ct. 2238 (2011)...........................................................................................................13

*NXP USA, Inc. v. Impinj, Inc.*,
   No. 2:20-cv-01503-JHC, 2023 WL 3933877 (W.D. Wash. June 8, 2023),
   *reconsideration denied*, No. 2:20-cv-01503-JHC, 2023 WL 4052338 (W.D.
   Wash. June 16, 2023)............................................................................................................27

*Open Text S.A. v. Box, Inc.*,
   No. 13-cv-04910-JD, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015)..................................30, 35

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  875 F.3d 1369 (Fed. Cir. 2017)..................................................................................23

*Princeton Biochems., Inc. v. Beckman Coulter, Inc.*,
  411 F.3d 1332 (Fed. Cir. 2005)..................................................................................19

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
  725 F.3d 1377 (Fed. Cir. 2013)..................................................................................15

*In re Robertson*,
  169 F.3d 743 (Fed. Cir. 1999)....................................................................................16

*Schumer v. Lab'y Comput. Sys., Inc.*,
  308 F.3d 1304 (Fed. Cir. 2002)..................................................................................14

*Schwing GmbH v. Putzmeister Aktiengesellschaft*,
  305 F.3d 1318 (Fed. Cir. 2002)..................................................................................12

*Smart Skins LLC v. Microsoft Corp.*,
  No. C15-544-MJP, 2016 WL 4148091 (W.D. Wash. July 1, 2016).......................23

*Synqor, Inc. v. Artesyn Techs., Inc.*,
  709 F.3d 1365 (Fed. Cir. 2013)....................................................................................2

*TQ Delta, LLC v. 2Wire, Inc.*,
  No. CV 13-1835-RGA, 2021 WL 2649739 (D. Del. June 28, 2021).....................12

*TQ Delta LLC v. Adtran, Inc.*,
  No. CV 14-954-RGA, 2021 WL 1200595 (D. Del. Mar. 30, 2021)........................12

*WMS Gaming, Inc. v. Int'l Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999)..................................................................................20

**Other Authorities**

Fed. R. Civ. P. 56............................................................................................................2

Fed. R. Evid. 702.......................................................................................................1, 22

## I.     NATURE AND STAGE OF THE CASE

Acceleration Bay, LLC ("Acceleration Bay") filed suit against Amazon Web Services, Inc. ("AWS") on July 6, 2022.  D.I. 1.  Acceleration Bay asserts that AWS infringes U.S. Patent Nos. 6,701,344 (the "'344 Patent"), 6,714,966 (the "'966 Patent"), 6,732,147 (the "'147 Patent"), 6,829,634 (the "'634 Patent"), and 6,910,069 (the "'069 Patent") (together, the "Asserted Patents").

The Court held a claim construction hearing on October 4, 2023 and issued its claim construction order on October 25, 2023.  D.I. 77, 81.  Fact and expert discovery respectively closed on February 9, 2024 and May 28, 2024.  D.I. 109, 129.  Trial is set for September 23, 2024.  D.I. 14.

Acceleration Bay now moves for partial summary judgment on specific infringement, validity, and damages issues and to exclude proposed opinions of AWS' validity and damages experts under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) and Rule 702 of the Federal Rules of Evidence.  The parties conferred on Acceleration Bay's motions to exclude and are at an impasse.

## II.     SUMMARY OF ARGUMENT

Various issues relating to infringement and validity should be resolved on summary judgment.  The undisputed facts, as confirmed by the admissions of AWS' engineers and non-infringement expert and its technical documents, establish that there is no genuine dispute that its accused Transit Gateway product satisfies the m-regular and incomplete claim limitations of the asserted claims.  Partial summary judgment as to these limitations would streamline and focus the remaining dispute over infringement.

Summary judgment of validity is also warranted given AWS' failures as to the basic requirements for an invalidity defense.  AWS' invalidity expert offers no opinions based on

anticipation.  With respect to obviousness, he utilized a hindsight-based methodology, prohibited by Federal Circuit precedent and failed to provide a legally sufficient motivation to combine the eight prior art references he cites.  Thus, AWS has failed to come forward with a triable issue of fact as to the invalidity of any asserted claim.  At a minimum, the fundamentally flawed opinions of AWS' invalidity expert should be excluded as unreliable and based on a flawed methodology that is untethered to the legal requirements for validity.

Acceleration Bay also moves to exclude as unsupported, unreliable, and unhelpful the non-infringing alternative opinions of AWS' non-infringement expert, Ms. Nadya Sultanik, and the non-infringing alternative and damages opinions of AWS' economic expert, Ms. Lauren Kindler.

## III.    ARGUMENT

### A.    AWS' Transit Gateway is M-Regular and Incomplete

Partial summary judgment of infringement is warranted.  While various claim limitations are disputed and will be resolved by the jury, with respect to AWS' Transit Gateway product, "there is no genuine dispute" that it satisfies the m-regular and incomplete claim limitations.  Fed. R. Civ. P. 56(a).  Partial summary judgment is appropriate where, as is the case here, there is no genuine dispute that specific claim limitations are satisfied.  Rule 56(a) provides that "summary judgment may be requested not only as to an entire case but also as to a . . . part of a claim or defense."  Fed. R. Civ. P. 56 advisory committee's note at 2010 amendment.  The Federal Circuit has expressly affirmed the practice of granting partial summary judgment as to a specific limitation.  *Synqor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1379 (Fed. Cir. 2013) ("[T]his court affirms the grant of partial summary judgment of infringement on this limitation.").

As set forth below, Acceleration Bay "demonstrat[es] the absence of a genuine issue of material fact," relying on AWS' source code and technical documents to prove that Transit

Gateway meets these elements. *Juniper Networks, Inc. v. Palo Alto Networks, Inc.*, 15 F. Supp. 3d 499, 506 (D. Del. 2014) (citations omitted).

"To defeat a motion for summary judgment, [AWS as] the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (internal quotations and citations omitted). AWS must "come forward with specific facts showing that there is a genuine issue for trial" to defeat summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 585 n.10 (1986) (internal quotations, citations and emphasis omitted); *Fortinet, Inc. v. Sophos, Inc.*, No. 13-cv-05831-EMC, 2015 WL 6513655, at *2-3 (N.D. Cal. Oct. 28, 2015) (granting partial summary judgment of infringement). AWS failed to come forward with any evidence creating a genuine issue of material fact as to these limitations. AWS' non-infringement expert, Ms. Sultanik, offers opinions that are irrelevant and contrary to the established evidence in the case regarding Transit Gateway's operation. Thus, summary judgment as to these limitations is appropriate.

### 1.    Overview: Transit Gateway is Critical to AWS' Ability to Provide Scalable Computer Services

AWS offers a variety of products providing on-demand cloud computing services. AWS provides these services using a network of server farms located throughout the United States and around the world. AWS offers customers the flexibility to scale the amount of computer resources they use on an as-needed basis and frees customers from the need to manage their own hardware resources.

AWS' systems are based on the concept of "Virtual Private Clouds" ("VPCs"). Ex. 1[1], Medvidović Rpt. ¶¶ 98-100. VPCs are virtual networks that are dedicated to a specific customer's

---

[1] Unless otherwise noted, "Ex." refers to exhibits attached to the Declaration of Christina M. Finn, filed herewith.

AWS account, allowing customers to isolate their computing resources from those of other AWS customers. AWS customers with large enterprise networks can use hundreds to thousands of different servers and VPCs to configure their AWS networks. *Id*. ¶¶ 114, 146, 199. While VPCs are the building blocks for these large enterprise networks, the isolation of VPCs increases the complexity of enabling communications between customers' VPCs on their own enterprise networks. *Id*. ¶¶ 90-91.

After AWS launched its cloud services, its customers' networks grew rapidly and AWS began experiencing scaling issues. AWS needed a solution to manage its different customers, implementing thousands of VPCs all sharing the same AWS computer hardware, generally called "multitenant" architectures, that would allow customers to keep their VPCs private and isolated, while also allowing interconnecting of VPCs when a customer wanted the VPCs to be able to broadcast data to each other. Ex. 2 ("Guidance for Multi-Tenant Architectures on AWS"); *see also*, *e.g.*, Ex. 3, AMZ_AB_000095858 (describing how Transit Gateway allows for separate VPCs to interconnect).

To solve this problem, AWS created Transit Gateway to interconnect its customers' network components. Today, AWS depends on Transit Gateway to meet the needs of its customers to create large networks of computers. Ex. 1, Medvidović Rpt. ¶¶ 98-100; Ex. 4 at AMZ_AB_000124315 (the Transit Gateway can be used "to interconnect your virtual private clouds (VPCs) and on-premise networks."). In particular, Transit Gateway allows customers to streamline their network architecture by connecting different network components. Ex. 3 AMZ_AB_000095853 at 858, 860 (describing how a customer can organize their network with the Transit Gateway). Without Transit Gateway, implementing the types of complicated networks many of AWS' customers depend on would be difficult, if not impossible, on a multitenant

architecture.  *See*, *e.g.*, Ex. 5 at AMZ_AB_000124306 (describing how Transit Gateway "is built
for enterprise who run thousands of networks distributed in VPCs across AWS regions and on-
premise networks . . . .  Some of AWS' largest customers have built their cloud backbone using
[Transit Gateway] . . . .  The trust customers place in [Transit Gateway] to run their often revenue
generating businesses is immense . . . .").

        To  implement  Transit  Gateway  on  AWS'  multitenant  architecture,  AWS  devised
"Hyperplane," a new network system within Transit Gateway that greatly increased its speed and
functionality.   Ex. 6, AMZ_AB_000124554 (describing the premise of the Hyperplane is to
provide a highly available forwarding service).  Transit Gateway relies on Hyperplane technology
in order to enable AWS' customers to better structure their networks and permit AWS to keep
separate the data of its many customers.  Ex. 7 (Overview of Amazon Web Services) at 1-4.



        Hyperplane works by ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████.  Ex. 6 at AMZ_AB_000124557 (describing the use of the
████████████████████████); Ex. 8  at AMZ_AB_000124590 (describing how the
████████████████████████████).  AWS' ██████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████.   Ex.  6  at
AMZ_AB_000124556-57 ████████████████████████████████████
████████████████████████████████████████████████████; *id*. at
124567 ██████████████████████████████████████████████
███████████████████████████.

---

[2] Virtual machines are computers running in software.

Hyperplane uses ██████████████████████████████████████████

██. *See, e.g.*, Ex. 6 at AMZ_AB_000124554 (describing ██████████████████). There

are ██████████████████████████████████████████████████████

████████████████████████████████. Ex. 1, Medvidović Rpt. ¶¶ 99-

101.

Hyperplane also uses ███████████████████████████. Ex. 9 at

AMZ_AB_000124581 (describing ███████████████████████████

███). Similarly, Hyperplane will also ████████████████████████

████████████████████████████████████████████████████.

Ex. 1, Medvidović Rpt. ¶ 207. The Hyperplane ███████████████

██████████████████████████████████████████████████

████████████████████████████████████████. *Id.*

¶ 208. The ████████████████████████████████████████

████████████████. *Id.*

AWS ██████████████ the Hyperplane technology underlying Transit Gateway,

which is completely opaque AWS' customers, ████████████████████████

███████. Ex. 6 at AMZ_AB_000124554 (describing how Transit Gateway, referred to as

████████████████████████████████████████████████████

███████████████).

### 2.    Transit Gateway is M-Regular and Incomplete

As set forth below, there is no genuine material dispute that Transit Gateway uses m-

regular and incomplete networks for its (1) ████████████████, (2) health data layer, and (3)

multicasting functionalities. As construed by the Court, a "network is m-regular" means "[a] state

that the network is configured to maintain, where each participant is connected to exactly m

neighbor participants." D.I. 81 at 2. "[P]articipants" are "[c]omputers or computer processes that are connected by a network." *Id.* at 3. Some, but not all, of the asserted claims, further require that the network be "incomplete," meaning that not all participants are directly connected to each other.[3]

**(a)** ███████████████████ **is Configured to Be M-Regular and Incomplete**

As Acceleration Bay's technical expert, Dr. Medvidović, explained, the Hyperplane ███ ████████████████████████████████████████████████████████ ███████████████ . Ex. 1, Medvidović Rpt. at ¶¶ 272, 274. AWS' expert, Ms. Sultanik, does not dispute this point. Ex. 10, Sultanik Rebuttal Rpt. at ¶ 318.

The Hyperplane ██████████████████████████████████████████████ ██████████████ . Ex. 1, Medvidović Rpt. at ¶¶ 201-208. Hyperplane ████ █████████ maintains the network as m-regular and incomplete by █████████████ ███████████████████████████████████████ . *Id.* at ¶¶ 272, 317 ("█ █████████████████████████████████████████████████████████ ██████████ "). A ███████████████████████████ Hyperplane ██████████ . *Id.* at ¶ 316 (citing Ex. 6 at AMZ_AB_000124564, 556-557 ("█████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ )).

As explained in Dr. Medvidović's report, the AWS figure below demonstrates that each of the ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[3] Asserted Claims 6, 9, and 10 of the '147 Patent do not require the network to be incomplete.

████████████████████).  Ex. 1, Medvidović Rpt. at ¶ 318 (citing Ex. 6, AMZ_AB_000124568,

Fig. 8 annotated).



Dr. Medvidović prepared a table identifying ████████████████████████████

in Figure 8 above:



Ex. 1, Medvidović Rpt. ¶ 318.  Thus, ███████████████████████████████████ ███████.

### (b)        Health Layer is Configured to Be M-Regular and Incomplete

Dr. Medvidović also established that Hyperplane ███████████████████████ ██████████████████████████.  For example, ███████████████████████████ ████████████████████.  *See, e.g.,* Ex. 1, Medvidović Rpt. at ¶ 208; Ex. 8 at AMZ_AB_000124590 (████████████████████████████████████████ ████████████████████████████); Ex. 6 at AMZ_AB_000124563-64 (describing the Health Layer with three tops).  Hyperplane has a set number of tops ████████████ ██████████████████ Ex. 1, Medvidović Rpt. at ¶¶ 201-202; Ex. 11 at AMZ_AB_000124572-73 ("What TGW Autoscaling does") (describing how, by default, each █████████████████████████████████████████████████████████████ ████████████████████); Ex. 12, MacCarthaigh Tr. at 187:19-23 ("Each Transit Gateway ███████████████████████████████████████████████████), 202:8-203:2 ████████████████████████████████████████████████; Ex. 11 at AMZ_AB_000124575████████████████████████████████████.  M-regularity is enforced ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████.  Ex. 11 at AMZ_AB_000124572 (describing how ██████████ █████████████████████████████████████████████████████████).  This ███████████████████████████████████████████.

---

[4] Availability Zones (or "AZs") are subdivisions made in different data centers to isolate them from each other to increase the stability of the system.  Ex. 1, Medvidović Rpt. at ¶ 86.

### (c)    Multicast is Configured to Be M-Regular and Incomplete

Multicast uses ███████████████████████████████████████████████ ████████████████████████████████████████. For example, an AWS multicast document shows a configuration in which ████████████████████████████. *See* Ex. 9 at AMZ_AB_000124580, Fig. 4 (showing ██████████████████████████ ██████); *see also id.* at 581 ("For every [Availability Zone], ████████████████ ██████████████████████ This cluster is an arbitrary but stable █████████████ █████████████████████ . . . . It gives us the horizontal scaling feature for multicast replication. As we throw █████████████████████████████████████ ████ the replication capacity of the fleet proportionately increases."). Thus, Multicast is m-regular because █████████████████████████████████████████████████ ███████████████████████████████.

### 3.    AWS Has Not Established any Genuine Factual Disputes

AWS fails to come forward with any evidence to establish genuine disputes as to the fact that Transit Gateway uses m-regular and incomplete networks. In fact, AWS' expert admits that Transit Gateway is configured ████████████████████████, in the example she discusses, ████. Ex. 10, Sultanik Rebuttal Rpt. at ¶ 282 ("HyperPlane ███████████████ ████████████████████████████████████████████████████████████████ ████).

There is also no dispute that each participant can have the same number of connections in Transit Gateway. *See, e.g.*, Ex. 13, Sultanik Tr. at 206:13-23 (confirming that Transit Gateway ████████████████████████████████████████████████████). Similarly, Ms. Sultanik confirms that █████████████████████████████████████████████ shown in Figure 8 of AMZ_AB_000124554-71. *See id.* at 69:6-14; Ex. 6 (Sultanik Ex. 4, Fig. 8).

And Ms. Sultanik does not offer any opinion that the networks are complete, nor could she because ███████████████████████████████. Ex. 10, Sultanik Rebuttal Rpt. at ¶¶ 334-344 (Ms. Sultanik does not include an explanation for how the networks are allegedly complete).

Rather, Ms. Sultanik argues that customers can configure Transit Gateway networks. *See, e.g.*, *id.* at ¶¶ 334-339 (asserting that customers configure Transit Gateway). Customer configuration, however, is irrelevant to the infringement opinion offered by Dr. Medvidović, which is not based on the aspects of Transit Gateway that are configured by customers. Instead, as explained above, Dr. Medvidović's analysis that is the subject of this motion is based on Hyperplane functionality that AWS customers do not interact with, let alone configure. Neither AWS nor Ms. Sultanik offers any evidence to the contrary. Thus, customers' ability to configure certain aspects of Transit Gateway has no bearing on the automatic functionality that makes Hyperplane m-regular and incomplete.

Ms. Sultanik's Rebuttal Report contains a general discussion of Transit Gateway's Hyperplane technology and ███████████, but does not offer an explanation for how Hyperplane and the tops fail to satisfy the m-regular and incomplete limitations. *See, e.g.*, Ex. 10, Sultanik Rebuttal Rpt. at ¶¶ 339-344. In particular, Ms. Sultanik does not make the affirmative claim that Dr. Medvidović's explanation ███████████████████ is incorrect. And during her deposition, Ms. Sultanik conceded that ███████████████████████. For example, Ms. Sultanik agreed that ██████████████████ shown in Figure 4 of AMZ_AB_000124584 at 590 (*see* Ex. 8), and ████████████████████████ ████████. Ex. 13, Sultanik Tr. at 92:2-21; Ex. 1, Medvidović Rpt. at ¶ 142 ("For example, ████████████████████████████████. See AMZ_AB_000124584 at 590 Figure 4").

Ms. Sultanik also fails to address, and therefore leaves unrebutted, Dr. Medvidović's opinion regarding the Health Layer being m-regular and incomplete network. The entirety of Ms. Sultanik's rebuttal analysis is her incorrect statement that "Dr. Medvidović describes the health layer for HyperPlane. But monitoring the health of the cell's instances doesn't implicate m-regularity." Ex. 10, Sultanik Rebuttal Rpt. at ¶ 344. The bald denial of infringement cannot establish a genuine dispute of fact. *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1325-26 (Fed. Cir. 2002) ("Without further support, [an expert's] conclusory statement is insufficient to raise a genuine evidentiary dispute for trial.").

Given Ms. Sultanik's failure to rebut Dr. Medvidović's infringement analysis with anything other than conclusory denials, partial summary judgment is warranted as to the m-regular and incomplete limitations. *See TQ Delta, LLC v. 2Wire, Inc.*, No. CV 13-1835-RGA, 2021 WL 2649739, at *2, *7 (D. Del. June 28, 2021) (granting summary judgement of infringement because defendants did not present "affirmative evidence" showing that the "Accused Products [do not] meet every limitation of the Asserted Claims"); *see also TQ Delta LLC v. Adtran, Inc.*, No. CV 14-954-RGA, 2021 WL 1200595, at *6 (D. Del. Mar. 30, 2021) (granting Plaintiff's summary judgement of infringement because "[t]here is no genuine dispute that the source code of the Accused Products . . . infringes the asserted claims").

## B.    Mr. Greene's Deficient Invalidity Opinions Should Be Excluded and Summary Judgment of Validity Should Be Granted

AWS' anticipation and obviousness defenses rest entirely on the legally insufficient opinion of Mr. Joseph Greene, who fails to provide any of the analysis necessary to prove these defenses at trial. Mr. Greene relies only on improper hindsight, *ipse dixit*, and unsubstantiated conclusory assertions. Mr. Greene's opinions, therefore, should be excluded as unreliable and unhelpful to the jury. *See, e.g., Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 140 F. App'x

12

236, 244 (Fed. Cir. 2005) (affirming exclusion of conclusory expert testimony that was unsupported other than by the expert's subjective belief).

Because of the fundamental flaws in Mr. Greene's opinions and the absence of any other basis to present an invalidity case, AWS cannot carry its clear and convincing burden to show invalidity. *Microsoft Corp. v. i4i Ltd.*, 131 S.Ct. 2238, 2242-43 (2011) (party challenging patent on obviousness grounds bears a high burden of persuasion); *Extang Corp. v. Truck Accessories Grp., LLC*, No. CV 19-923 (KAJ), 2022 WL 610451, at *1 (D. Del. Feb. 18, 2022) ("the party challenging validity must prove that the claims are invalid by clear and convincing evidence.") (citation omitted). Thus, the Court should grant summary judgment that the asserted claims are valid over AWS' unsupported invalidity defenses.

> **1.    Summary Judgment of No Anticipation is Warranted Because Mr. Greene Does Not Offer Any Specific Anticipation Opinion**

While AWS purports to assert an anticipation defense, its invalidity expert, Mr. Greene, does not offer any anticipation opinion. In particular, Mr. Greene does not opine in either of his reports that any of the eight references at issue anticipate any of the asserted claims. Mr. Greene's reply report does not mention anticipation at all, and he only uses "anticipate" or "anticipation" in three places in his opening report: (1) in the legal standard section of his report, (2) in his summary of the file history, and (3) to make the bald claim that the asserted claims are "anticipated and/or rendered obvious by prior art references." Ex. 14, Greene Report at ¶¶ 2a, 55, 108-114, and 139.

When deposed, Mr. Greene was unable to identify any specific asserted claim that he contended was anticipated or any specific references that allegedly anticipate any of the asserted claims. Instead, when asked about anticipation, Mr. Greene consistently referred to combinations of references or portions of his report addressing obviousness. For example, when Mr. Greene was asked if the Du reference anticipates any asserted claim, he responded that Du is used "as one

of the references.  Not the sole reference.  It covers certain aspects of it."  Ex. 25, Greene Tr. at 29:17-30:7; *see also id.* at 30:11-31:4 (in providing answers regarding anticipation, Mr. Greene said that Du "shows up mostly in the obvious sections" and "was a supplemental reference, not the primary reference"); *id.* at 44:23-45:4 (Mr. Greene said he "did not try to present [Du] as one and only one.  I said, these three [references] do it on a claim-by-claim basis").

Mr. Greene did not appear to understand that anticipation is limited to the disclosure of a single reference.  When pressed to explain the basis for his statement in the summary of his opinions which refers to anticipation, Mr. Greene testified that "[i]n all cases, I used combinations."  *Id.* at 26:13-18; Ex. 14, Greene Report at ¶ 2a.  Mr. Greene explained that his "thinking behind the word 'anticipating'" is "that you have to refer to multiple sources and products to put something together new, to meet a business need."  Ex. 25, Greene Tr. at 22:22-24:6.  Mr. Greene further testified that Section IX.A. of his report, which is titled "Motivation to Combine and Reasonable Expectation of Success Summary," is where he documented his ***anticipation*** analysis.  *Id.* at 36:5-22; *see also, e.g.*, *id.* at 33:13-34:10 (testifying that he did not use the words "anticipate" or that any asserted claims are "invalid over a single reference" in Section IX of his report, which purportedly addresses anticipation);  Ex. 14, Greene Report at Section IX.

Mr. Greene's failure to disclose the specifics of any particular anticipation opinion is fatal to AWS' anticipation defense.  "[T]estimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference."  *Schumer v. Lab'y Comput. Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) (invalidity experts must explain in

detail how each claim element is disclosed in the prior art reference and conclusory testimony of experts is insufficient to show anticipation); *see also Elder v. Tanner*, 205 F.R.D. 190, 193-94 (E.D. Tex. 2001) (excluding patent expert's conclusory opinions regarding anticipation which contained no discussion of their thought processes because their testimony would not assist the trier of fact in determining validity).

Given these failures, Mr. Greene should not be permitted to offer any opinions on anticipation. "The purpose of the expert disclosure rule [] to 'provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses'" is impermissibly frustrated if an expert is permitted to provide opinions without clearly disclosing them. *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (Fed. Cir. 2013) (citation omitted). Acceleration Bay should not be left to guess as to Mr. Greene's opinions, if any, regarding anticipation.

Thus, the Court should preclude Mr. Greene from opining on anticipation and enter summary judgment of no anticipation of all asserted claims, as AWS has not come forward with a triable case of anticipation.

## 2.    Mr. Greene's Unsupported Reliance on Inherency for Every Claim Element Should Be Excluded as Unreliable

Mr. Greene offers an unsupported boilerplate assertion that, to the extent any limitation of the asserted claims is not explicitly disclosed, it is inherently disclosed. *See* Exs. 15-24, Greene Report Appx. B1, B2, B3, C1, C2, C3, D1, D2, E1, and E2. For every element of every asserted claim, Mr. Greene simply repeats the stock phrase that, "[t]o the extent Acceleration Bay contends that [the prior art] does not disclose this element, it is . . . inherent." *See, e.g.*, Ex. 15, Appx. B1 at 4, 7, Ex. 18, Appx. C1 at 5, 7-8, Ex. 21, Appx. D1 at 4, Ex. 23, Appx. E1 at 10. Mr. Greene offers no explanation or support for this assertion. This *ipse dixit* opinion should be excluded as

unreliable and unhelpful to the jury as it is nothing more than a bare conclusion or placeholder for undisclosed opinions.

In his deposition, Mr. Greene confirmed that he did not explain the basis for any of his inherency opinions. Ex. 25, Greene Tr. at, *e.g.*, 184:13-187:13. He testified that he did not explain why elements "would be inherent or necessarily disclosed or flow from the teachings of" the prior art references because to him "it seemed obvious." *Id.* at 186:10-20. He continued that "[b]ut again, to others, it might not be. But it is something that we had to know at the time . . . . " *Id.*

Mr. Greene's unexplained feeling that inherency was obvious is not evidence the jury can rely on. In order to rely on a prior art reference's inherent disclosure of an element, rather than explicit description of the element found in the reference, Mr. Greene was required to demonstrate, with clear and convincing evidence, that the particular element is "necessarily" present or is "the natural result of the combination of elements explicitly disclosed by the prior." *Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1381 (Fed. Cir. 2018) (citation omitted); *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (reasoning that "[i]nherency . . . may not be established by probabilities or possibilities [and] [t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient") (internal quotations and citations omitted).

Mr. Greene's opinion should be excluded because he failed to explain "how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it,'" as Mr. Greene would ask the jury to do. *Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*, No. CV 15-819-LPS-CJB, 2018 WL 1785033, at *6 (D. Del. Apr. 4, 2018) (citation omitted); *Gen. Elec. Co. v. Joiner*, 118 S. Ct. 512, 519 (1997) (affirming exclusion of *ipse dixit* expert opinion). Thus, Mr. Greene

should not be permitted to opine that any claim elements are inherently disclosed by the asserted references.

> **3.    Summary Judgment of No Obviousness and Exclusion of Mr. Greene's Obviousness Opinions is Warranted Because He Relies on Improper Hindsight**

The Court should grant summary judgment of no obviousness and exclude Mr. Greene's obviousness opinions as unreliable because they are based on improper hindsight.  During his deposition, Mr. Greene readily admitted that he utilized the asserted claims as a roadmap to find prior art and mix and match snippets from the references to try to recreate each asserted claim.

> Q. [F]or your opinions in this case, you utilized the asserted claims of the asserted patents to determine which pieces or which references to utilize, right?
>
> A. Yeah, *the claims were -- as I worded it, the questions that had to be answered. Where in the world would you find this healing algorithm, okay. And so that was the start. . . . And the goal was to go line by line, claim by claim, or subclaim, or whatever you call the "dot B," and see if I could find an answer to it. That was my task*.
>
> Q. *So you used the claims kind of as a roadmap to determine which prior art or references to utilize*. Is that right?
>
> A. *Yes*. If I understand the question, again, I would phrase it as, those were the questions that I had to answer of, has this been done somewhere else. So take a claim, has this been documented . . . somewhere else, this functionality.  That's how I approached it.

Ex. 25, Greene Tr. at 73:12-74:18 (emphasis added).

Mr. Greene did not even attempt explain why a POSITA would have combined particular elements of the references he relied on in the way they are arranged in the claims, and instead simply provided a "requirements matrix" from which a POSITA could pick and choose elements of the documents to build the product as required, which is how he thought of the asserted claims. *See, e.g.*, *id.* at 210:5-211:1 ("I had a different approach. . . . [G]oing back to claims charts, which

I would see as a ***requirements traceability matrix***, which made a lot of sense to my way of thinking. There is [where] I list what '882 Maxemchuk covers and then what is explained in ATT Maxemchuk, and there you see the differences between those two columns.") (emphasis added); *id.* at 52:11-55:10 (explaining that he "list[ed] all the pieces" such that a person of ordinary skill in the art ("POSITA") "may choose different parts of different documents," which he explained seemed obvious to him).

In other words, Mr. Greene treated the asserted claims as a requirements documents and then relied on that list of requirements as a checklist to cherry pick from the asserted references and combine them in a way that allegedly yields the claimed inventions. The fundamental flaw with Mr. Greene's approach is that a POSITA would not have had the asserted claims to use as a requirements document or blueprint.

Simply contending that various elements of the asserted claims can be found in the prior art is not an obviousness opinion "because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (citation omitted). Yet, Mr. Greene explained during his deposition that all he did was provide the building blocks and leave it to the "person in the field . . . to put the various pieces together." He elaborated his reasoning as follows:

> [T]hey may choose different parts of different documents just based upon coding language chosen or hardware environments. Different ones resonate more with others. So you're given a whole bunch of choices, and then the person in the field, the implementer, would then have to choose the best of breed; that's one of our concepts we like to use in computers. You choose the best of breed from each of the articles or vendor products. That's another thing; we prefer to buy versus build. And then that would then allow you to produce the best product, okay. So while each one is a possible product that

> would work, combining them in the correct way will produce the
> best product.

Ex. 25, Greene Tr. at 52:11-55:10.

Because Mr. Greene admitted that he only provided the building blocks to recreate the asserted claims, his opinion is fundamentally unreliable and unhelpful and AWS' obviousness defense fails as a matter of law because Mr. Greene's "motivation to combine these prior art references appears to derive not from the knowledge of one skilled in the art or from the actual language of the prior art references, but rather from the [Asserted Patents themselves]." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys.*, 101 F. Supp. 2d 1257, 1259-60 (N.D. Cal. 1999) (denying reconsideration of summary judgment of no obviousness where expert's testimony demonstrated revealed improper methodology "to 'pick and choose' elements from among [the prior art] and, with explicit reference to the [asserted] patent, to establish obviousness with 'hindsight.'").

The Federal Circuit has criticized exactly this type of roadmap methodology as improperly relying on hindsight. *Hitkansut LLC v. United States*, 130 Fed. Cl. 353, 386-87 (2017), *aff'd*, 721 F. App'x 992 (Fed. Cir. 2018) (citing *Princeton Biochems., Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (Fed. Cir. 2005)) (denying summary judgment of obviousness where expert utilized similar method as Dr. Greene because such an "approach is not consistent with the language of Section 103 or the teachings of the Federal Circuit").

"[O]bviousness can not be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention," which is exactly how Mr. Greene testified he went about his analysis. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998). Rather, "[t]here must be a teaching or suggestion within the prior art, or within the general knowledge of a person of ordinary skill in the field of the invention, to look to particular

19

sources of information, to select particular elements, *and to combine them in the way they were combined by the inventor*." *Id.* (citation omitted) (emphasis added); *see also InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1348 (Fed. Cir. 2014) (to demonstrate obviousness, it is not enough to show "all of the elements of the claims disparately existed in the prior art."). Because Mr. Greene's assertions of invalidity are all based on combinations of alleged prior art references, he was required to provide his opinion as to the motivation or "glue" to combine the references to achieve the particular claimed invention. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999); *InTouch Techs.*, 751 F.3d at 1351-52, 1355 (finding district court "improperly admitted" expert's testimony with respect to invalidity because the testimony "consisted of conclusory references" and contained no analysis pertaining to the "motivation for one of ordinary skill in the art at the time of the invention to combine" the prior art references).

Mr. Greene's opening report offers only a boilerplate "motivation to combine" section.  Ex. 14, Greene Report at Section IX.A.  In his discussion of motivation to combine, he offers generic statements that the asserted references are collectively directed to computer networks and based on computers and protocols.  This cursory discussion could be copied and pasted into the introduction of any obviousness discussion for any computer or network patent claim.  Critically, Mr. Greene does not provide any specific discussion of why it would have been obvious to combine any specific portions of any particular references to obtain the specific inventions of the asserted claims.

Mr. Greene's reply report does not fix this problem.  He claims that in his experience, "[a]lmost every one of the technical solutions I've implemented during my career involved combining different techniques, and not pre-packaged solutions."  Ex. 26, Greene Reply Report at ¶ 59.  He then purports to identify similarities in the subject matter of the various references.  *Id.*

at ¶¶ 61-69.  But nowhere does he explain the reason *why* a POSITA would have combined particular features of any of these references to yield the particular inventions of the asserted claims.

Indeed, Mr. Greene never explains why, absent the use of the asserted claims as a roadmap, a POSITA would be motivated to combine any of the references because he does not explain deficiencies in any of the references that would require a POSITA to try to fill a gap or solve a problem.  Indeed, Mr. Greene never even explains the problem the inventors were trying to solve with their inventions.  Where, as here, the expert fails "to provide any evidence that, without the benefit of viewing the [Asserted Patents], one skilled in the art would have been motivated to combine [the prior art] in such a manner as to render the [Asserted Patent] obvious," summary judgment of no obviousness should be granted.  *Advanced Cardiovascular*, 101 F. Supp. 2d at 1259-60.

Mr. Greene's generic descriptions of each of the references fails to present a triable issue of fact because they "bear[] no relation to *any specific combination of prior art elements*."  *Adasa Inc. v. Avery Dennison Corp.*, No. 6:17-cv-01685-MK, 2020 WL 5518184, at *6 (D. Or. Sept. 14, 2020), *aff'd in part*, *rev'd in part* on other grounds, 55 F.4th 900 (Fed. Cir. 2022) (emphasis added) (citing *ActiveVideo Networks*, 694 F.3d at 1328) (denying summary judgment of obviousness where defendant failed to articulate why the prior art would have prompted a POSITA to combine the elements as claimed and how it is possible to combine them).

Federal Circuit precedent requires "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" in order to help "a lay jury in avoiding the pitfalls of hindsight that belie a determination of obviousness."  *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citation omitted).  Conclusory, *ipse dixit*

statements from experts are insufficient to create a triable issue of fact as to validity. *Koito*, 381 F.3d at 1152 ("General and conclusory testimony . . . does not suffice as substantial evidence of invalidity.") (citation omitted). Thus, summary judgment of no obviousness should be granted.

**C.    The Opinions of AWS' Experts on Non-Infringing Alternatives Should Be Excluded and Summary Judgment Should Be Granted That There are No Non-Infringing Alternatives**

**1.    Ms. Sultanik's Opinions on Non-Infringing Alternatives are Unsupported and Unreliable**

Ms. Sultanik did not rely on sufficient facts or data, or even perform any independent analysis, to support her purported opinions regarding non-infringing alternatives ("NIAs"). As set forth below, there are multiple reasons her NIA opinions fail to meet the threshold admissibility requirements of Fed. R. Evid. 702 and should be excluded under *Daubert*.

***First,*** Ms. Sultanik did not offer any independent opinion on NIAs. Instead, she copied and pasted, nearly verbatim, AWS' conclusory November 2023 interrogatory response into her report, with her only addition being to occasionally sprinkled in the phrase "[i]n my opinion" to attempt to add an expert gloss to AWS' attorney argument. *Compare* Ex. 10, Sultanik Rebuttal Rpt. at ¶¶ 718-724 *with* Ex. 27 (AWS' 11/2/2023 Supp. Resp. to Interrogatory No. 6) at 23-26. Ms. Sultanik had no involvement in preparing AWS' interrogatory response that she copied from as she did not begin working on this case until January 2024, after AWS had already served it. Ex. 13, Sultanik Tr. at 213:12-16.

As the purported support for her NIA opinion, Ms. Sultanik simply cites to AWS' interrogatory response. *See, e.g.*, Ex. 10, Sultanik Rebuttal Rpt. at ¶ 715 & n.1328, ¶ 722 & n.1333, ¶ 723 & nn.1334-1335. While the citation is literally accurate in identifying from where she copied these portions of her report, AWS' attorney-drafted contentions are not evidence. Courts have excluded expert testimony as unreliable when it relied on nothing more than private conversations

with company employees—here, Ms. Sultanik relies on even less, and simply repeats the statements that AWS' counsel wrote during discovery.  *See, e.g.*, *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1179 (N.D. Cal. 2010) (excluding expert testimony on NIAs that did not rely on "any research-and-development documentation, deposition testimony, or sworn declarations that might demonstrate [defendant's] capacity to 'implement' noninfringing alternatives during the period of alleged infringement").

*Second*, Ms. Sultanik fails to establish a prima facie case of any viable NIAs.  AWS bears the burden to establish that any purported NIAs were available at the time of infringement and commercially and technically acceptable to replace the infringing functionality.  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (NIA cannot be relied upon if it was "not acceptable to potential customers or was not available at the time" of infringement) (citing *Grain-Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1353-55 (Fed. Cir. 1999)); *Smart Skins LLC v. Microsoft Corp.*, No. C15-544-MJP, 2016 WL 4148091, at *2 (W.D. Wash. July 1, 2016) ("The relevant case law establishes that Microsoft, the alleged infringer, has the burden of showing that non-infringing alternatives were both available to it and were acceptable to its customers during the damages period.") (citing *LaserDynamics, Inc. v. Quanta Comput., Inc.*, No. 2:06-CV-348, 2011 WL 197869, at *3 (E.D. Tex. Jan. 20, 2011) ("[Defendant] . . . bears the burden of proving that the non-infringing alternatives were 'available' to it during the accounting period.") (citation omitted)).  Ms. Sultanik failed to carry this burden.

Ms. Sultanik did not identify any facts or data to establish that AWS' purported NIAs provide the same benefits as the infringing functionalities, that customers would find the proposed modifications acceptable, or that the modifications were available or well-known in the field in August 2011 when infringement began.  *See, e.g.*, *LaserDynamics*, 2011 WL 197869, at *3 (court

23

may consider as evidence of availability whether, *inter alia*, the NIA "was well known in the field at the time of infringement" and defendant had the necessary "know-how" to use it) (citation omitted).

Ms. Sultanik lists the same unsupported conclusion for each alleged alternative, which she fails to support with relevant documents, sworn testimony, or analysis—namely, that any given alternative would have "minimal if any impact on performance, wouldn't change the functionality of the Accused Products, and wouldn't require significant resources to implement." Ex. 10, Sultanik Rebuttal Rpt. at ¶ 719; *see also, id.* at ¶ 720 (change would "minimally impact performance, wouldn't change the functionality . . . wouldn't require significant resources" or "additional hardware"), ¶ 722 ("wouldn't significantly impact performance, change the functionality . . . or require significant resources" or "additional hardware"), ¶ 724 ("wouldn't significantly impact performance or change the functionality . . . wouldn't require any additional hardware or allocated resources").

Ms. Sultanik also states without any explanation or supporting evidence that implementation "would take a short amount of a senior programmer's time," although she never cites a shred of evidence of, *e.g.*, (1) the cost of an employee's time; (2) what is a "short" amount of time in this context; or (3) the time or costs involved in writing code for the infringing functionality or other existing functionality as a proxy for estimating the time and costs to implement an alleged alternative. *Id.* at ¶¶ 720, 722, 724. She offers only the blanket statement, made in a summary paragraph not related to any specific NIA, that "[f]rom my review of the deposition testimony and my own experience coding and revising code, I further understand that these software changes would have been implementable with minimal burden on AWS and could have been achieved quickly." Ex. 10, Sultanik Rebuttal Rpt. at ¶ 717. Ms. Sultanik does not

identify this purportedly supportive deposition testimony relating to implementing an alternative, and she cannot be permitted to simply cite her experience to sidestep the requirement that she apply a "discernible methodology" to sufficient facts and data. *See, e.g., GPNE Corp. v. Apple, Inc.*, No. 12-cv-02885-LHK, 2014 WL 1494247, at *4-5 (N.D. Cal. Apr. 16, 2014) (excluding damages expert opinions based solely on "30 years of experience" because experience is not factual information or data that can be tested, peer-reviewed, or assigned a margin of error).

**Third**, Ms. Sultanik does not address how the proposed changes to the accused products would impact their performance with respect to latency, scalability, reliability, cost—or, for that matter, any specific performance marker at all. She simply parrots the unsupported claim in AWS' interrogatory response that the impact to "performance" is "minimal" or "insignificant." Ex. 10, Sultanik Rebuttal Rpt. at ¶¶ 720, 722, 724. Ms. Sultanik's proposed testimony merely rubberstamps the statements of AWS' counsel in classic *ipse dixit* fashion.

**Fourth**, Ms. Sultanik fails to analyze or support her suggestion that the '069 Patent identifies purported prior art networks that could be NIAs for any Asserted Patent. *Id*. at ¶ 724 & nn.1336-38 (citing '069 Patent at 1:47-60, 1:61-2:1, 2:27-41); Ex. 27 (AWS' 11/2/2023 Supp. Resp. to Interrogatory No. 6) at 26; Ex. 28 ('069 Patent). She generalizes these three short passages from the '069 Patent, which criticize then-available technology, to claim that *all* "the Asserted Patents acknowledge [that] other non-infringing alternatives existed." Ex. 10, Sultanik Rebuttal Rpt. at ¶ 724. In addition to failing to cite any facts relating to purported disclosures in the other Asserted Patents, Ms. Sultanik ignores that the existence of inadequate prior art is not the same as the existence of an NIA, which must be ***acceptable*** as well as available. Moreover, Ms. Sultanik did not analyze: (1) any specific alleged prior art system, much less show the alleged prior art would have been available to AWS in August 2011, (2) acceptability in terms of performance and

conveying the advantages of the patented technology, or (3) cost of implementing a different system.  *See id*.  She also ignores that the passages in the '069 Patent adjacent to those upon which she relies explicitly describe the shortcomings of prior art systems, demonstrating that they would be ***unacceptable*** as an NIA.  *See, e.g.*, Ex. 28 ('069 Patent) at 1:41-46, 2:1-16, 2:33-45.

In sum, Ms. Sultanik merely repeats AWS' unsupported allegation that there were NIAs available to it, without providing evidence or analysis to demonstrate any of those alleged NIAs were acceptable or available to AWS.  Asking the fact finder to simply accept Ms. Sultanik's classic *ipse dixit* testimony is improper, such that her NIA opinions are inadmissible and should be excluded.  *See, e.g., Bowling v. Hasbro, Inc.*, No. 05-229S, 2008 WL 717741, at *4, *7 (D.R.I. Mar. 17, 2008) ("[A]n expert opinion is not admissible when it is connected to existing data only by the *ipse dixit* of an expert.") (citation omitted); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("nothing in either *Daubert* or the Federal Rules of Evidence" requires acceptance of an expert's *ipse dixit* testimony) (citation omitted).

Because AWS bears the burden of proof on NIAs and since no other witness can provide the requisite analysis needed to establish the adequacy of any alleged NIAs, summary judgment of no NIAs is appropriate.

### 2.      Ms. Kindler's NIA Opinion Depends on Ms. Sultanik's Deficient Opinion and Lacks Any Independent Analysis

The NIA opinions of Ms. Kindler, AWS' damages expert, should be excluded because they are entirely dependent on Ms. Sultanik's infirm NIA opinions.  In her report, Ms. Kindler simply repeats Ms. Sultanik's unsupported claims regarding NIAs (which in turn were copied from AWS' interrogatory response).  Ex. 29, Kindler Rebuttal Rpt. at ¶¶ 151-152 (the sum total of Ms. Kindler's purported analysis of NIAs, which simply repeats Ms. Sultanik's conclusion); *see also*,

*id.* at ¶¶ 10-12, 134, 155, 170, 171, 174, 196, 217-218 (mentioning alleged existence of NIAs without analysis).

Ms. Kindler offers no independent assessment of the availability of any NIAs and, as a non-technical expert, would have no basis to do so.  Ms. Kindler admitted at deposition that she did not know what facts or data Ms. Sultanik relied on to evaluate AWS' proposed NIAs, other than "expertise and experience."  Ex. 30, Kindler Rough Tr. at 186:15-188:9.  Ms. Kindler was unsure what Ms. Sultanik meant by a "short amount" of a programmer's time being needed to implement the NIAs, and acknowledged that programming involves testing and other considerations that neither expert addressed.  *Id.* at 186:15-188:9.  Ms. Kindler acknowledged that she did not conduct any economic feasibility analysis or test the accuracy of Ms. Sultanik's cost estimates using any independent research, because she believed she did not need to "quantify" NIA implementation costs if they were minimal.  *Id.* at 184:2-25.  Thus, Ms. Kindler performed no analysis whatsoever of the economic considerations around AWS' proposed NIAs.

Ms. Kindler's damages opinions have been excluded by other courts where "the only reasonable interpretation of her report is that she adopted the figures provided by [a witness] without independent evaluation.  And how [that witness] calculated those figures is anyone's guess." *NXP USA, Inc. v. Impinj, Inc.*, No. 2:20-cv-01503-JHC, 2023 WL 3933877, at *3-4 (W.D. Wash. June 8, 2023), *reconsideration denied*, No. 2:20-cv-01503-JHC, 2023 WL 4052338 (W.D. Wash. June 16, 2023) (excluding Ms. Kindler's apportionment analysis).  In *NXP*, as here, Ms. Kindler could not identify at deposition how the witness reached the conclusions that he did, chose not to perform an independent analysis of her own, and failed "at minimum, to ensure that [the apportionment] methodology was adequately explained, either in her report or elsewhere in the record." *Id.* at *5.  Here, Ms. Kindler did not know what Ms. Sultanik relied upon or even what

Ms. Sultanik *meant*, but nonetheless relied wholesale on her conclusory statements to find that the alleged NIAs were easy or inexpensive to implement. *See, e.g.*, Ex. 30, Kindler Rough Tr. at 184:2-25, 186:15-188:9. That determination, however, does not somehow absolve Ms. Kindler from performing an expert analysis and satisfying the *Daubert* standard.

To the extent that Ms. Kindler believes she did not need to perform an economic analysis because "the cost would not exceed the royalty payment range that I've come up with," such an assumption is wrong as a matter of law. *See id.* at 185:1-14; *see also, e.g.*, *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008), *mandate recalled and amended on other grounds*, 557 F.3d 1377 (Fed. Cir. 2009) (defendant "is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative. We have previously considered and rejected such an argument.") (citation omitted),  As the Federal Circuit held in *Mars*, "an infringer may be liable for damages, including reasonable royalty damages, that exceed the amount that the infringer could have paid to avoid infringement." *Id.* Thus, Ms. Kindler cannot sidestep *Daubert* requirements by claiming that an NIA would be inexpensive, particularly since there is no reliable evidence indicating the expense of the alleged NIAs in the first place.

For these reasons, Ms. Kindler's NIA opinions should be excluded as unreliable, unfounded, and unhelpful to the jury, and summary judgment should issue that were no NIAs available to AWS.

### D.    Ms. Kindler's Unreliable Damages Opinions Should Be Excluded

#### 1.    Ms. Kindler's Damages Opinions Are Arbitrary and Untethered to the Facts of the Case

Ms. Kindler's results-oriented opinion that the parties to the hypothetical negotiation would have agreed to a lump sum payment of $1.5-3 million should be excluded as arbitrary, unsupported,

and unreliable.  Ms. Kindler's opinion is a quintessential black box, wherein she lists several inputs and then, through no discernible methodology, simply outputs an unexplained low range of numbers.

To arrive at her reasonable royalty range, Ms. Kindler purports to have considered various qualitative and quantitative factors that would have guided the hypothetical negotiation.  Ex. 29, Kindler Rebuttal Rpt. ¶ 10.  These factors include data points that can generally be grouped into the following categories: (i) Boeing agreements related to the Asserted Patents that Ms. Kindler refers to as quantitative support for the upper end of her royalty range, (ii) Acceleration Bay and AWS patent license and settlement agreements Ms. Kindler refers to as quantitative support for the lower end of her royalty range; and (iii) other data points, including unaccepted offers to the Asserted Patents, purported non-infringing alternatives, and a qualitative analysis of the features and success of the Accused Products, that Ms. Kindler indicates "support" her royalty range without providing any quantitative basis. Taking these factors into account, Ms. Kindler opines that the outcome of the hypothetical negotiation between Boeing and AWS "would have been a non-exclusive, freedom-to-operate, U.S. license to the Patents-in-Suit in exchange for a lump-sum royalty payment in the range of $1.5 million and $3 million (with the likely outcome at the lower end of this range)."[5]  *Id.* at ¶ 11.

At her deposition, however, Ms. Kindler disclaimed reliance on any specific data point as the basis for either boundary of her reasonably royalty range and insisted the range was not specifically tied to any one or more data points.  Rather, she adopted an approach whereby she claimed to have relied on numerous data points to arrive at her reasonable royalty range, while

---

[5] As the parties agree, Boeing would have been the licensor in the hypothetical negotiation because it owned the Asserted Patents in 2011, when AWS' infringement began.

simultaneously claiming her range would not change if she was not permitted to rely on any one data point or combination of data points. Thus, despite Ms. Kindler's claim that she based her reasonable royalty opinion on seemingly everything, it is indiscernible as to what her opinion is actually based upon.

Opinions based on "all of the evidence in the record" plus "experience" should be excluded as untestable black-box opinions. *See, e.g.*, *GPNE*, 2014 WL 1494247, at *4-5. Highlighting the arbitrariness of her opinion, Ms. Kindler contends that the range stands even if she ignores fundamental damages principles like NIAs (*see supra*, Section C; Ex. 30, Kindler Rough Tr. at 193:9-194:6) or the scope of infringement (*see infra*, Section D(2); *id.* at 62:23-63:23). Essentially, Ms. Kindler tries to shield herself from cross-examination or the consequences of having the inputs into her analysis excluded or disregarded by the fact finder by divorcing her ultimate opinion from the "reams of evidence that she claims she considered." *Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, at *3, 6 (N.D. Cal. Jan. 23, 2015) (excluding damages expert that claimed "she did not rely" on various purportedly supportive data points cited in her report, and that claimed her final rate was not "driven in any way, shape, or form by the numbers discussed in the market approach") (internal quotations omitted). But in light of her disclaimer, "[e]xclusion is required because the link, if any, between those inputs and [her] final royalty is written in invisible ink." *Id.* at *6. Thus, despite Ms. Kindler's claim that she based her reasonable royalty opinion on seemingly everything, it is actually based on nothing and is inherently unreliable.

**Data Points Relating to Upper Reasonable Royalty Range**. When asked what formed the $3 million upper end of her reasonable royalty range, Ms. Kindler responded that the number is based "all of the evidence and economic analysis presented in my report." Ex. 30, Kindler

Rough Tr. at 38:2-18.  Ms. Kindler, however, would not identify any specific data point that she used as either a starting point or limit with respect to that upper bound.  When pressed on how she quantified the actual reasonable royalty range, Ms. Kindler claimed her opinion would stand regardless of whether any particular data point was used.  *Id*. at 38:19-40:8, 146:25-147:10.  Such an evasive response, however, reveals the arbitrary nature of her opinion.  Moreover, none of the data points Ms. Kindler purports to have considered supports her opinion.

Specifically, one example of a data point that Ms. Kindler considered is an ███████ patent license and settlement agreement between Amazon.com (not the same company as Defendant AWS) and ZitoVault, LLC, ████████████████████ ZitoVault ████████ ████████████████████████.[6]  Ex. 29, Kindler Rebuttal Rpt. ¶¶ 10, 112-116.  However, Ms. Kindler testified that this settlement and license agreement did not form the high end of her reasonable royalty range, instead stating that the agreement was "informative as to a relevant datapoint," but there were other data points that would be consistent with the final outcome.  Ex. 30, Kindler Rough Tr. at 38:2-18.  Ms. Kindler testified that her reasonable royalty range would not change if she were not permitted to rely on this Amazon.com-ZitoVault Patent License and Settlement Agreement.  *Id*. at 38:19-39:10.

When asked what other data points purportedly support the upper bound of her reasonable royalty range, Ms. Kindler referred to her "adjustment" to a patent purchase agreement between Boeing and Acceleration Bay in 2014.  *Id.* at 39:11-40:8.  Under the Boeing-Acceleration Bay Patent Purchase Agreement, ████████████████████████████████ ████████████████████████████████████████████████r

---

[6] The parties dispute whether the ZitoVault agreement and patents are economically and technologically comparable.

████████████████████████████████████████████████. Ex. 29, Kindler Rebuttal Rpt. ¶¶ 10, 73-85. Ms. Kindler disregarded the actual value reflected in the agreement in favor of performing a questionable market share analysis that reduced the value of the agreement to what Ms. Kindler opines reflects "an *ex-post* indication of Boeing's willingness-to-accept for a license to the Patents-in-Suit to AWS of *no more than* $2.2 million." *Id*. at ¶ 85 (emphasis in original); *see id.* at ¶¶ 73-85 (purported market share analysis).

Notwithstanding the flaws in her analysis, Ms. Kindler testified that Acceleration Bay-Boeing Patent Purchase Agreement was a relevant data point that falls within in her range. Ex. 30, Kindler Rough Tr. at 141:9-13. According to Ms. Kindler, because her computation of value was within her reasonable royalty range, she "[didn't] know if [she] would lower that upper bound range or not" if she were not permitted to rely on this agreement. *Id*. at 39:11-40:8; *see also id*. at 146:25-147:10. (Ms. Kindler further testified that her reasonable royalty range would likely stay the same if she was not relying on the Acceleration Bay-Boeing Patent Purchase Agreement). Her inability to articulate how the various data points impact her opinions uncovers that her results-oriented opinion is arbitrary. Indeed, Ms. Kindler did not provide ***any*** analysis as to how the $2.2 million figure purportedly based on the Boeing and Acceleration Bay patent purchase agreement could translate into a $3 million upper bound to the hypothetical license. In sum, Ms. Kindler failed to articulate a principled basis for her $3 million upper bound opinion or explain the impact of the evidence supposedly supporting her opinion.

**Data Points Relating to Lower Reasonable Royalty Range**: Similarly, Ms. Kindler's lower reasonable royalty range is arbitrary. When asked what formed the $1.5 million low end of her reasonable royalty range, Ms. Kindler responded that the number is based on "everything I've presented in my report." Ex. 30, Kindler Rough Tr. at 37:5-38:1; Ex. 29, Kindler Rebuttal Rpt.

¶ 11.  In her list of factors considered, Ms. Kindler identified another settlement and patent cross license agreement between Acceleration Bay and Epic Games dated April 2020 that included, among other financial terms, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████.  Ex. 29, Kindler Rebuttal Rpt. ¶¶ 10, 88-99.  However, when asked at her deposition whether this agreement formed the basis of her reasonable royalty range, Ms. Kindler testified that the low end of her range was "informed by all the evidence in [her] report, which would include that datapoint, but it includes other datapoints as well" and that the agreement was "consistent with" the $1.5 million figure.  Ex. 30, Kindler Rough Tr. at 40:9-41:5; *see also id.* at 157:13-158:2.  Ms. Kindler again testified that she did not think her reasonable royalty range would change if she was not relying on the Acceleration Bay-Epic Games Cross License and Settlement Agreement.  *Id*. at 158:3-14.

The only other support Ms. Kindler identified as the basis for her lower reasonable royalty range was the Boeing-Sony Patent License Agreement, which was executed in 2006 and ████████ ███████████████████████████████████████████████████.  *Id*. at 40:9-41:5; Ex. 29, Kindler Rebuttal Rpt. ¶¶ 10, 67-72, 99.  However, Ms. Kindler again testified that her reasonable royalty range would not change if she was not able to rely on the Boeing-Sony Patent License Agreement because she would simply look to other data points to justify her range. Ex. 30, Kindler Rough Tr. at 129:14-130:22.  Thus, Ms. Kindler's analysis for her upper and lower royalty ranges are just arbitrary, as she has no analysis and could not articulate specifically the basis for her opinions.

**<u>Other Data Points Purportedly Supporting Reasonable Royalty Range</u>**: Ms. Kindler claimed that she considered each of the following data points, but that they did not form the basis

of her quantification of the reasonable royalty range and that her opinion would not change without it.  Such equivocation are untestable black box opinions that renders her opinion inadmissible.

*First*, despite Ms. Kindler identifying the availability of NIAs as one of the factors she relied on to determine the outcome of the hypothetical negotiation, she provided no quantitative analysis of the cost of such alternatives or explanation of how such costs supported her reasonable royalty range.  Indeed, Ms. Kindler testified that one could entirely remove her opinion on NIAs and her opinion would not change.  Ex. 30, Kindler Rough Tr. at 193:9-194:6 ("But I think the answer to your question is the answer – my conclusion would not change if we were to not even talk about non-infringing alternatives, because again, those dynamics would be captured within the negotiated royalty payments that we can observe.").

*Second*, Ms. Kindler referred to various efforts to monetize the Asserted Patents in 2009-2010.  Ex. 29, Kindler Rebuttal Rpt. ¶¶ 10, 86-87.  However, Ms. Kindler stated that her reasonable royalty range would stay the same even "if you were to take this entire section out of [her] report and this evidence didn't exist."  Ex. 30, Kindler Rough Tr. at 149:16-25.

*Third*, Ms. Kindler generally refers to qualitative data points relating to the importance of AWS' contributions to the Accused Products and features of the Accused products purportedly unrelated to the patented technology.  Ex. 29, Kindler Rebuttal Rpt. ¶ 10.  Ms. Kindler provides no quantification as to how these data points would provide the basis for the amount of her reasonable royalty range.  *Id.* at ¶¶ 145-147, 159-166.  Thus, none of these other factors support the specific reasonable royalty range Ms. Kindler arrives at, despite her purported reliance on them.

Ms. Kindler's statement that "anything within that range would be reasonable given all the evidence presented in my report" highlights the lack of any cognizable methodology in Ms. Kindler's approach.  Ex. 30, Kindler Rough Tr. at 38:2-12.  In fact, when looking at the specific

34

factors Ms. Kindler considered in determining the outcome of the hypothetical negotiation, Ms. Kindler could not identify whether there was a minimum set of data points that have to exist in order for her reasonable royalty range to stand. *Id*. at 199:7-200:6. Rather, Ms. Kindler evaded answering the question, only to testify that she "can't really answer [the] question because there's so much evidence in this case that points to the outcome that I reach." *Id.* at 199:24-200:2.

Ms. Kindler's opinion amounts to a whack-a-mole approach whereby a fact finder could remove any, and perhaps even all, of her data points, without her reasonable royalty range changing. Common sense dictates that such a result could not be true if Ms. Kindler had in fact employed a sound methodology. Thus, her opinions should be excluded as an improper black-box and results-oriented "invisible ink" assertion rather than a methodologically-sound economic analysis. *Open Text S.A.*, 2015 WL 349197, at *6 ("Exclusion is required because the link, if any, between those inputs and [her] final royalty is written in invisible ink.").

## 2.    Ms. Kindler's Damages Opinions Fail to Assume Infringement

Ms. Kindler's damages opinions should also be excluded as fatally flawed because she does not account for Acceleration Bay's actual infringement allegations. Instead, she deems five accused products to be irrelevant to infringement based on her improper interpretation of Dr. Medvidović's Opening Report on infringement. *See, e.g.*, Ex. 29, Kindler Rebuttal Rpt. at ¶ 10 & n.10, ¶ 184(a) (mischaracterizing infringement allegations); Ex. 30, Kindler Rough Tr. at 54:24-55:7 (same). As a result, Ms. Kindler values an entirely different infringement scenario than the one at issue, violating the blackletter law that damages experts must assume infringement. *See, e.g.*, *Lucent Techs. Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009) (hypothetical negotiation requires an assumption the asserted claims are infringed).

Ms. Kindler's decision to simply ignore infringement by five of the seven AWS accused products renders unreliable her affirmative opinions because she does not capture all of AWS'

infringement in her assessment of damages. *See, e.g.*, Ex. 29, Kindler Rebuttal Rpt. at ¶ 10 & n.10,
¶ 170 & n.590 (citing her fundamental mischaracterization of infringement case as underlying her
conclusions); *see also id.* at ¶¶ 141-144 (expressly excluding five accused products from revenue
calculations based on mischaracterization of infringement case), 153-156 (omitting five accused
products from consideration under *Georgia-Pacific* factor relating to extent of use). Yet tellingly,
Ms. Kindler does discuss the excluded products as "features and functionalities unrelated to the
Patents-in-Suit" and uses this discussion to generate an unspecified amount of "downward
pressure" on the royalty range—even though these products are expressly accused as part of AWS'
infringement. *Id.* at ¶¶ 145(c)-(g), 147. It also taints her critique of Mr. Gunderson's analysis,
which is based on her incorrect interpretation of the infringement issues in the case. *See, e.g., id.*
at ¶ 184(a). Thus, because she selected an arbitrary subset of Accused Products to value while
excluding from her analysis multiple products accused of infringement, Ms. Kindler's opinions
are not tied to the facts of the case, can only confuse the trier of fact, and should be excluded.

Acceleration Bay's infringement expert, Dr. Medvidović, identifies CloudFront, Lambda,
EC2, EKS, and GameLift as Accused Products in this case. *See, e.g.*, Ex. 1, Medvidović Opening
Rpt. at ¶¶ 3, 103, 107, 110, 117, 126 (introducing each Accused Product and the Asserted Patents
they infringe). Ms. Kindler nevertheless excludes these products from her damages analysis
because these products use VPC and Transit Gateway, which are also accused of infringement.

Ms. Kindler ignores Dr. Medvidović's explanation that, "[w]hile VPC and Transit Gateway
infringe alone, each of these [five additional accused] services further infringes beyond the
functionality provided by VPC or Transit Gateway." Ex. 31, Medvidović Reply Rpt. at ¶ 203. Dr.
Medvidović specifically explained how these Accused Products, like EC2, independently

contribute functionality that meets particular claim limitations.[7]  *See, e.g., id.* at ¶¶ 200-212 (replying to Ms. Kindler's infringement interpretation and specifying where opinions are disclosed in his Opening Report).  Ms. Kindler's contention that Dr. Medvidović somehow intended to limit the infringement case by stating that, *e.g.*, EC2 infringes "through the use" of VPC and Transit Gateway, seeks to twist that phrase out of context into some kind of disclaimer and ignores his actual opinions, discussed above.  Thus, Ms. Kindler fails to accept Acceleration Bay's infringement allegations and Dr. Medvidović's opinions for purposes of her damages analysis.

Ms. Kindler compounded the flaw in her opinion at deposition.  She conceded that, if all the Accused Products do infringe as Acceleration Bay alleges, she did not offer an alternative calculation for AWS' revenues and Mr. Gunderson's royalty base calculation would be correct. Ex. 30, Kindler Rough Tr. at 60:16-62:22.  But, incredibly, she suggests that she did not need to provide an alternative calculation for damages, because her opinion would stand unchanged even if she was forced to accept the scope of infringement according to Acceleration Bay.  *Id.* at 62:23-63:23.  Ms. Kindler's claim is untenable because she is saying that AWS' damages should be the same regardless of whether seven products infringe or only two products, which further proves that her black-box damages opinions are unmoored to Acceleration Bay's infringement case.

Since Ms. Kindler failed to accept Acceleration Bay's infringement case as required by law, she has no operative opinion tied to the infringement actually being asserted in the case, and

---

[7] For example, Dr. Medvidović described EC2 and explained that it is also part of infringement itself because it satisfies particular limitations by providing functionality to add and remove network participants.  *See, e.g.*, Ex. 1, Medvidović Opening Rpt. at ¶¶ 113, 140, 548, 568.  Dr. Medvidović does this for all of the Accused Products.  *See* Ex. 1, Medvidović Opening Rpt. at ¶¶ 127, 195, 349, 388, 399, 469 (GameLift), ¶¶ 104, 195, 343, 388, 389, 394, 395, 402, 404, 446 (CloudFront), ¶¶ 108, 195, 220, 659, 664 (Lambda), ¶¶ 119, 195, 343, 388, 397 (EKS); *see also* Ex. 32, Cole Reply Rpt. at ¶¶ 27-28 (benefits of patented technology to Accused Products is not limited to use of Transit Gateway or VPC).

thus her opinion is unreliable because it is unrelated to the relevant facts of the case. Alternatively, if Ms. Kindler truly finds that, for purposes of damages, it makes no difference if seven products infringement or only two products infringe, then her opinions are completely arbitrary and unmoored from consideration of ***any*** infringement. Her failure to consider the appropriate scope of infringement renders Ms. Kindler's opinions unreliable, and they should be excluded.

## IV. CONCLUSION

For the reasons set forth above, the Court should grant Acceleration Bay's motions for (1) partial summary judgment that Transit Gateway satisfies the m-regular and incomplete claim limitations, (2) summary judgment that the asserted claims are novel and non-obvious, and (3) summary judgment that there are no non-infringing alternatives available to AWS. The Court should also exclude the proposed (1) invalidity opinions of Mr. Greene, (2) non-infringing alternative opinions of Ms. Sultanik and Ms. Kindler, and (3) damages opinions of Ms. Kindler.

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
James Hannah
Kristopher Kastens
Michael Lee
Christina M. Finn
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
(650) 752-1700

Aaron M. Frankel
Marcus A. Colucci
Cristina Martinez
Pooja P. Parekh
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Date:  May 31, 2024
Public version dated: June 7, 2024
11539988

POTTER ANDERSON & CORROON LLP

By: */s/ Philip A. Rovner*         
   Philip A. Rovner (#3215)
   Hercules Plaza
   P.O. Box 951
   Wilmington, DE 19899
   (302) 984-6000
   provner@potteranderson.com

*Attorneys for Plaintiff*
*Acceleration Bay, LLC*