IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACCELERATION BAY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-904 (RGA) (SRF) |
| | ) | |
| AMAZON WEB SERVICES, INC., | ) | **CONFIDENTIAL** ██████ |
| | ) | ██ |
| Defendant. | ) | |

## DEFENDANT AMAZON WEB SERVICES, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE <u>PLAINTIFF ACCELERATION BAY LLC'S EXPERT OPINIONS</u>

OF COUNSEL:

Alan M. Fisch
R. Williams Sigler
Jeffrey M. Saltman
Lisa N. Phillips
Kyle K. Tsui
FISCH SIGLER LLP
5301 Wisconsin Avenue NW, Suite 400
Washington, DC  20015
(202) 362-3500

Ken K. Fung
FISCH SIGLER LLP
400 Concar Drive
San Mateo, CA 94402
(605) 362-8207

May 31, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendant Amazon Web Services, Inc.*

**ORIGINAL FILING DATE: MAY 31, 2024**
**REDACTED FILING DATE: JUNE 7, 2024**

# TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................................1

II. NATURE AND STAGE OF THE PROCEEDINGS ...............................................2

III. SUMMARY OF THE ARGUMENT ......................................................................2

IV. STATEMENT OF FACTS ......................................................................................4

    A.    Boeing Licenses the Asserted Patents to AWS Then Sells Them to AB.................4

    B.    AB Sues AWS...........................................................................................................4

    C.    The Accused Products...............................................................................................5

V.  APPLICABLE LEGAL STANDARDS ..................................................................8

VI. ARGUMENT ...........................................................................................................9

    A.    The AWS-Boeing Agreement Precludes All Infringement Claims Relying on ██████████████████ . ...............................................................................9

    B.    AB's Alleged Damages Period Contravenes the Marking Statute. .......................11

    C.    Summary Judgment on Willfulness and Enhanced Damages is Appropriate........15

    D.    Summary Judgment of Non-Infringement on All 16 Asserted Claims Is Warranted Because No Accused Products Maintain an M-Regular Network.......19

        1.    VPC Does Not Maintain an M-Regular Network.....................................20

        2.    Transit Gateway Does Not Maintain an M-Regular Network. ..................25

        3.    AB Has Not Disclosed a Damages Theory for ██████ or Hyperplane. ............................................................................................29

    E.    AB's Experts' Flawed Apportionment Approach Should be Excluded. ...............30

        1.    Dr. Cole's Opinion Relies on Documents Outside the Damages Period. ....................................................................................................30

        2.    Dr. Cole Inconsistently Applied an Unreliable Methodology. ..................33

    F.    Mr. Gunderson Relies on Revenue Unrelated to Infringement. ...........................36

    G.    Mr. Gunderson's Reliance on A Jury Verdict Should Be Excluded......................39

VII. CONCLUSION......................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
    324 F. Supp. 3d 470 (D. Del. 2018)............................................................................40

*Acceleration Bay LLC v. Activision Blizzard*,
    C.A. No. 6-453, D.I. 858 (D. Del. May 3, 2024)............................................4, 39, 40

*Acceleration Bay v. Take-Two Interactive Software, Inc.*,
    612 F. Supp. 3d 408 (D. Del. 2020)............................................................................20

*Acceleron, LLC v. Dell Inc.*,
    No. 1:12-cv-4123, 2022 WL 1087683 (N.D. Ga. Mar. 7, 2022), *aff'd*, No.
    2022-1620, 2023 WL 4503189 (Fed. Cir. July 13, 2023).........................................16

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
    24 F.3d 178 (Fed. Cir. 1994)........................................................................12, 13, 15

*Bayer Healthcare LLC v. Baxalta Inc.*,
    989 F.3d 964 (Fed. Cir. 2021)....................................................................................15

*Bench Walk Lighting LLC v. LG Innotek Co.*
    C.A. No. 20-51, 2021 WL 65071 (D. Del. Jan. 7, 2021), *report and
    recommendation adopted,* 530 F. Supp. 3d 468, 478 (D. Del. 2021). .....................17

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
    C.A. No. 15-56, 2020 WL 5409052 (D. Del. Sept. 9, 2020) ....................................18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................................8

*Contour IP Holding, LLC v. GoPro, Inc.*,
    No. 3:17-CV-04738, 2020 WL 5106845 (N.D. Cal. Aug. 31, 2020) ........................36

*CSIRO v. Cisco Sys., Inc.*,
    809 F.3d 1295 (Fed. Cir. 2015)....................................................................................9

*Datatreasury Corp. v. Wells Fargo & Co.*,
    522 F.3d 1368 (Fed. Cir. 2008)..............................................................................1, 10

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)....................................................................................1, 2, 8, 30

*Eastman Kodak Co. v. Agfa-Gevaert N.V.*,
    560 F. Supp. 2d 227 (W.D.N.Y. 2008)................................................................12, 13

*EF Operating Corp. v. American Buildings*
  993 F.2d 1046 (3d Cir. 1993).................................................................................................14

*Eko Brands, LLC v. Adrian Rivera Maynez Enter., Inc.*,
  946 F.3d 1367 (Fed. Cir. 2020)............................................................................................16

*Epic Games, Inc. v. Acceleration Bay LLC*,
  No. 4:19-cv-4133 (N.D. Cal.), D.I. 1 .............................................................................14, 18

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.,*
  No. 2:15-cv-1202, 2017 WL 2190055 (E.D. Tex. May 18, 2017) ........................................16

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014)...............................................................................29, 30, 39

*Extang Corp. v. Truck Accessories Grp., LLC*,
  C.A. No. 19-923, 2022 WL 607868 (D. Del. Feb. 18, 2022) ................................................15

*Finjan, Inc. v. Juniper Networks, Inc.*,
  387 F. Supp. 3d 1004 (N.D. Cal. 2019) ................................................................................15

*Flatworld Interactives LLC v. Samsung Elecs. Co.*,
  77 F. Supp. 3d 378 (D. Del. 2014)........................................................................................12

*Genband US LLC v. Metaswitch Networks Corp.*,
  No. 2:14-cv-33, 2016 WL 122967 (E.D. Tex. Jan. 9, 2016) .................................................32

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*
  579 U.S. 93 (2016).................................................................................................................15

*Horizon Meds. LLC v. Apotex Inc.*,
  C.A. No. 22-640, 2022 WL 16739909 (D. Del. Nov. 7, 2022) ........................................1, 10

*In re Teleglobe Commc'ns Corp.*,
  493 F.3d 345 (3d Cir. 2007)..................................................................................................14

*Innovus Prime, LLC v. Panasonic Corp.*,
  No. 12-cv-660, 2013 WL 3354390 (N.D. Cal. July 2, 2013) ..........................................10, 11

*IoEngine, LLC v. PayPal Holdings, Inc.*,
  607 F. Supp. 3d 464 (D. Del. 2022).....................................................................................40

*IP Power Holdings Ltd. v. Westfield Outdoor, Inc.*,
  No. 2:19-CV-01878, 2020 WL 2992415 (D. Nev. June 4, 2020) ........................................17

*Kaavo Inc. v. Amazon.com Inc.*,
  323 F. Supp. 3d 630 (D. Del. 2018).....................................................................................25

*Kimble v. Marvel Entertainment, LLC*,
    576 U.S. 446 (2015)..................................................................................................18

*Laser Dynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)..............................................................................29, 30

*MasterObjects, Inc. v. Amazon.com, Inc.*,
    No. C 20-08103 WHA, 2021 WL 4685306 (N.D. Cal. Oct. 7, 2021) .....................17

*Maxwell v. J. Baker, Inc.*,
    86 F.3d 1098 (Fed. Cir. 1996)................................................................................12

*Novartis Corp. v. Ben Venue Laby's, Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001)..............................................................................24

*NXP USA, Inc. v. Impinj, Inc.*,
    No. 2:20-cv-1503, 2023 WL 3852914 (W.D. Wash. June 6, 2023) ........................19

*Podobnik v. U.S. Postal Serv.*,
    409 F.3d 584 (3d Cir. 2005)......................................................................................8

*Ravgen, Inc. v. Quest Diagnostics Inc.*,
    No. 2:21-cv-9011, 2022 WL 2047613 (C.D. Cal. Jan. 18, 2022)............................19

*Refac Electronics Corp. v. A & B Beacon Business Machines Corp.*
    695 F. Supp. 753 (S.D.N.Y. 1988). ........................................................................12

*Schneider ex rel. Estate of Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003)......................................................................................8

*Skills Platform Inc. v. AviaGames Inc.*,
    No. 21-cv-2436, 2023 WL 8438738 (N.D. Cal. Dec. 5, 2023).................................32

*SRI Int'l v. Advanced Tech. Labs.*,
    127 F.3d 1462 (Fed. Cir. 1997)..........................................................................12, 13

*Transcore LP v. Elec. Transaction Consultants Corp*,
    563 F.3d 1271 (Fed. Cir. 2009)................................................................................10

*Unova Inc. v. Hewlett-Packard*
    No. 02-cv-3772, 2006 WL 5434534 (C.D. Cal. Feb. 16, 2006) ..............................13

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)................................................................................29

*Wang Labs., Inc. v. Toshiba Corp.*,
    993 F.2d 858 (Fed. Cir. 1993)..................................................................................38

iv

*Woods v. Showers*,
    822 F. App'x 122 (3d Cir. 2020) ................................................................................30

*Wrinkl, Inc. v. Facebook, Inc.*,
    C.A. No. 20-1345, 2021 WL 4477022 (D. Del. Sept. 30, 2021) ............................................18

**Statutes**

35 U.S.C. § 284............................................................................................................15, 19

35 U.S.C. § 287.............................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................8

Fed. R. Evid. 702 ....................................................................................................8, 30

## I.    INTRODUCTION

Summary judgment is appropriate on four different grounds. First, a patent owner "cannot transfer an interest greater than that which it possesses."[1] So, Plaintiff Acceleration Bay ("AB") cannot enforce rights that the prior owner of the asserted patents, Boeing, lacked. But that is what AB—and Boeing, which retained ███████████████████████—are doing. In 2010, over a decade before this lawsuit was filed, Boeing and Defendant Amazon Web Services ("AWS") entered into an agreement providing Boeing with access to AWS products ███████████ ██████████████████. In exchange, ██████████ │ ███████████████████████ ████████████████. ████████████████████████████████████████████ ██████████ products, and then sold the patents to AB in 2014. Here, AB now accuses those products of infringing those same patents. But Boeing's agreement with AWS bars AB's claims. Second, there is no evidence that AWS received pre-suit notice of infringement, as required to start the damages period under 35 U.S.C. § 287. AB's sole pre-suit letter did not specifically assert infringement of *any* claim by *any* product, which the law requires. Thus, summary judgment precluding any pre-suit damages is warranted. Third, and for similar reasons, there is no evidence of willful or egregious conduct that could warrant enhanced damages. Fourth, like with Take Two and EA in prior AB cases, the undisputed facts here show that AWS's products do not use the asserted patents' distinct "m-regular" network. Rather, AWS users must manually define every network connection in the accused products, which do not default to an m-regular configuration. Summary judgment of non-infringement on all asserted claims should thus be granted.

In addition, certain of AB's experts' opinions on damages are unreliable and should be excluded under *Daubert*. Indeed, AB's expert on technical apportionment, Eric Cole, failed to

---

[1] *Horizon Meds. LLC v. Apotex Inc.*, C.A. No. 22-640, 2022 WL 16739909, at *4 (D. Del. Nov. 7, 2022) (quoting *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008)).

properly analyze the accused products' features or apportion the asserted patents' value. And AB's damages expert, Lance Gunderson, improperly relied on a jury verdict and the overall revenue of all the accused products, rather than the revenue associated with the accused usage. Thus, the challenged AB expert opinions should be excluded under *Daubert*.

## II.   NATURE AND STAGE OF THE PROCEEDINGS

AB accuses seven AWS products and three Amazon.com products of infringing five patents.[2] This Court held a claim construction hearing in October 2023, and has issued an order construing "m-regular," among other terms, the same as in prior AB cases involving these patents.[3]

## III.   SUMMARY OF THE ARGUMENT

1.      Each of the following grounds for summary judgment would substantially reduce the contested issues and potential damages in this case, and one would dispose of the case entirely:

(a).    Boeing and AWS agreed that Boeing could use AWS's products ███████

███████████████████████████████████████████████████████████

███████. When Boeing sold the asserted patents to AB, ██████████████████

███████. Because these products were licensed, summary judgment of non-infringement on these products—and other products that allegedly infringe because they use VPC—is appropriate.

(b).    The parties agree that the potential damages period began when AB provided AWS with actual notice of alleged infringement under 35 U.S.C. § 287. AB claims that it provided such notice in a March 13, 2019 letter. But this letter mentioned only one product (CloudFront), never identified the asserted '344 patent, and failed to state any patent-infringement claims. Summary judgment limiting damages to after the complaint's filing is thus warranted.

---

[2] *See* Ex. 1 at 3.

[3] *See* D.I. 77.

(c).    No evidence shows that AWS had the necessary knowledge to willfully infringe before the complaint's filing. Nor is there any evidence of any willful infringement or egregious conduct in the one-month period between AB's filing of this lawsuit and the final patent's expiration. Thus, summary judgment on willfulness and enhanced damages is appropriate.

(d).    All the asserted claims describe networks that are "m-regular," which this Court construed as: "a state that the network is configured to maintain, where each participant is connected to exactly m neighbor participants." AB cannot show that the accused VPC and Transit Gateway products satisfy the "m-regular" requirement, because uncontested facts shows that a user must manually create connections between participants in these networks. And since AB alleges that the accused products infringe only through their use of VPC or Transit Gateway, summary judgment of noninfringement on all asserted claims is warranted.

2.    Further, certain of AB's expert opinions should be excluded because:

(a).    Mr. Gunderson relies on Dr. Cole for the apportionment percentages used in his damages analysis. But Dr. Cole used arbitrary lists of features for each accused product, and assigned each feature the same value without any underlying rationale. As this approach is unreliable under Federal Circuit law, these opinions should be excluded.

(b).    AB has independent infringement theories for only two products: VPC and Transit Gateway. AB alleges that the other accused products (e.g., EC2) infringe only through their use of VPC and Transit Gateway. Consistent with Judge Fallon's denial of AB's motion to compel EC2 external financial data, AB's infringement theories do not capture revenue associated with external customers' (i.e., non-Amazon) usage of products like EC2. Mr. Gunderson's opinions including such revenue in his calculations thus should be excluded.

(c)    Mr. Gunderson issued a second supplemental report opining that the recent *AB v.*

3

*Activision* jury verdict supports his damages theories in this case. But verdicts are not evidence of an arms-length negotiation between the parties, as this Court held in the *Activision* case itself. The verdict is irrelevant, and Mr. Gunderson's second supplemental report should be excluded.

## IV. STATEMENT OF FACTS

On July 31, 2000, aerospace manufacturer Boeing filed the applications that would later issue as the asserted patents.[4] These five patents arose out of an effort at Boeing to create a system that allowed its engineers to simultaneously view 3D schematics of airplanes.[5]

### A. Boeing Licenses the Asserted Patents to AWS Then Sells Them to AB.



, Boeing and AWS entered into an Enterprise Customer Agreement ("AWS-Boeing Agreement"). Among other things, this agreement gave Boeing access to AWS's services, and ██████████████████████████████████████████████████ ████████████████████████████████.[6] Boeing was the original assignee and remained the owner of all asserted patents until December 10, 2014, when it sold them to AB.[7] That sale agreement provided that Boeing would receive ████████████████████████████ ████████████████████████████████████████████████████. By December 2014 though, Boeing had used ████████████████████. So, Boeing did not have the right to enforce the asserted patents against those ████████████████.[8]

### B. AB Sues AWS.

Despite Boeing's agreement with AWS, on March 13, 2019, AB sent Amazon.com a letter

---

[4] D.I. 1-1 at 2, 61, 122, 183, 242.

[5] Ex. 2 at 45:16–46:11.

[6] Ex. 3 (AWS-Boeing Agreement) at 13.

[7] Ex. 4.

[8] *See id.*; Ex. 5; Ex. 6; Ex. 7 at 110:22-111:10, 111:17-112:2, 112:8-14, 112:16-114:12; Ex. 8 at 132:18–21.

referencing the '966, '147, '634, and '069 patents.[9] The letter mentioned CloudFront, but did not reference any other products. And the letter did not allege that CloudFront infringed, nor reference any patent claims. AWS responded that it would investigate AB's allegations.[10] AB did not reply, and on July 6, 2022, filed its complaint. By that point, two of the asserted patents had expired, two more would expire within two weeks, and the last expired 32 days after the complaint was filed, on August 7, 2022.[11] Thus, the damages period ended on August 7, 2022.

### C.     The Accused Products

The first two AWS products that AB accuses are VPC and Transit Gateway.[12] AB also accuses eight other AWS or Amazon-related products, by virtue of their reliance on VPC, or both VPC and Transit Gateway.[13]

**VPC:** VPC allows users (i.e., customers) to set up a virtual network on AWS's hardware infrastructure that is "logically isolated from other virtual networks in the AWS cloud."[14] When a user does so, the virtual network resembles a private network that a customer would build on its own premises, but uses the AWS infrastructure to allow for scalability (i.e., the addition of additional computing resources).[15]

A user can connect multiple VPCs through a feature called VPC peering, which is a

---

[9] Ex. 9.

[10] *Id.*

[11] *See* Ex. 11 at ¶ 249.

[12] Ex. 1 at 3 (identifying first two products as: (1) VPC, "including VPC Peering, Transit VPC, and ▮▮▮▮"; and (2) Transit Gateway, "including Hyperplane and Multicast").

[13] *Id.* Five are accused "through use of VPC" (CloudFront, Elastic Kubernetes Service, GameLift, App Mesh, and Luna), and three "through use of VPC and Transit Gateway" (EC2, Prime Video, and Twitch). *Id.* Of these, Luna, Prime Video, and Twitch are not AWS products.

[14] Ex. 12 at 3. As used in AWS documents, "VPC" refers to either the "Virtual Private Cloud" service or a virtual network that a customer sets up using it.

[15] *Id.*

connection between VPCs established by one VPC's user sending a request to connect and a second VPC's user accepting.[16] Users must use a "route table" to manually create routes between VPCs for them to communicate with each other.[17] And VPCs do not support transitive routing, i.e., a user cannot use a third VPC to indirectly transfer information between two VPCs.[18] However, users can set up a "transit VPC" network in a hub-and-spoke configuration where a single central VPC uses an instance of EC2 (another AWS product) to route traffic to different VPCs, but customers must manually configure and maintain this routing themselves.[19]

VPC also uses another AWS networking service called ██████████████████ ████████████████████████████████.[20] In addition to VPC, ████████ is used by many other components and services of AWS, including NAT Gateway, Network Load Balancer, and Elastic File System.[21] ██████████████████████████████████ to route network traffic to the appropriate destination.[22] ████████████████████████████████████████████ ████████████████████████.[23] There are ██████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████.[24] ████████████████████████████ ████ at the customer's VPC to ████████████████████████████████████ attached to

---

[16] *Id.* at 8; Ex. 13 at 1–2.

[17] Ex. 12 at 2.

[18] Ex. 14 at 4, 6.

[19] *Id.* at 7.

[20] *E.g.*, Ex. 15 at 1.

[21] *E.g.*, *id.;* Ex. 16.

[22] Ex. 15 at 7–8.

[23] *Id.* at 4.

[24] *Id.* at 5–6.

██████████████████████.[25] ████████ uses processes called shuffle sharding and flow hashing to determine which route to send packets on and how to spread traffic to ensure that no customer's workload overloads the physical servers underlying other VPCs.[26]

**Transit Gateway:** Launched on November 26, 2018, Transit Gateway is a virtual router used to interconnect a customer's VPCs and on-premises networks.[27] So, the purpose of a Transit Gateway is to connect VPCs. Transit Gateway instances act as hubs that direct traffic between "attachments" (VPCs and customers' own networks).[28] Attachments connect only to Transit Gateway, not to each other, in a hub-and-spoke model.[29] Like VPCs, Transit Gateway instances need users to define routes in a route table.[30] The table then determines how to route packets from the source attachment to the target attachment.[31] Transit Gateway also supports multicast functionality, which allows it to send a single message to multiple recipients.[32]

Transit Gateway uses Hyperplane as one component to route data.[33] Hyperplane is an underlying networking service that AWS also uses to power other services besides Transit Gateway, like Network Load Balancer.[34] Hyperplane is made up ███████████████████

---

[25] *Id.* at 4–6.

[26] *Id.* at 5, 7–9.

[27] Ex. 17 at 1; Ex. 18.

[28] Ex. 17 at 6.

[29] Ex. 14 at 5 ("This hub-and-spoke model simplifies management and reduces operational costs because VPCs only connect to the Transit Gateway instance to gain access to the connected networks.").

[30] Ex. 17 at 6.

[31] *Id.*

[32] *See id.* at 58.

[33] Ex. 19 at 1.

[34] Ex. 20 at 53:8-54:9; Ex. 21 at 1.

7

—to execute the ▮▮▮▮▮▮▮ used to route packets between attachments based on the routing tables.[36] Because of shuffle sharding, not every ▮▮▮▮▮▮ has a route to every destination.[37] But, through ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ it can send the data to another ▮▮▮▮▮▮ that has the appropriate route.[38] Hyperplane also has a health layer that monitors the status of ▮▮▮▮▮▮.[39]

## V.    APPLICABLE LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." When the nonmoving party bears the burden of proof on an element at trial, but fails to supply sufficient evidence to establish that element, summary judgment must be granted in favor of the moving party.[40] And the nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions'" to avoid summary judgment.[41]

Federal Rule of Evidence 702 requires that expert testimony be "not only relevant, but reliable."[42] Reliable testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'."[43] And the Federal Circuit has explained

---

[35] Ex. 21 at 1–2.

[36] *Id.* at 10; Ex. 22 at 71:19-21 (▮▮▮▮▮▮ and ▮▮▮▮▮▮ use "different software, different hardware").

[37] Ex. 19 at 3.

[38] Ex. 21 at 4, 15–16.

[39] *Id.* at 17–18.

[40] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986).

[41] *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation omitted).

[42] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

[43] *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (internal citations omitted).

that "damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more."[44]

## VI.   ARGUMENT

### A.   The AWS-Boeing Agreement Precludes All Infringement Claims Relying on ███████████████

Boeing bargained away its right ███████████████████ ███████████ in 2010, four years before it sold the patents to AB. Thus, Boeing could not transfer that right to AB. ███████████████████████████ ███████████████████ all infringement claims relying on these products should be dismissed.[45]

In the AWS-Boeing Agreement, Boeing ██████████████████



[46]

It's undisputed that when it entered into the AWS-Boeing Agreement ███████████████ Boeing owned the asserted patents. And when Boeing sold them to AB in December 2014, it had accrued ███████████████████ its use of ████████████████ as confirmed by AWS's billing records.[47] ██████████████████████████████████████████████████████,

---

[44] *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks omitted).

[45] As noted, AB's infringement contentions regarding CloudFront, Lambda, EKS, GameLift, and Luna are premised solely on their use of VPC. Ex. 23 at ¶¶ 103, 107, 117, 126, 145. Therefore, this motion, if granted, would eliminate CloudFront, EC2, VPC, Lambda, EKS, GameLift, and Luna as accused products.

[46] Ex. 3 (AWS-Boeing Agreement) at 13 (emphasis added).

[47] *See* note 8, *supra*; Exs. 5; 6; 7 at 112:16-114:12.

███████████████. Indeed, the Federal Circuit has explained that "a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee."[48] And here, per its terms, the license applied ████████████████████████████████

When it sold the patents to AB, Boeing could assign only the patent rights it still possessed. Through its agreement with AWS, ████████████████   ████████████████ ████████████████████   and thus, it could not assign ████████████████ Nor could it circumvent its agreement by ████████████████████████. As Judge Burke recently explained, "while the assignment of patent rights may alter the ownership of those rights, such an assignment cannot expand those rights."[49] Thus, "the assignee of a patent is bound by prior licenses issued with respect to that patent…even if the assignee was unaware of a prior license agreement."[50] Indeed, "[i]t is a longstanding principle that an assignee…takes the patent subject to prior licenses…whether or not [it] had notice."[51]

*Innovus Prime, LLC v. Panasonic Corp.* is also analogous. There, the original patent owner, Philips, and the defendant, Panasonic, entered into a mutual non-assertion agreement covering "patents relevant to 'audio and video products.'"[52] Innovus Prime, a later assignee, sued Panasonic for infringement, arguing that it was not bound by the Philips-Panasonic Agreement.[53] The court disagreed, holding that "[p]atent owners cannot transfer an interest greater than what they possess,

---

[48] *Transcore LP v. Elec. Transaction Consultants Corp*, 563 F.3d 1271, 1275 (Fed. Cir. 2009).

[49] *Horizon*, 2022 WL 16739909, at *4.

[50] *Id*.

[51] *Innovus Prime, LLC v. Panasonic Corp*., No. 12-cv-660, 2013 WL 3354390, at *5 (N.D. Cal. July 2, 2013).

[52] *Id.* at *1.

[53] *Id.* at *2, *4.

so assignees 'take[ ] a patent subject to the legal encumbrances thereon.'"[54] As in *Innovus,* here the original patent owner (Boeing/Philips)  covering the asserted patent(s), then a later assignee (AB/Innovus Prime) sued the defendant (AWS/Panasonic) █████████████ ██████ ██████ And like Philips, Boeing agreed to █████████████ as part of its agreement with AWS. As such, Boeing could not have assigned the right █████████████ █████████ to AB, and AB purchased the patents subject to the █████████. Thus, all infringement claims relying on █████████ should be dismissed.

## B.    AB's Alleged Damages Period Contravenes the Marking Statute.

It is undisputed that the potential damages period began when AB provided AWS with actual notice of its alleged infringement.[55] Although AB contends that its March 13, 2019 letter provided the required notice, that letter mentioned only one product (CloudFront), did not identify the '344 patent, and did not state any specific infringement allegation.[56] So, the damages period began on July 6, 2022, when AB filed this case.

Section 287 provides that patentees who sell embodying products or authorize their sale "may give notice to the public that the [products are] patented" by marking them.[57] If they do not, "no damages shall be recovered…for infringement" until the patentee provides actual notice of the

---

[54] *Id.* at *5 (quoting *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368 (Fed. Cir. 2008)). As a result, the court also explained that notice of such an encumbrance to the assignee "was not required." *Id.* at *7.

[55] *E.g.*, Ex. 11 at ¶ 59 ("Acceleration Bay is entitled to damages from … the date [it] sent a letter to Amazon.com providing notice….").

[56] *See id.*; Ex. 9 (March 13 letter) at 2-3.

[57] 35 U.S.C. § 287(a).

alleged infringement. [58] As the Federal Circuit has pronounced, this requires "affirmative communication of a specific charge of infringement by a specific accused product or device."[59] Here, AB has not contested that Boeing licensed the asserted patents to Sony, who produced and sold unmarked embodying products. [60] AB also has not contested that it authorized Edge Video to practice the asserted patents without marking. [61] Thus, under § 287, AB cannot recover damages before the filing of the complaint, unless AB can show that it first provided AWS actual notice. [62]

General references to patents and products do not constitute actual notice under § 287. As the Federal Circuit stated in *Amsted Industries Inc. v. Buckeye Steel Castings Co.*, "mere[] notice of the patent's existence or ownership" is insufficient. [63] Rather, actual notice requires the communication of a "*specific* charge of infringement by a *specific* accused product or device."[64] For this reason, courts routinely hold that letters only provide actual notice for the specific products they accuse of infringement. For example, in *Refac Electronics Corp. v. A & B Beacon Business Machines Corp.*, the Southern District of New York found that a series of letters failed to provide actual notice that the defendant's blood-pressure devices allegedly infringed, because the letters

---

[58] *Id.*

[59] *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994).

[60] Ex. 24 (Boeing-Sony Patent License Agreement) at 2-3.

[61] *See* Ex. 25 at 124:1-13; Ex. 26 (Resp. No. 7).

[62] *See Flatworld Interactives LLC v. Samsung Elecs. Co.*, 77 F. Supp. 3d 378, 384 (D. Del. 2014) ("The duty of alleging, and the burden of proving, either actual notice or constructive notice is upon the patentee.") (quoting *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996)); *see also* 35 U.S.C. § 287(a) ("Filing of an action for infringement shall constitute such notice.").

[63] 24 F.3d at 187; *see also Flatworld*, 77 F. Supp. 3d at 384 ("Actual notice must be of 'the infringement,' not 'merely notice of the patent's existence.'") (quoting *Amsted*, 24 F.3d at 187).

[64] *Amsted*, 24 F.3d at 187 (emphasis added); s*ee also Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 560 F. Supp. 2d 227, 238 (W.D.N.Y. 2008) ("[W]hether notice is sufficient" depends on "whether 'the recipient is informed of the identity of the patent and the activity that is believed to be an infringement.'") (quoting *SRI Int'l v. Advanced Tech. Labs.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997)).

accused only other products.[65] As the court explained, a "clue" that other devices could be infringing is insufficient, since actual notice requires identification of a "specific" device.[66] Similarly, in *Unova Inc. v. Hewlett-Packard*, the Central District of California held that the damages period for the category of product specifically identified in a pre-suit letter began when the patent owner sent its letter, but the damages period for all other products began when the patent owner filed suit.[67] Indeed, the marking statute is designed to provide public notice of a patent and prevent a patent holder from lying in wait to later accuse a purported infringer.[68]

Here, AB's 2019 letter did not satisfy AB's burden of notice for any of the accused products. That letter states that AB's "analysis of [its] patent portfolio and Amazon.com & Amazon Web Service's CloudFront Content Delivery Network (CDN) indicates direct use of Acceleration Bay patented technology."[69] The letter went on to state AB's belief that "Amazon requires a license" to the '966, '147, '634, and '069 patents.[70] The letter did not identify any other products beyond CloudFront, mentioning only "AWS global infrastructure" and "other AWS services" in a description of CloudFront that AB copied from AWS's website.[71] The letter also did not make any specific charge of infringement against CloudFront.

Indeed, AB itself has argued that letters like the one it sent AWS do not contain specific infringement allegations. AB previously sent near-identical letters to at least 14 other companies—

---

[65] 695 F. Supp. 753, 755 (S.D.N.Y. 1988).

[66] *Id.*; *accord Amsted*, 24 F.3d at 187 ("Actual notice requires…specific accused product.").

[67] No. 02-cv-3772, 2006 WL 5434534, at *1 (C.D. Cal. Feb. 16, 2006).

[68] *See SRI Int'l*, 127 F.3d at 1470.

[69] Ex. 9 at 1.

[70] *Id.* (citing '966 patent and "patented technologies contained in the table below"); *id.* at 1-2 (cited table including '147, '634, and '069 patents, along with unasserted US Patent No. 6,910,497).

[71] *See id.* at 1-2.

including Epic Games—accusing them of infringing its patents.[72] Both AB's letters to Epic and AWS—which are dated within 15 days of each other—refer to a product's "use of" AB's "patented technologies," include a chart listing AB's patents, identify no claims, include no claim charts, and invite a "business solution."[73] After receiving its letter, Epic filed an action seeking a declaration of non-infringement.[74] AB moved to dismiss, arguing that its letter—substantively identical to the letter here—"lack[s] any patent infringement analysis."[75] AB described its letter as a "superficial communication[]" that did not explain "what claims Epic allegedly infringes, or which patents or claims are supposedly infringed."[76] And AB's president, Joe Ward, testified that the AB's letter to Epic did not contain any infringement allegations.[77] This all shows that the 2019 letter to AWS did not state any specific infringement charge against CloudFront or any other product.

And AB is estopped from arguing otherwise. In *EF Operating Corp. v. American Buildings*, the Third Circuit recognized that "one cannot casually cast aside representations, oral or written, in the course of litigation simply because it is convenient to do so."[78] Where a party's position is (1) clearly inconsistent with a prior position and (2) allows that party to obtain an unfair advantage as a result of the inconsistency, the doctrine of judicial estoppel stops that party from "playing fast and loose with the courts."[79] That doctrine applies here. AB's reliance on its 2019 letter to AWS

---

[72] *See, e.g.*, Ex. 27.

[73] *Compare* Ex. 27 with Ex. 9.

[74] *See Epic Games, Inc. v. Acceleration Bay LLC*, No. 4:19-cv-4133 (N.D. Cal.), D.I. 1.

[75] Ex. 28 at 5–6.

[76] *Id.* at 6. The court ultimately determined that AB's activities were sufficient to confer subject matter jurisdiction over the declaratory judgment action. *See* Ex. 29 at 1.

[77] Ex. 25 at 246:15–18 ("Q. Those letters did not make any specific infringement allegations against Epic Games, right? A. That's correct.").

[78] 993 F.2d 1046, 1050 (3d Cir. 1993).

[79] *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 377 (3d Cir. 2007).

is inconsistent with its position that the substantively identical letter in *Epic Games* did not allege infringement. And permitting this inconsistent position would lead to an unfair advantage, with AB potentially obtaining over three years of alleged damages for infringement that AWS had no notice of. In short, AB's letter did not provide actual notice of alleged infringement of any products as required under § 287.[80] Partial summary judgment limiting the damages period to after July 6, 2022, when AB filed this case, is thus warranted.

### C.    Summary Judgment on Willfulness and Enhanced Damages is Appropriate.

In *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, the Supreme Court clarified that § 284 enhanced damages were "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior."[81] As the Court further explained, the conduct warranting enhanced damages has been variously described in its cases as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."[82] Since *Halo*, the Federal Circuit has divided the enhanced-damages determination into two stages.[83] First, the factfinder must find that the infringement was willful.[84] This requires the patent owner to show the accused infringer had knowledge of the patent and "a specific intent to infringe at the time of the challenged conduct."[85] Then, if the factfinder finds willfulness, the district court determines

---

[80] *See Amsted*, 24 F.3d at 187; *Finjan, Inc. v. Juniper Networks, Inc.*, 387 F. Supp. 3d 1004, 1015 (N.D. Cal. 2019) (granting partial summary judgment, where pre-suit letter did not identify patent).

[81] 579 U.S. 93, 103 (2016).

[82] *Id*. at 103–04; *accord id*. at 106 (Enhanced damages "should generally be reserved for egregious cases typified by willful misconduct.").

[83] *Extang Corp. v. Truck Accessories Grp., LLC*, C.A. No. 19-923, 2022 WL 607868, at *1 (D. Del. Feb. 18, 2022) (internal citation omitted).

[84] *Id.*, at *1; *accord Bayer Healthcare LLC v. Baxalta Inc.,* 989 F.3d 964, 988 (Fed. Cir. 2021).

[85] *Bayer*, 989 F.3d at 987; *Extang*, 2022 WL 607868, at *1; *Halo*, at 105 (noting "subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages").

the appropriateness of enhanced damages, considering whether the accused infringer's conduct was "egregious" or "worthy of punishment."[86] Here, AB's allegations fail at both steps.

AB's only basis for pre-suit willfulness is its March 13, 2019 letter.[87] It is undisputed that this letter identified only CloudFront and also did not identify all the asserted patents.[88] The letter does not mention VPC, Transit Gateway, EC2, EKS, Luna, Prime Video, Twitch, GameLift, AppMesh, or any other of the other 200+ products that AWS offers, as AB admits.[89] Beyond that, the letter does not detail CloudFront's alleged infringement. It states only that AB's "analysis of [its] patent portfolio and Amazon.com & Amazon Web Service's CloudFront Content Delivery Network (CDN) indicates direct use of Acceleration Bay patented technologies."[90]

Courts have found that such broad allegations do not show willfulness. For example, in *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, Circuit Judge Bryson found that a pre-suit letter identifying the allegedly infringed patents was insufficient to send willfulness to the jury.[91] In doing so, he noted that the letter did not set out the strength of the patent owner's infringement case or address validity, and was sent years after the defendant began marketing the accused product.[92] Likewise, AB's letter does not describe how or why CloudFront infringes, and vaguely refers to only "the AWS global infrastructure, as well as other AWS services" rather than

---

[86] *Eko Brands, LLC v. Adrian Rivera Maynez Enter., Inc.,* 946 F.3d 1367, 1378 (Fed. Cir. 2020).

[87] Ex. 9. The letter identifies the '966, '147, '634, '069, and '497 patents. The '497 patent was not asserted as part of this suit.

[88] *Id.*; *see also* Ex. 30 at 16 (AB admitting its letter did not mention '344 patent).

[89] *See* Ex. 9; *see also* Ex. 31 at 11 (confirming that all products were launched before AB's letter, and could have been included).

[90] Ex. 9.

[91] No. 2:15-cv-1202, 2017 WL 2190055, at *2 (E.D. Tex. May 18, 2017).

[92] *Id.*; *accord, e.g.*, *Acceleron, LLC v. Dell Inc.*, No. 1:12-cv-4123, 2022 WL 1087683, at *4–5 (N.D. Ga. Mar. 7, 2022), *aff'd*, No. 2022-1620, 2023 WL 4503189 (Fed. Cir. July 13, 2023).

specifically referencing any other products.[93] It does not mention validity, nor does it set out any facts that would have allowed AWS to gauge the strength of AB's case. And it was sent almost eleven years after CloudFront first launched publicly in 2008.[94]

This Court has also dismissed pre-suit willfulness claims on nearly identical facts. In *Bench Walk Lighting LLC v. LG Innotek Co.*, this Court adopted a recommendation to dismiss willfulness where the pre-suit letter: (1) did not identify two of the ten asserted patents; (2) did not specifically reference most of the accused products; and (3) included "no attempt to describe how it is that [defendant] is said to be infringing" the asserted patents.[95] AB's willfulness claims are equally deficient, as its letter did not cite all the asserted patents, did not identify nine of the ten accused products, and did not explain its infringement allegations. Further, AWS stated in response to the letter that it would review the patents, alongside the numerous IPRs that had invalidated many of the patents' claims.[96] That response is inconsistent with wanton infringement. To be sure, courts have found that such an investigation evidences a defendant's good-faith belief that it does not infringe and counsels against a finding of willfulness or egregiousness.[97]

And, as noted, AB itself has argued that letters like the one it sent AWS do not contain specific infringement allegations, stating that they are "superficial communications" that do not explain "what claims" the recipient allegedly infringes, or "which patents or claims are supposedly

---

[93] *See MasterObjects, Inc. v. Amazon.com, Inc.*, No. C 20-08103 WHA, 2021 WL 4685306, at *5 (N.D. Cal. Oct. 7, 2021) (dismissing willfulness claim where there was no explanation in pleading of "how or why Amazon's instrumentalities specifically infringed" asserted patents).

[94] Ex. 32. CloudFront came out of its Beta format in 2010; *see* Ex. 31 at 11.

[95] C.A. No. 20-51, 2021 WL 65071, at *11–12 (D. Del. Jan. 7, 2021), *adopted* 530 F. Supp. 3d 468, 478 (D. Del. 2021).

[96] Ex. 10.

[97] *See IP Power Holdings Ltd. v. Westfield Outdoor, Inc.*, No. 2:19-CV-01878, 2020 WL 2992415, at *3 (D. Nev. June 4, 2020).

infringed."[98] Thus, estoppel applies here—indeed, AB's position that its 2019 letter to AWS shows willfulness is inconsistent with its argument that the substantively identical letter in *Epic Games* did not allege infringement. And permitting this inconsistent position would lead to an unfair advantage, with AB potentially obtaining trebled damages on patent claims for which it provided no notice. So, in addition to the March 13 letter being insufficient to show a specific intent to infringe, AB is estopped from arguing otherwise. For both reasons, summary judgment on pre-suit willfulness should be granted.

There is likewise no basis to find that AWS willfully infringed the patents after AB filed suit because one cannot infringe, willfully or otherwise, an expired patent.[99] Here, AB concedes that all five asserted patents expired before AWS answered the complaint on September 15, 2022.[100] No reasonable jury could find willful infringement during the one-month period between the complaint's July 6, 2022 filing and the last patent's expiration on August 7, 2022. And even assuming *arguendo* that they could, there would be no basis for the Court to find Amazon's conduct during this period sufficiently egregious to warrant enhanced damages.[101] Indeed, this Court has repeatedly held that a complaint's filing is not enough to send post-complaint willfulness to a jury.[102] Otherwise, a defendant could avoid a willfulness claim only if it immediately stopped selling all accused products upon the complaint's service, even if it has been selling those products

---

[98] Ex. 28 at 6.

[99] *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 451 (2015).

[100] Ex. 33 at 14 ("The damages period runs from the March 13, 2019 date of Acceleration Bay's notice to Amazon through the expiration date of each of the Asserted Patents, the last of which is August 7, 2022.").

[101] *See Halo*, 579 U.S. at 94 (Culpability depends on knowledge at the time of challenged conduct.).

[102] *E.g.*, *Blackbird Tech LLC v. ELB Elecs., Inc.*, C.A. No. 15-56, 2020 WL 5409052, at *8 (D. Del. Sept. 9, 2020); *Wrinkl, Inc. v. Facebook, Inc.*, C.A. No. 20-1345, 2021 WL 4477022, at *7–8 (D. Del. Sept. 30, 2021).

for years.[103] Here, because any infringement in the month after the complaint could not have been willful or show the type of egregious piracy § 284 seeks to curb, summary judgment on AB's pre- and post-suit willfulness claims, as well as § 284 enhanced damages should be granted.

### D. Summary Judgment of Non-Infringement on All 16 Asserted Claims Is Warranted Because No Accused Products Maintain an M-Regular Network.

The asserted claims of each of the five patents require an m-regular network.[104] That is, the networks described by the asserted '344, '966, '634, and '147 claims must be—per the Court's construction—"configured to maintain a state where each participant is connected to exactly m neighbor participants."[105] And, while the term "m-regular" does not appear in the only asserted '069 claim, this Court construed it to have substantially the same requirement.[106] Because AB cannot show that AWS's products require or seek to maintain a state where each participant is connected to the same number of other participants, summary judgment is appropriate.

AB accuses ten products in this case—VPC, Transit Gateway, CloudFront, EC2, EKS, GameLift, AppMesh, Luna, Prime Video, and Twitch—but it has not advanced an independent infringement theory for any product except VPC and Transit Gateway.[107] Indeed, AB's infringement expert Nenad Medvidovic opines that the other eight products infringe only insofar as they use VPC and Transit Gateway. For example, he opines that EC2 infringes "through the use

---

[103] *See NXP USA, Inc. v. Impinj, Inc.*, No. 2:20-cv-1503, 2023 WL 3852914, at *4 (W.D. Wash. June 6, 2023); *Ravgen, Inc. v. Quest Diagnostics Inc.*, No. 2:21-cv-9011, 2022 WL 2047613, at *3 (C.D. Cal. Jan. 18, 2022).

[104] The asserted claims are: '344 claims 13 and 21; '966 claims 12 and 19; '147 claims 6, 9, and 10; '634 claims 10-11, 13, 15-18, and 25; and '069 claim 1. Ex. 1 at 3.

[105] D.I. 81 at 2.

[106] *Id.* at 4 (requiring networks "configured to maintain a state where each participant is connected to the same number of other participants, where the number is at least three").

[107] *E.g.*, Ex. 1 at 3 (AB's Dec. 20, 2023 contentions, listing accused products and asserting that they infringe through the use of VPC or both VPC and Transit Gateway).

of VPC and Transit Gateway," and GameLift infringes "through the use of VPC."[108] Thus, AB premises all of its infringement theories on VPC and Transit Gateway infringing. And since there is no genuine dispute of material fact that VPC and Transit Gateway do not use m-regular networks, summary judgment of noninfringement on all claims is warranted.

### 1.    VPC Does Not Maintain an M-Regular Network.

To infringe any of the patents, a network of peered VPCs must be m-regular. As this Court recognized when considering the same m-regular construction in a previous case, an m-regular network does not require each participant to always be connected to the same number of neighbors "so long as, when appropriate, [the network] tries to get to that configuration."[109] Or, as AB's validity expert, Michael Goodrich, testified, a POSITA would understand the claims to require that the network must be configured in such a way that participants' connections are m-regular by design.[110] Thus, the focus is not just on the number of connections, it is on whether the network itself seeks a state where there is a specific number of connections.[111]

AWS's VPC networks are fundamentally different. VPC is designed so that customers have total control over what their VPCs connect to and can build precisely the network they need.[112]

---

[108] Ex. 23 at ¶¶ 110, 126; *see also* ¶¶ 103 (CloudFront), 107 (Lambda), 117 (EKS), 145 (Luna), 146 (Prime Video), 147 (Twitch). Dr. Medvidovic fails to provide a separate opinion for AppMesh. *Id.* at ¶ 388 (alleging that it is an overlay using VPC and Transit Gateway). He does, however, provide an opinion on Lambda, an eleventh product missing from AB's contentions. Ex. 1 at 3.

[109] *Acceleration Bay v. Take-Two Interactive Software, Inc.*, 612 F. Supp. 3d 408, 419 (D. Del. 2020).

[110] Ex. 34 at 110:21–111:3.

[111] *See id.* at 124:13–21 (Dr. Goodrich testifying that he could not determine whether a network was configured to maintain m-regularity from a "single snapshot in time.").

[112] Ex. 35 ("You have complete control over your virtual networking environment, including selection of your own IP address ranges, creation of subnets, and configuration of route tables and network gateways. ").

Nothing standardizes the number of VPC connections amongst participants, nor does AWS automatically connect a VPC to anything else. VPC peering connects a single VPC to another VPC.[113] No VPC peers with another VPC by default. A user must set up every VPC peering connection manually. To peer VPCs, the user of the second VPC must accept a request sent from the first VPC.[114] Then, a user at each VPC must define a route between IP addresses in the newly peered VPCs.[115] So, the AWS system does not rearrange the network to maintain connections if a new VPC is added or disconnected.[116] That is not an m-regular network because the peered network does not seek to keep participants connected to the same number of other participants.

Indeed, Dr. Medvidovic's own testing shows this, as he set up a peering connection that connected two VPCs.[117] AWS did not require him to create a network of three or more participants, and the system did nothing to maintain the connection that he set up. The testing of Nadya Sultanik, AWS's infringement expert,[118] confirms the same—the user defines the connections, and nothing requires at least three VPC instances to connect to each other.[119] In fact, Ms. Sultanik's testing confirms that every connection must be explicitly defined in a routing table, contrary to the limitation in the asserted '634 and '069 claims' preambles requiring "non-routing table based"

---

[113] Ex. 13 at 4.

[114] *Id.* at 2–4 ("The owner of the *requester VPC* send a request to the owner of the *accepter VPC* to create the VPC peering connection."), 8–9 (describing accepting a VPC peering connection).

[115] *Id.* at 2 ("the owner of each VPC in the VPC peering connection must manually add a route to one or more of their VPC route tables that points to the IP address range of the other VPC (the peer VPC).").

[116] *See id.* at 16–17 (showing manual steps a user must take to troubleshoot VPC connection issues).

[117] Ex. 23 at ¶¶ 151–57 (describing Dr. Medvidovic's testing).

[118] Ms. Sultanik's testing is also supported by over two decades of experience in the software industry, including at Lockheed Martin and now Arcweb Technologies, where she designs health and financial software. *See* Ex. 37.

[119] Ex. 36 at ¶¶ 139–47 (describing Ms. Sultanik's testing).

21

networks.[120] Thus, the undisputed facts contradict Dr. Medvidovic's assertion that "VPC peering forms a network where each participant has at least 3 neighbor participants."

In the simplest configuration, only two VPCs must be peered.[121] Although there is a limit of 50 peering connections per VPC, AWS can raise that limit,[122] and there is no evidence that the network seeks to maintain any specific number of connections related to that. A peering network is completely functional with less than three VPCs peered. That is confirmed by AWS's internal documents that Dr. Medvidovic cites throughout his report. In AWS's VPC peering user guide, the first example of peered VPCs shows a network with only two VPCs.[123]



And a later example shows two VPCs peered to a central VPC, but not to each other.[124]



Those two diagrams do not appear in Dr. Medvidovic's infringement analysis, and he instead relies

---

[120] *See* D.I. 1-1 at 238 (claim 10 of the '634 patent], 297 (claim 1 of the '069 patent).

[121] Ex. 13 at 1.

[122] *Id.* at 50.

[123] *Id.* at 1; *see also* Ex. 34 at 124:1–5 (Dr. Goodrich testifying that network of two participants with one connection between them would not satisfy claim language).

[124] Ex. 13 at 4.

on a third diagram from the same guide depicting seven participants in a full mesh configuration.[125]



According to him, this third diagram supports his opinion that "VPC peering forms a network where each participant has at least 3 neighbor participants."[126] But Dr. Medvidovic agreed that fully mesh networks, like the one in the diagram, predated the asserted patents.[127] Further, that complete mesh network is just one configuration that a user can set up to connect VPCs, as evidenced by the caption on the diagram noting that a user "might use this full mesh configuration" in certain circumstances.[128] The user guide goes on to explain that the user must "update the route table for each VPC as follows to implement this configuration."[129] So, neither the diagram Dr. Medvidovic uses in his report, nor those he overlooks, show that VPC peering is m-regular.

Dr. Medvidovic also opines that VPC infringes through its use of ▮▮▮▮. But that opinion fails to raise a genuine dispute of material fact, because he cites no evidence showing that ▮▮▮▮ is concerned with keeping the same number of connections at any given time. Indeed, Dr.

---

[125] Ex. 23 at ¶ 219. *But see* ¶ 92 (containing the first diagram in his explanation of the technology.).

[126] *Id.*

[127] Ex. 48 at 107:18-108:8.

[128] Ex. 13 at 25.

[129] *Id.*

Medvidovic does not dispute that ██████████████████████████████ ████████████.[130] Because of that scaling, ██████████████████████ ████████████.[131] For example, ██████ uses flow hashing and shuffle sharding as techniques to spread data and workload out, and Ms. Sultanik explains that, "both of th[o]se techniques contemplate a changing number of connections."[132] Rather than disputing the evidence showing that ██████ uses a changing number of connections, however, Dr. Medvidovic instead provided only conclusory opinions that ██████ satisfies the m-regular limitations of all claims.

For instance, Dr. Medvidovic repeatedly cites an AWS document entitled ██████████ ██████████ without any significant explanation, as support for his conclusion that "██████ creates an m-regular network."[133] But that AWS document describes ████████████████████████



████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Thus, Dr. Medvidovic's bare citations to such documents, combined with conclusory opinions, fail to raise a genuine dispute of material fact over whether ██████ satisfies the "m-regular" limitation.[136]

---

[130] *See generally* Ex. 15 at 5 (flow hashing is designed to send data to a "variable number of backend targets"), 6 (describing shuffle sharding to reduce workload).

[131] *Id.* at 5 █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ).

[132] Ex. 36 at ¶ 207; Ex. 15 at 5–6.

[133] Ex. 23 at ¶ 211; *see also* ¶¶ 433, 434, 490, 491, 555, 557, 630, 632 (similar).

[134] Ex. 38 at 1.

[135] *See id.* at 8; *see also* Ex. 23 at ¶ 211, 433, 490, 555, 630 (Dr. Medvidovic citing this page).

[136] *See Novartis Corp. v. Ben Venue Lab'y's, Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001) (applying

Ms. Sultanik also confirms that conclusion. As her report describes, a diagram Dr. Medvidovic repeatedly refers to depicts a ███████ network connected to five ENIs, but does not capture the fact that ████████████████████████████████████████████.[137] Thus, ███████ is not configured to maintain a network in which each participant is connected to the same number of other participants; it maintains a network that scales to connect to the number of participants necessary to meet demand.[138] So, neither VPC peering, nor ███████ within VPC, is configured to maintain a state where each participant is connected to the same number of other participants. Summary judgment of noninfringement on VPC for all asserted claims should be granted.

### 2. Transit Gateway Does Not Maintain an M-Regular Network.

Transit Gateway networks do not maintain m-regularity, either. Transit Gateway "provides a hub and spoke design for connecting VPCs and on-premises networks."[139] Such a network, by design, cannot be m-regular, because the hub will have connections to each of the spokes, but the spokes will be connected to only the hub. Indeed, AB's apportionment expert, Dr. Cole, confirmed that hub-and-spoke networks, as well as full mesh networks, differ from m-regular networks.[140]

Further, just like VPC, nothing in a Transit Gateway instance necessarily requires that the network have three or more participants, or that the participants all be connected to the same number of other participants. AWS's internal documentation, which Dr. Medvidovic relies on,

---

Third Circuit law requiring factual predicate of expert's opinion to have some support in the record); *Kaavo Inc. v. Amazon.com Inc.*, 323 F. Supp. 3d 630, 643–44 (D. Del. 2018) ("Plaintiff's reliance on contrary expert opinion alone is insufficient to create a genuine issue of material fact.").

[137] Ex. 36 at ¶ 207 (citing Ex. 15).

[138] *See id.*

[139] Ex. 14 at 5.

[140] Ex. 39 at 96:9–14 ("Q. Aside from m-regular network what are some examples of other types of networks that you have worked on? A. I mean, there could be hub-and-spoke, there could be mesh, there could be partially connected, fully connected.").

describes numerous configurations, including one involving multiple VPCs connecting to a central

Transit Gateway, and that Transit Gateway allowing each VPC to access the internet.[141]



As shown, the Transit Gateway acts as the hub and thus has far more connections than any of the

individual VPCs, which do not connect to each other. Similarly, the user guide describes peering

two Transit Gateways together, but not the networks connected to either of them.[142]



Neither of these example diagrams show an m-regular network where every participant is

connected to the same number of other participants. And Dr. Medvidovic did not explain why the

Transit Gateway hubs are considered participants for purposes of the claims. Rather, he relied on

---

[141] Ex. 14 at 16–17.

[142] *Id.* at 18–19.

a diagram in his report depicting a full mesh network of three Transit Gateway instances as participants.[143] But he omitted that AWS's documentation states that this is only one solution a customer might choose "if you have multiple Transit Gateways as shown in Figure 2 below."[144]

And, again, Dr. Medvidovic's own testing shows that there is no requirement that a Transit Gateway be a part of a network with three or more participants. His report shows the process of setting up a Transit Gateway, and nothing in that process specifies a particular number of connections.[145] Ms. Sultanik's testing further confirms that the customer (not AWS) must define the route between any two Transit Gateway attachments for them to be able to communicate.[146] That does not describe a network that maintains m-regularity on its own—indeed, if another attachment were added to the Transit Gateway, the customer would have to reconfigure the network to maintain any particular number of connections.

Nor does Transit Gateway infringe through its use of Hyperplane, as AB alleges. Indeed, like ███, Hyperplane uses shuffle sharding to manage workload as it scales.[147] Because of that, the ███████████████████ █████████.[148] According to Dr. Medvidovic, this ████████ creates an m-regular network.[149] But he relies on a diagram that he says depicts a network where "[e]ach of the █████ are connected to ████, making the network 3-regular and incomplete."[150] But

---

[143] *See* Ex. 23 at ¶ 223.

[144] Ex. 40 at 3.

[145] *See* Ex. 23 at ¶¶ 170–72.

[146] Ex. 36 at ¶¶ 148–57 (describing steps necessary to update a Transit Gateway routing table).

[147] *Supra* note 37.

[148] *Supra* note 38.

[149] Ex. 23 at ¶ 318.

[150] *Id.*

one example of a particular implementation does not show the state the network seeks to maintain, i.e., it does not show that the network seeks a state where there is a certain number of connections. Indeed, AB's validity expert Dr. Goodrich testified that he could not determine whether a network was configured to maintain m-regularity from a "single snapshot in time."[151] Beyond that, as Ms. Sultanik confirms and as the diagram shows, there are not ▮▮▮▮▮ depicted, meaning the network cannot be m-regular as Dr. Medvidovic suggests.[152] Likewise, Dr. Medvidovic does not explain his opinion that ▮▮▮▮▮ creates an m-regular network. And, as Ms. Sultanik explains, nothing about ▮▮▮▮▮ suggests an m-regular network.[153]

Finally, Dr. Medvidovic also opines that Hyperplane's multicast capability infringes.[154] But he again misinterprets a diagram to reach that conclusion. The diagram does not show every participant in the network with the same number of connections. It depicts ▮▮▮▮▮ ▮▮▮▮▮.[155] That does not show that every ▮▮▮▮▮. And Dr. Medvidovic ignores that the ▮▮▮▮▮ in each of the two availability zones are also connected to each other to facilitate the multicasting.[156] That means the ▮▮▮▮▮ ▮▮▮▮▮ do not, and the network is not m-regular.

So, neither Transit Gateway itself, nor its implementation of Hyperplane, maintains an m-regular network with at least three participants. And since neither VPC peering nor Transit Gateway infringes, none of the remaining products can infringe, given that AB's infringement

---

[151] *See* Ex. 34 at 124:13–21.

[152] *See* Ex. 36 at ¶ 342. Again, each participant must be connected to the same number of other participants. The diagram Dr. Medvidovic relies on, on its face, doesn't show that.

[153] *Id.* at ¶ 344.

[154] *E.g.*, Ex. 23 at ¶¶ 427–30.

[155] Ex. 41 at 5.

[156] *Id.*

theories rely on them infringing through the use of at least one of those products.[157] Thus, summary judgment of non-infringement on all asserted claims is proper for each of the accused products.

### 3.    AB Has Not Disclosed a Damages Theory for ▮▮▮▮ or Hyperplane.

Even if there is a genuine fact dispute as to whether ▮▮▮▮ or Hyperplane satisfy the "m-regular" requirement, AB has not articulated an admissible damages theory for either component. ▮▮▮▮ and "Hyperplane" do not appear in Mr. Gunderson's report, and he testified in deposition that he was not familiar with those components.[158] And Dr. Cole admitted that he did not apportion their value in his assessment of VPC or Transit Gateway.[159]

It is black-letter law that a patent owner may seek "only those damages that are attributable to the infringing features of the product."[160] Thus, if VPC infringes only through its use of ▮▮▮▮, or Transit Gateway infringes only through its use of Hyperplane, then AB may recover damages for only the value that ▮▮▮▮ or Hyperplane provide. Given that Dr. Cole did not apportion the value of those components separately, and Mr. Gunderson did not consider them at all, there is no reliable or admissible expert evidence that could support a damages award based on them.[161] Thus, AB should not be permitted to present a damages theory based on any ▮▮▮▮ or Hyperplane infringement, since AB's experts do not express any opinions based on reliable methodology that "reflects the value attributable to the infringing features of the product, and no more."[162]

---

[157] *Supra* note 108.

[158] Ex. 42 at 156:22–157:12 (▮▮▮▮), 164:2–13 (Hyperplane).

[159] *Id.* at 157:13–16 ("Q. In your apportionment analysis did you attempt to isolate the value of ▮▮▮▮…? A. I do not believe I did that, no."), 191:18–22 (agreeing that he "didn't attempt to isolate just the value of HyperPlane from the other portions of Transit Gateway").

[160] *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).

[161] *See Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).

[162] *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

**E.    AB's Experts' Flawed Apportionment Approach Should be Excluded.**

As the Federal Circuit has explained, a patentee "must in every case give evidence tending to separate or apportion the patentee's damages between the patented feature and the unpatented features."[163] Where "the accused infringing products have both patented and unpatented features," as here, patent infringement damages "must reflect the value attributable to the infringing features of the product, and no more."[164] Since expert testimony must be "not only relevant, but reliable," apportionment analysis must be the product of reliable methods.[165] But Dr. Cole's opinions regarding the "technical value of the infringing functionality," on which Mr. Gunderson also relied, were not the product of reliable methods. Instead, Dr. Cole based his opinion on features of the accused products that existed after the damages period and failed to apply his own methodology.

**1.    Dr. Cole's Opinion Relies on Documents Outside the Damages Period.**

Dr. Cole based his determination of the "technical value of infringing functionality" solely "on what…features [were] included on the AWS website."[166] As such, the reliability of his analysis rested on his use of the right lists' features, and any change to the published lists could alter his conclusions.[167] That means he had to rely on features present in the accused products from March 13, 2019 through August 7, 2022, the maximum damages period in this case.[168] But Dr. Cole did not review any versions of the AWS website that existed during this damages period;

---

[163] *Laser Dynamics*, 694 F.3d at 67.

[164] *Ericsson*, 773 F.3d at 1226.

[165] *Daubert*, 509 U.S. at 589; *see* Fed. R. Evid. 702; *Woods v. Showers*, 822 F. App'x 122, 124 (3d Cir. 2020) ("The reliability of an expert's conclusions and opinions hinges on the reliability of the expert's methodology.").

[166] Ex. 39 at 185:4-7 (A: "That is correct.").

[167] *Id.* at 187:2-15 (agreeing his "analysis could change" if products change), 198:9-15 (agreeing his "apportionment analysis is a result of the number of functions [he] identified").

[168] *See* Ex. 11 at ¶ 63.

instead, he relied on versions from after August 7, 2022. In fact, he admitted that his report "didn't take into account the damages period" at all.[169] On that basis alone, his opinions are unreliable.

And it also shows that his entire opinion rests on two baseless assumptions: that each allegedly infringing function was introduced after the alleged date of first infringement, and that none of the accused products' features had changed since the beginning of the damages period. Dr. Cole's analysis of EC2 exemplifies the first error. In his report, Dr. Cole identified five allegedly infringing features of EC2 using a post-damages period version of the AWS website.[170] He then attributed each feature's entire value to the asserted patents, assuming that the feature was introduced after the alleged August 2011 date of first infringement.[171] But a June 2009 version of the EC2 website includes two of the features—Elastic IP Addresses and Multiple Locations. As shown below, Dr. Cole's 2023 report tracks the June 2009 website's language nearly verbatim.[172]

| Dr. Cole's Report (¶¶ 235, 241) | June 2009 EC2 Website |
|---|---|
| **Multiple Locations.** EC2 enables customers to place instances in multiple locations. EC2 locations are composed of Regions and Availability Zones. Availability Zones are engineered to be insulated from failures in other Availability Zones, and provide customers with inexpensive, low latency network connectivity to other Availability Zones in the same Region. Customers can protect their applications on EC2 from single location failure by launching instances in separate Availability Zones. Regions consist of one or more Availability Zones and are geographically dispersed. | **Multiple Locations.** Amazon EC2 provides the ability to place instances in multiple locations. Amazon EC2 locations are composed of Regions and Availability Zones. Availability Zones are distinct locations that are engineered to be insulated from failures in other Availability Zones and provide inexpensive, low latency network connectivity to other Availability Zones in the same Region. By launching instances in separate Availability Zones, you can protect your applications from failure of a single location. Regions consist of one or more Availability Zones, are geographically dispersed. |

[169] Ex. 39 at 275:22-276:1.

[170] *Id.* at 261:11–22; Ex. 43 at ¶ 234.

[171] Ex. 43 at ¶ 234.; Ex. 23 at ¶ 676 (asserting date of first infringement based on release of VPC peering); D.I. 114-4 at ¶ 302 (same).

[172] *Compare* Ex. 43 ¶¶ 235, 241 *with* Ex. 44 at 2; *see also* Ex. 39 at 266:12-267:20 (acknowledging similarities).

| Elastic IP Addresses. Elastic IP addresses are static IP addresses designed for dynamic cloud computing. An Elastic IP address is associated with their account, not with a particular instance, and customer control that address until customers choose to explicitly release it. Unlike traditional static IP addresses, however, Elastic IP addresses allow customers to mask instance or Availability Zone failures by programmatically remapping their public IP addresses to any instance in their account. | Elastic IP Addresses. Elastic IP addresses are static IP addresses designed for dynamic cloud computing. An Elastic IP address is associated with your account not a particular instance, and you control that address until you choose to explicitly release it. Unlike traditional static IP addresses, however, Elastic IP addresses allow you to mask instance or Availability Zone failures by programmatically remapping your public IP addresses to any instance in your account. |
| --- | --- |

It is undisputed that EC2 implemented those features at least two years before the date of alleged first infringement. Yet Dr. Cole still attributes 100% of their value to the asserted patents.[173]

Dr. Cole also assumed that none of the accused products' features changed between the damages period and when he accessed the AWS website (December 2023/January 2024).[174] Courts permit such assumptions only when they are based on sufficient evidence.[175] But Dr. Cole provided no such support. He never investigated how the products changed or searched for earlier versions of the publicly available AWS websites on which he relied.[176] Indeed, he testified:

> Q: [D]id you analyze how the product has changed as part of your apportionment analysis?
>
> A: No. …
>
> Q: [D]o you have the earlier version of the website listed in your materials considered? I didn't see them?

---

[173] Ex. 43 at ¶ 234.

[174] Some of the websites Dr. Cole relied upon were produced in the case and accessed by him or AB in October 2022, over two months after the damages period ended.

[175] *Cf. Skills Platform Inc. v. AviaGames Inc.*, No. 21-cv-2436, 2023 WL 8438738, at *7 (N.D. Cal. Dec. 5, 2023) (permitting expert to assume that accused products' features did not change because he "rel[ied] on Skillz's SEC filings, which the parties agree list the same features year-after-year"); *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-33, 2016 WL 122967, at *3 (E.D. Tex. Jan. 9, 2016) (allowing expert to "mix[] and match[]" product versions because he cited evidence showing they "operated in the same way for purposes of the claimed features").

[176] Ex. 39 at 181:17-182:3 (VPC), 215:18-217:6 (Transit Gateway), 237:10-238:9 (CloudFront), 261:11-22 (EC2), 274:5-276:21 (EKS), 279:1-13 (GameLift); Ex. 43 at ¶¶ 207 (Lambda).

A: I do not believe that I do.[177]

Thus, Dr. Cole's analysis is unreliable, because it is premised on unsupported assumptions regarding which features were available during the damages period.

### 2.     Dr. Cole Inconsistently Applied an Unreliable Methodology.

As described above, Dr. Cole began his calculation of the "technical value of infringing functionality" by identifying the accused products' functions. Ostensibly, he would do this by studying "function data sheets" and "lower-level technical documents."[178] According to his proposed methodology, he would then evaluate the "relative importance" of these functions using seven considerations.[179] For each of the functions that Dr. Cole and Dr. Medvidovic determined had infringed, Dr. Cole found that they were each "core functions" and were "at least as valuable as non-core functions."[180] He then assigned each function, including those that did not relate to infringement, the exact same value, before adding the percentages for the allegedly infringing functions together.[181] This became his "technical value of the infringing functionality," which Mr. Gunderson applied as an "apportionment percentage" to the revenues for the accused products.[182]

---

[177] Ex. 39 at 187:21-189:3.

[178] Ex. 43 at ¶¶ 126-27 (explaining that Dr. Cole "made various adjustments to the listings of functions" to combine "substantially overlapping" functions and to remove "pricing" and "business policies"); *see generally* ¶¶ 122-310.

[179] *Id.* at ¶ 131 ("(1) whether the function is standard in the industry…; (2) the cost to develop [it]…; (3) the technical challenges presented…; (4) if the function provides value for the Accused Product…; (5) if the item is a technical function…or just a business policy; (6) evidence that the feature is driving consumer demand for the product; and (7) the weighting a company would put on the function when determining what features to invest in and develop").

[180] *Id.* at ¶ 130.

[181] *Id.*

[182] Ex. 43 at ¶ 122; Ex. 11 at ¶¶ 62-63. For the majority of the accused products, these revenue calculations were incorrect since they were not limited to those services' use of VPC and/or Transit Gateway. *See infra* section VI.F.

But Dr. Cole did not apply his own methodology, never considering several of the seven factors he said needed to be considered in his apportionment analysis. For example, he did not consider the cost to develop these functionalities (Factor 2), despite claiming that he "gave more weight to features that were costly to develop."[183] He also did not review any customer surveys or speak with users of the accused products to determine which features were "driving consumer demand" for the accused products (Factor 6),[184] nor did he "review[] any documents regarding any…AWS competitor[] products" (Factor 1).[185] Further, he created his initial VPC function list by selecting one of multiple lists available on the AWS website, not by reviewing multiple "data sheets" and "technical documents."[186] As discussed above, he did not review any of those websites as they existed during the damages period. Despite lacking foundational information, for each accused product he typically concluded that the non-infringing functions were "less valuable" because they had either been around for many years or had become industry standard.[187] But, he never addressed whether the allegedly infringing features were new or standard.[188]

And Dr. Cole assigned each function an equal value, meaning his entire calculation is a

---

[183] Ex. 43 at ¶ 131; *see* Ex. 39 at 167:4-168:5; 341:20-342:7; *see generally* Ex. 43 at ¶¶ 141-59 (VPC function analysis doesn't reference cost to develop).

[184] Ex. 43 at ¶ 131; *see* Ex. 39 at 156:21-157:4, 160:15-162:2 (testifying, *inter alia*, that he did not speak with customers "about their use of the accused products"); *see, e.g., generally* Ex. 43 at ¶¶ 153-54, 156, 158 (stating, for example, that a specific function is "not one that customers would regularly use," without explanation or citation).

[185] *See* Ex. 43 at ¶ 131; *see, e.g.*, Ex. 39 at 162:5-163:6, 207:14-22, 227:2-5, 229:20-230:1, 233:15-19, 242:19-22, 268:10-13, 270:10-13.

[186] Ex. 43 at ¶¶ 126-27, 138. Dr. Cole's report cites a webpage containing a different ten-function list. The list in his report comes from AB-AWS_122639, which is not in his report or materials considered. Exs. 39, 50.

[187] Ex. 43 at ¶¶ 154, 158-59 (discussing three non-infringing features: network access control list, security groups, and lattice).

[188] *Id.* at ¶¶ 141-51; Ex. 39 at 209:4-19 (testifying he did not know whether competitors offered traffic mirroring or how long this feature had been offered).

product of the list he began with, which he derived from a snapshot of the Amazon website. Thus, his entire analysis is based on what was listed on the Amazon website when he reviewed it. For example, he determined that 44.44% of VPC's value comes from the asserted patents because four of its nine (44.44%) functions purportedly relate to infringement.[189] But the website he relied on in his opening report should have resulted in a different value, since it did not include several of the allegedly infringing functions, including Network Manager.[190]

Further, Dr. Cole incorrectly attributed 100% of the value of each allegedly infringing function to the asserted patents, even where a function's benefit stems from another product that he already apportioned. For example, given his conclusion that 44.44% of VPC's value comes from the asserted patents, it follows that a feature whose alleged infringement is solely premised on its use of VPC peering cannot receive more than 44.44% of its value from the asserted patents.[191] Yet Dr. Cole still assigned 100% of each allegedly infringing feature's value to the asserted patents.[192] For example, he opined that EKS's Service Mesh feature—which he argues infringes because it ███████████████████—owes its entire value to the asserted patents.[193] Dr. Cole does not explain how that would be possible, when VPC, the only basis for the Service Mesh feature's alleged infringement, only owes 44.44% of its value to the asserted patents. So, because Dr. Cole did not consider the features of the accused products during the damages period and did

---

[189] Ex. 43 at ¶ 140.

[190] *Id.* at ¶ 138 (citing docs.aws.amazon.com/vpc/latest/userguide/what-is-amazon-vpc.html). After his deposition, Dr. Cole issued an errata revising the VPC website he relied upon to one he did not include in his report or his materials considered.

[191] Ex. 39 at 244:7-11; Ex. 43 at ¶ 122.

[192] Ex. 43 at ¶¶ 139-40, 163-64, 185, 234, 258, 292.

[193] *Id.* at ¶¶ 258, 261.

not apply his own methodology, his unreliable apportionment opinions should be excluded.[194] Mr. Gunderson's opinions rely on that flawed analysis, and should also be excluded.[195]

### F.     Mr. Gunderson Relies on Revenue Unrelated to Infringement.

AB's damages expert, Mr. Gunderson, lists eleven accused products in his report, but purports to calculate damages for seven: VPC, Transit Gateway, CloudFront, EC2, EKS, Lambda, and GameLift.[196] In his report, Dr. Medvidovic contends that five of those products (CloudFront, Lambda, EC2, EKS, and GameLift) infringe through their use of the other two: VPC and Transit Gateway.[197] In other words, AB asserts that these products infringe based on their internal use of VPC and/or Transit Gateway services, not based on their sale to external customers.[198] █████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ But Mr. Gunderson, AB's damages expert, did not limit his damages calculation for CloudFront, Lambda, EKS, and GameLift to internal use; instead, he based it on those products' external revenue.[200] This is

---

[194] *See Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-CV-04738, 2020 WL 5106845, at *13 (N.D. Cal. Aug. 31, 2020) (holding that equal weighting of features in apportionment analysis requires sufficient explanation).

[195] That is, AWS requests that this Court exclude ¶¶ 122-310 of Dr. Cole's report (Ex. 43); ¶¶ 7, 60-63, 292-93, 304-05, and Exs. 4-18 of Mr. Gunderson's report (Ex. 11); and ¶¶ 23-28 and Exs. 4-6, 11-13, and 19 of Mr. Gunderson's Reply Report (Ex. 45). This would include Mr. Gunderson's entire damages calculation, since he applies his royalty rate to revenue calculated based on Dr. Cole's apportionment. *See* Ex. 11 at ¶¶ 62-64; Ex. 45 at ¶¶ 23-24.

[196] *See* Ex. 11 at ¶ 62. Mr. Gunderson did not calculate damages associated with Luna, Twitch, and Prime Video, which are not AWS products, or AppMesh.

[197] *See supra* note 108.

[198] *See* D.I. 114.

[199] *See* D.I. 114-1 at 77:12-14 ████████████████████████████ ████████████████████ ).

[200] Ex. 42 at 174:17–21. Because of Judge Fallon's order, Mr. Gunderson calculated damages for EC2 based on EC2's usage of Transit Gateway and VPC. *Id.* at 132:22–133:3.

contrary to Judge Fallon's prior ruling on a motion to compel external financial data for EC2.[201] As a result, his damages calculation relies on an overstated royalty base. Because of this error, all portions of Mr. Gunderson's damages opinion relying on the overall revenue of CloudFront, Lambda, EKS, and GameLift should be excluded as unsupported.[202] And because Mr. Gunderson's VPC and Transit Gateway damages calculations already encompass internal usage by all other AWS products, including EC2, his EC2 damages calculation should also be excluded.

More particularly, Judge Fallon previously considered the relevance of external revenue when denying AB's recent motion to compel that revenue for EC2. In doing so, she found that EC2's external sales data was not relevant because AB could not "identify any portion of the final infringement contentions or expert report that articulate[d] an infringement theory based on the sale or use of EC2 other than through its use of" VPC and Transit Gateway.[203] Judge Fallon relied on Dr. Medvidovic's statement that EC2 "infringes the '966, '344, '634, and '147 patents through the use of VPC and Transit Gateway."[204] Dr. Medvidovic used similar language for CloudFront, EKS, Lambda, and GameLift.[205] So AB has similarly only accused those products' infringement through their use of VPC (only EC2 is alleged to infringe through the use of Transit Gateway).

In his reply report issued one month after the motion to compel order, Dr. Medvidovic attempted to recast his prior opinions.[206] But this only reinforced that Judge Fallon's ruling for

---

[201] D.I. 115.

[202] Due to the motion to compel ruling, Mr. Gunderson limited his analysis for EC2 to just its use of VPC and Transit Gateway, so his calculation for EC2 is not implicated by this motion.

[203] D.I. 115.

[204] *Id.* (citing Ex. 23) at ¶¶ 110-11.

[205] Ex. 23 at ¶¶ 107 ("Lambda infringes the '966, '344, '634, and '147 Patents through the use of VPC which infringes for the reasons I explain in Sections X to XIII"), 103 (similar for CloudFront), 117 (similar for EKS), and 126 (similar for GameLift).

[206] Ex. 46 at ¶ 203.

EC2 was correct and should apply to CloudFront, Lambda, EKS, and GameLift. For example, in his reply report, Dr. Medvidovic asserted that paragraph 111 of his opening report explained that "EC2 provides infringing broadcast channels that allow for flexible, scalable compute capacity."[207] But his EC2 overview—including paragraphs 110 and 111—never mentions broadcast channels.[208] He does, however, state that "Amazon Elastic Compute Cloud (EC2) infringes the '966, '344, '634, and '147 Patents through the use of VPC and Transit Gateway."[209] Likewise, he asserted that paragraphs 195, 659, and 664 of his opening report explained that "Lambda operates infringing broadcast channels and information delivery services."[210] But those paragraphs, which relate to the alleged infringement of other non-Lambda services, explain that GameLift uses Lambda functions and that "Lambda uses VPC technology as the basis for its technology."[211]

AB's hypothetical negotiation date further supports that it has not set forth any infringement theories based on external customers' direct use of these products. The hypothetical negotiation occurs on the date of the first alleged infringement.[212] EC2 and CloudFront launched in 2006 and 2008, respectively.[213] Yet, Dr. Medvidovic and Mr. Gunderson identify a hypothetical negotiation date of August 2011 based on the launch of VPC peering, a separate service.[214] Thus, if CloudFront and EC2 infringed apart from their use of VPC peering, the date of first infringement

---

[207] *Id.* at ¶ 204; Ex. 23 at ¶ 110.

[208] Ex. 23 at ¶¶ 110-16.

[209] *Id.* at ¶ 110.

[210] *Id.* at ¶ 211.

[211] *Id.* at ¶¶ 195, 659, 664; Ex. 46 at ¶ 211.

[212] *See, e.g., Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 869-70 (Fed. Cir. 1993).

[213] Ex. 47 at ¶¶ 17 (EC2), 37; *see also* D.I. 114-4 at ¶ 302 (Gunderson noting asserted patents had all issued by June 21, 2005).

[214] Ex. 23 at ¶ 676; D.I. 114-4 at ¶ 302; Ex.11 at ¶ 302.

38

would have been when EC2 first launched in 2006 or when CloudFront launched in 2008.[215] But instead, the date of first alleged infringement coincides with the release of VPC peering.[216] When asked at his deposition, Mr. Gunderson was unable to explain why the hypothetical negotiation date was not in 2006 or 2008, when those two services launched.[217]

Here, AB accused CloudFront, Lambda, EC2, EKS, and GameLift of infringement only through their use of VPC and/or Transit Gateway.[218] So, sales of those products to external customers are not relevant, since any value from the asserted patents derives from VPC or Transit Gateway. As damages are limited to "the value attributable to the infringing features…and no more," use of this data inflates AB's damages.[219] Moreover, Mr. Gunderson's VPC and Transit Gateway calculations were based on revenue for "All Customers," which includes CloudFront, Lambda, EC2, EKS, and GameLift.[220] Thus, his VPC and Transit Gateway calculations accounted for all allegedly infringing use. Therefore, because Mr. Gunderson relied on revenue unrelated to infringement for CloudFront, Lambda, EKS, and GameLift and double-counted internal use of EC2, his CloudFront, Lambda, EC2, EKS, and GameLift calculations should be excluded.

### G.    Mr. Gunderson's Reliance on A Jury Verdict Should Be Excluded.

On May 16, 2024, Mr. Gunderson issued a second supplemental report incorporating the recent *Activision* jury verdict into his damages analysis.[221] Specifically, he opined that "the $23.4

---

[215] *See* Ex. 48 at 205:20–207:1 (acknowledging EC2 and Cloudfront were available before date of first infringement.).

[216] Ex. 23 at ¶ 676; D.I. 114-4 at ¶ 302. Transit Gateway was introduced in Nov. 2018. *See* Ex. 18.

[217] Ex. 42 at 82:20–83:2.

[218] *See supra* note 108.

[219] *Ericsson*, 773 F.3d at 1226.

[220] Ex. 47 at ¶ 184(b); Ex. 11 at ¶¶ 97-98 and Report Exs. 12, 13, 20.

[221] Ex. 49 at ¶ 2 (citing *Acceleration Bay LLC v. Activision Blizzard*, C.A. No. 16-453, D.I. 858 (D. Del. May 3, 2024) ("Activision Blizzard Verdict")).

million patent infringement damages awarded in the Activision Blizzard Verdict should also be considered."[222] But that jury verdict is irrelevant and Mr. Gunderson's opinions regarding it should be excluded. Indeed, this Court excluded a similar opinion by AB's damages expert in the *Activision* case because "[j]ury-determined damages are not evidence of arm's-length negotiations between parties, and will not help the trier of fact determine a royalty" and "[a] jury verdict does not represent evidence from which a hypothetical negotiation can be reliably determined."[223] For the same reasons, Mr. Gunderson's Second Supplemental Expert Report, which solely addresses the *Activision* jury verdict, should also be excluded.

## VII.   CONCLUSION

██████████████████████████████, summary judgment is warranted on all claims against ████████████████████, and any claims relying on the use of those products. Further, the damages period begins on July 6, 2022, and AB cannot show the requisite knowledge or egregious conduct to support willfulness and enhanced damages. And neither VPC nor Transit Gateway maintain an m-regular network, warranting summary judgment on all claims. Beyond that, Dr. Cole's apportionment analysis and Mr. Gunderson's reliance on unrelated revenue and the *Activision* jury verdict should be excluded.

---

[222] *Id.* at ¶ 5.

[223] *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 489 (D. Del. 2018) (excluding AB's damages expert's "royalty opinion insofar as it relied on…jury verdict"); *see IoEngine, LLC v. PayPal Holdings, Inc.*, 607 F. Supp. 3d 464, 503-05 (D. Del. 2022) (collecting cases and excluding damages expert's opinion relying on two jury verdicts). *See also* Ex. 42 at 54:14–16 ("Q. Is a jury verdict evidence of an arm's-length negotiation between the parties? A. I would say no.").

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)

OF COUNSEL:

Alan M. Fisch
R. Williams Sigler
Jeffrey M. Saltman
Lisa N. Phillips
Kyle K. Tsui
FISCH SIGLER LLP
5301 Wisconsin Avenue NW, Suite 400
Washington, DC  20015
(202) 362-3500

Ken K. Fung
FISCH SIGLER LLP
400 Concar Drive
San Mateo, CA 94402
(605) 362-8207

May 31, 2024

1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendant Amazon Web Services, Inc.*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2024, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered

participants.

I further certify that I caused copies of the foregoing document to be served on

May 31, 2024, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                      *VIA ELECTRONIC MAIL*
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

Paul J. Andre, Esquire                                        *VIA ELECTRONIC MAIL*
Lisa Kobialka, Esquire
James R. Hannah, Esquire
Michael H. Lee, Esquire
Christina M. Finn, Esquire
Kristopher B. Kastens, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA  94065
*Attorneys for Plaintiff*

Aaron M. Frankel, Esquire                                     *VIA ELECTRONIC MAIL*
Marcus A. Colucci, Esquire
Cristina L. Martinez, Esquire
Pooja P. Parekh, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
*Attorneys for Plaintiff*

*/s/ Jennifer Ying*

Jennifer Ying (#5550)