**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ACCELERATION BAY, LLC,

        Plaintiff,

    v.

AMAZON WEB SERVICES, INC.,

        Defendant.

Civil Action No. 22-904-RGA

---

<u>MEMORANDUM OPINION</u>

Philip A. Rovner, POTTER ANDERSON & CORROON, LLP, Wilmington, DE; Paul J. Andre, Lisa Kobialka, James Hannah (argued), Kristopher Kastens, Michael Lee, Christina M. Finn, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Redwood Shores, CA; Aaron M. Frankel (argued), Marcus A. Colucci, Pooja P. Parekh, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY,

        Attorneys for Plaintiff.

Jack B. Blumenfeld, Jennifer Ying, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Alan M. Fisch, R. Williams Sigler (argued), Jeffrey M. Saltman (argued), Lisa N. Phillips, Kyle K. Tsui, Lauren Hutchison (argued), FISCH SIGLER LLP, Washington, D.C.; Ken K. Fung, FISCH SIGLER LLP, San Mateo, CA,

        Attorneys for Defendant.

September 12, 2024

/s/ Richard G. Andrews

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me are Plaintiff's summary judgment and *Daubert* motions (D.I. 150) and

Defendant's summary judgment and *Daubert* motions (D.I. 147).  The motions have been fully

briefed.  (D.I. 148, 161, 170 (Defendant's motion); D.I. 151, 159, 172 (Plaintiff's motion)).  I

heard oral argument on August 21, 2024 (Hearing Tr.).[1]  At my request, the parties submitted

supplemental letter briefing on several issues in dispute.  (D.I. 192, 193, 194, 195).

For the reasons set forth below, Plaintiff's summary judgment and *Daubert* motions are

GRANTED IN PART and DENIED IN PART.  Defendant's summary judgment and *Daubert*

motions are GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

Plaintiff owns U.S. Patent Nos. 6,701,344 ("the '344 patent"), 6,714,966 ("the '966

patent"), 6,732,147 ("the '147 patent"), 6,829,634 ("the '634 patent"), and 6,910,069 ("the '069

patent").  Plaintiff acquired the patents from Boeing, the original assignee and owner of the

patents, on December 10, 2014.  (D.I. 149-1, Ex. 4).  The sale agreement provides that Boeing

will receive seventy-five percent of the proceeds from the settlements, sales, and licensing

revenues that Plaintiff obtains from the patents.  (*Id.* at 4).

The asserted patents are directed towards computer network systems and methods of

adding participants to, removing participants from, and delivering information across computer

networks.  The '344 Patent issued on March 2, 2004 and expired on September 21, 2021.  (D.I.

149-1, Ex. 11 ¶ 249).  The '966 patent issued on March 30, 2004 and expired on November 10,

2021.  (*Id.*).  The '147 patent issued on May 4, 2004 and expired on July 20, 2022.  (*Id.*).  The

---

[1] Citations to the transcript of the argument, which is docketed at D.I. 197, are in the format
"Hearing Tr. at __."

'634 Patent issued on December 7, 2004 and expired on August 7, 2022.  (*Id.*).  The '069 Patent

issued on June 21, 2005 and expired on July 9, 2022.  (*Id.*).

Defendant offers customers a variety of cloud computing products, including "Virtual

Private Clouds" ("VPCs"), which are virtual networks that run on computing resources isolated

from those used by Defendant's other customers, and services for connecting VPCs with each

other and with other networks.  (D.I. 148 at 5–8; D.I. 151 at 3–6).  Plaintiff filed this case on July

6, 2022, alleging Defendant infringed the asserted patents through various VPC-related products.

(D.I. 1).  The products that remain accused are VPC, Transit Gateway, CloudFront, Elastic Cloud

Computing ("EC2"), Elastic Kubernetes Services ("EKS"), GameLift, and App Mesh.[2]  (D.I.

149-1, Ex. 1 at 3).  The remaining asserted claims are claims 13 and 21 of the '344 patent, claim

1 of the '966 patent, claims 10 and 25 of the '634 patent, claim 6 of the '147 patent, and claim 1

of the '069 patent.[3]  (D.I. 188 at 1).

## II.   LEGAL STANDARD

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  Material facts are those "that could affect the outcome" of the proceeding.  *Lamont*

---

[2] Plaintiff also identified three accused products of Defendant's parent company in its
infringement contentions.  (D.I. 149-1, Ex. 1 at 3 (listing Luna, Prime Video, and Twitch as
Amazon's infringing products)).

[3] During the time it has taken to decide the pending motions, the parties have narrowed the case.
For example, Plaintiff no longer asserts any claims of the '344 or '069 patents.  (D.I. 211 at 4).

*v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B.  Infringement

A patent is directly infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent."  35 U.S.C. § 271(a).  Determining infringement is a two-step analysis.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  First, the court must construe the asserted claims to ascertain their meaning and scope.  *Id.*  The trier of fact must then compare the properly construed claims with the accused infringing product.  *Id.*  This second step is a question of fact.  *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  The patent owner bears the burden of proving infringement by a preponderance of the evidence.  *SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

"Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device."  *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).  "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).  A product that does not literally infringe a patent claim may still infringe under the doctrine of equivalents if the differences between an individual limitation of the claimed invention and an element of the accused product are insubstantial.  *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (1997).  The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence.  *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if at least one limitation of the claim in question does not read on an

element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is . . . appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Thus, summary judgment of non-infringement can only be granted if, after viewing the facts in the light most favorable to the non-movant, there is no genuine issue as to whether the accused product is covered by the claims (as construed by the court). *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

### C. Obviousness

A patent claim is invalid as obvious under 35 U.S.C. § 103 "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406–07 (2007). "As patents are presumed valid, a defendant bears the burden of proving invalidity by clear and convincing evidence." *Shire, LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1306 (Fed. Cir. 2015) (cleaned up). "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." *KSR*, 550 U.S. at 406 (citations and quotation marks omitted).

A court is required to consider secondary considerations, or objective indicia of nonobviousness, before reaching an obviousness determination, as a "check against hindsight

bias." *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1078–79 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

### D. Daubert

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702 (amended Dec. 1, 2023). The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset,

7

> pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[4]

## III.   DISCUSSION

### A.  Defendant's Motions

#### 1.  Infringement

Defendant seeks summary judgment of noninfringement on the basis that the accused products do not meet the m-regular limitation of the asserted claims.  (D.I. 148 at 19).  I believe that a genuine issue of material fact exists regarding whether the accused products meet this claim limitation.  I deny the motion for summary judgment of noninfringement.

#### 2.  The AWS-Boeing Non-Assertion Clause

Defendant argues that Plaintiff is barred from enforcing the asserted patents against VPC, EC2 and CloudFront because Boeing bargained away this right in 2010.  (*Id.*).

In October 2010, Defendant and Boeing entered into an "AWS Enterprise Customer Agreement" ("the 2010 Agreement").  (D.I. 149-1, Ex. 3).  The contract includes a non-assertion clause that reads:

> **7.6. Non-Assertion.**   During and after the term of the Agreement, Company will not assert, nor will Company authorize or assist any third party to assert, against AWS, its affiliates or any of their respective customers, vendors, business partners, or licensors, any patent infringement claim with respect to any Services that Company elects to use.

---

[4] The Court of Appeals wrote under an earlier version of Rule 702.  Subsequent amendments affect the substance of the rule, but I do not think they alter the applicability of the quoted discussion.

(*Id.* § 7.6).  "Company" is defined in the contract as "The Boeing Company."  (*Id.* at 1).  "Services" is defined as "(a) any web services that AWS makes generally available during the term of this Agreement for which Company registers on the AWS Site or (b) any Premium Support."  (*Id.* § 1).  Plaintiff does not dispute that any existing encumbrances traveled with the sale of the patents.  (Hearing Tr. at 8:15–25).  Plaintiff nevertheless raises several challenges to the enforceability of the non-assertion clause.

### a.  Abandonment

Plaintiff argues that Defendant abandoned the non-assertion clause in 2017 based on an announcement posted on Defendant's website.  (D.I. 161 at 2).  This announcement states:

> The AWS Customer Agreement was updated on June 28, 2017.  In this update we are improving the terms of the AWS Customer Agreement related to intellectual property rights.  These changes include . . . removing the patent non-assert clause.  AWS customers do not need to take any action to get the benefit of the updates to the online AWS Customer Agreement.

(D.I. 161 at 2 (quoting D.I. 162-1, Ex. 3)).

Plaintiff identifies several other items in the record as further evidence of abandonment.  In 2019, Plaintiff sent a letter to Defendant ("the 2019 Letter") with the subject line "Notice of Patents from Acceleration Bay."  (D.I. 149-1, Ex. 9, at 337 of 506; *see infra* Section III.A.3).  Defendant's response to this letter states, "Amazon takes these types of allegations seriously.  We will review your allegations and get back to you when appropriate."  (D.I. 149-1, Ex. 10).  Plaintiff maintains Defendant's failure to assert it had a license confirmed Defendant had abandoned its license.

In 2022, Defendant and Boeing entered an "Amended and Restated AWS Enterprise Agreement" ("the 2022 Amendment"), which amended and restated the 2010 Agreement as well as the two 2013 amendments and the 2018 amendment.  (D.I. 162-1, Ex. 4).  Plaintiff argues the

2022 Amendment's replacement of the non-assertion clause language with the word "RESERVED" serves as evidence of abandonment.  (D.I. 161 at 3–4).  Plaintiff further asserts this change should be considered a novation.  (*Id.*).

  None of Plaintiff's cited evidence supports a finding of abandonment.  Defendant's announcement that it removed the non-assertion clause in its "AWS Customer Agreement" does not support an inference that Defendant abandoned the non-assertion clause in the "AWS Enterprise Customer Agreement," an entirely different agreement, between Defendant and Boeing.  Defendant's response to the 2019 Letter does not indicate that Defendant took any position on whether it had a license; rather the response appears to be a generic corporate reply to allegations of infringement.  The 2022 Amendment has an effective date of February 28, 2022 and states, "The term of this Agreement will commence on the Effective Date."  (D.I. 162-1, Ex. 4, at 1; *id.* § 6.1).  The contract language makes clear that the 2022 Amendment only governs going forward from February 28, 2022.  Plaintiff identifies no language in the 2022 Amendment that suggests Boeing and Defendant intended the amendment to have a retroactive effect.

  There is no indication that Defendant and Boeing intended the 2022 Amendment to be a novation of Boeing's obligations under the non-assertion clause.  "Novation has been described as a mutual agreement among all parties concerned for discharge of a valid existing obligation by the substitution of a new, valid obligation on the part of the debtor or another."  *Peterson Power Sys., Inc. v. Turner Logistics, LLC*, 141 Wash. App. 1021, 2007 WL 3245259, at *4 (2007).  "To effect a novation there must be a clear and definite intention on the part of all concerned that novation is the purpose of the agreement, for it is a well settled principle that novation is never to be presumed."  *Id.*  "To find novation, a court requires clear and satisfactory proof of a clear and definite intention on the part of all concerned."  *Id.* (internal quotations and citations omitted).

"A novation is simply a substitution." *Pabst v. Hardwick*, 105 Wash. App. 1028, 2001 WL 293184, at *3 (2001) (citing *MacPherson v. Franco,* 34 Wash. 2d 179, 182 (1949)). "Between the same parties, a novation substitutes a new obligation for an old one." *Id.* "The elements are: the necessary parties, a valid prior obligation to be displaced by the new obligation, consideration, and mutual agreement." *Id.*

The contract makes clear that the 2022 Amendment is effective going forward from February 28, 2022 and does not affect pre-existing obligations. Furthermore, for novation to occur, there must be "a valid prior obligation to be displaced by the new obligation." *Pabst*, 105 Wash. App. 1028, 2001 WL 293184, at *3. While Boeing might have had prior obligations regarding patents it still owned as of the date of the 2022 Amendment, the asserted patents were sold to Plaintiff in 2014. Boeing had no valid prior obligation regarding the asserted patents under the non-assert clause. Plaintiff points to no case law that suggests that novation can alter obligations possessed by third parties not involved in the contractual relationship. Rather, Plaintiff appears to be a necessary party to a novation affecting its obligations regarding the asserted patents.

For the stated reasons, I find no reasonable jury could have found the non-assertion clause was abandoned or was subject to novation.

### b. Lack of Consideration

Plaintiff argues the non-assert clause is unenforceable due to lack of consideration. (D.I. 161 at 4). Plaintiff focuses on the fact that the "AWS Enterprise Customer Agreement" is a "form agreement" that offers no "special pricing" in exchange for Boeing's obligation not to assert its patents. (D.I. 161 at 5–6).

Plaintiff is incorrect that Boeing received no consideration.  Boeing gained, among other benefits, the right to access the Services provided by Defendant.  (*See* D.I. 149-1, Ex. 3 § 2.1). To the extent that Plaintiff is asking that I find the rate paid under the 2010 Agreement should have been lower because of Boeing's large patent portfolio, such an inquiry would be inappropriate.  *See Browning v. Johnson*, 70 Wash. 2d 145, 147 (1967) ("Where the consideration is legally sufficient, the courts are loath to inquire into its 'adequacy,' that is, into the comparative value of the promises and acts exchanged.").  If Boeing thought it was not receiving adequate consideration, the company and its team of experienced lawyers had, and should have taken, the opportunity to negotiate the contract terms.

### c.  Ambiguity

Plaintiff argues the language of the non-assertion clause is ambiguous because there are two possible interpretations as to the scope of the infringing use covered.  (D.I. 161 at 6; Hearing Tr. at 21:23–23:21).  Plaintiff proposes an interpretation of the non-assertion clause that prohibits Boeing from "assert[ing] or assist[ing] others in asserting infringement claims that are based on Boeing's own use of AWS services."  (D.I. 161 at 6).

Whether a contract provision is ambiguous is a question of law.  *Stranberg v. Lasz*, 115 Wash. App. 396, 402 (2003).  "A provision is not ambiguous merely because the parties suggest opposing meanings."  *Id.* (citing *Mayer v. Pierce County Med. Bureau, Inc.*, 80 Wash. App. 416, 420 (1995)).  "If a contract provision's meaning is uncertain or is subject to two or more reasonable interpretations after analyzing the language and considering extrinsic evidence (if appropriate), the provision is ambiguous."  *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wash. App. 706, 713 (2014).  There is a "high standard of clarity for exculpatory clauses: although such clauses are enforceable in commercial transactions, the law disfavors promises not

to sue in the future." *United Emps. Ins. Co. v. Mentor*, 1996 WL 509559, at *2 (Wash. Ct. App. Sept. 9, 1996).

To assist in determining the meaning of contract language, Washington courts apply "the context rule." *Id.* (citing *Berg v. Hudesman*, 115 Wash. 2d 657, 666–69 (1990)). "This rule allows examination of the context surrounding a contract's execution, including the consideration of extrinsic evidence to help understand the parties' intent." *Id.* (citing *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 502 (2005)). "Washington courts focus on objective manifestations of the contract rather than the subjective intent of the parties; thus, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." *Brogan & Anensen LLC v. Lamphiear*, 165 Wash. 2d 773, 776 (2009) (en banc) (citing *Hearst*, 154 Wash. 2d at 504).

"Extrinsic evidence is to be used to determine the meaning of specific words and terms used and not to show an intention independent of the instrument or to vary, contradict or modify the written word." *Viking Bank*, 183 Wash. App. at 713 (quoting *Hearst,* 154 Wash. 2d at 503) (cleaned up). "If relevant for determining mutual intent, extrinsic evidence may include (1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties." *Hearst*, 154 Wash. 2d at 502 (citing *Berg*, 115 Wash. 2d at 663).

I find, even after accounting for the higher clarity standard for exculpatory clauses, that the language of the non-assertion clause is unambiguous with respect to the scope of the infringing use covered. Boeing agreed it will not "authorize any third party to assert, against AWS . . . any patent infringement claim with respect to any Services that Company elects to

13

use." (D.I. 149-1, Ex. 3 § 7.6).  The provision's language contains no hint that the clause

contains an additional limitation specifying that the non-assertion clause only applies to patent

infringement claims based on infringing use stemming from Boeing's use of Defendant's

Services.[5]  Plaintiff fails to offer evidence that its interpretation is a reasonable interpretation of

the contract language.  In its briefing, Plaintiff focuses on the phrase "with respect to any

Services that Company elects to use."  (D.I. 161 at 6).  A facial reading of this language shows

that the phrase expresses a limitation about which Services are subject to the non-assertion

clause.  Beyond Plaintiff's conclusory assertion, it does not explain how this phrase also includes

the limitation that Boeing only promised not to assert or assist others in asserting infringement

actions based on Boeing's own use of AWS services.

      Plaintiff's extrinsic evidence, which focuses on the circumstances of the contract, does

not support its interpretation.  Plaintiff asserts that both parties are large, sophisticated

companies, that the agreement was a form agreement, and that the purpose of the agreement was

to purchase cloud services, not to give a broad portfolio license to Boeing's entire patent

_____

[5] Plaintiff cites two articles as evidence that the public criticized the "abusive nature and the
serious ambiguities" of a similar provision in a different set of Defendant's contracts.  (*See* D.I.
161 at 6 (citing D.I. 162-1, Exs. 1–2)).  The articles provide no analysis regarding contract
language.  The single line which might suggest the non-assertion clause has multiple
interpretations does not indicate which part of the clause is subject to multiple interpretations or
what those multiple interpretations might be.  (D.I. 162-1, Ex. 2 ("Depending on how a court
interpreted the clause, this could have allowed AWS to expand into virtually any customer's
market without having to worry if it was violating patents, and prevent customers from asserting
their patents against a hypothetical suit filed by AWS.")).  Furthermore, rather than asserting
ambiguity, the article writer appears to be attempting to remain conservative in his assertions by
not ruling out the possibility of a court finding a different reading.  The author interprets the
contract language as "appear[ing] to give AWS the right to deflect patent lawsuits filed by
current and former customers—no matter the amount of services they had used during their
business relationship with AWS—until the end of time."  (*Id.*).  I do not rely upon the author's
interpretation.

portfolio.  (Hearing Tr. at 20:24–24:14; D.I. 161 at 7–8).  Plaintiff fails to explain how these circumstances show that the "specific words and terms" it has identified incorporates the limitation it suggests.  *Viking Bank*, 183 Wash. App. at 713.  Rather than suggesting that the extrinsic evidence supports its proposed interpretation, Plaintiff's argument appears to be that the extrinsic evidence demonstrates that the parties intended the agreement to be generally "narrower" than it is on its face.[6]  Based on the evidence in the record, no reasonable jury could find that Plaintiff's proposed reading is a reasonable interpretation of the non-assertion clause language.

I am furthermore unconvinced that the extrinsic evidence supports Plaintiff's position that the parties had a mutual intent to pursue a "narrower" contract beyond the limitations expressly stated in the contract.  The "objective manifestations of the contract," the "actual words used," suggest the parties' intent to limit the non-assertion clause's scope based on which Services Boeing used.  *See Brogan*, 165 Wash. 2d at 776.  Plaintiff argues that the definition of "Service" allows Defendant to unilaterally change the scope of the non-assertion clause by updating its website to change the web services covered by the contract.  (D.I. 161 at 8).  The non-assertion clause's scope and Defendant's ability to alter the scope seem to be appropriately limited by Boeing's choice to elect usage of Defendant's Services.  This limitation also appears to reasonably tie the non-assertion clause to the purpose of the contract by allowing Defendant to

---

[6] For instance, one of Plaintiff's repeated criticisms is that it would not make sense for Boeing to give Defendant license rights to its "tens of thousands of patents."  (Hearing Tr. at 20:24–24:12).  Even under Plaintiff's interpretation, however, for Boeing's use of a particular service, Boeing would still be giving Defendant a license to its entire patent portfolio.  Plaintiff's arguments appear to be focused less on interpreting the contract language and more based on adequacy of the consideration or unconscionability.  *See Tadych v. Noble Ridge Constr., Inc.*, 200 Wash. 2d 635, 641 (2022) ("We have defined substantive unconscionability as an unfairness of the terms or results." (internal quotations omitted)).

offer Services to Plaintiff in exchange for Plaintiff agreeing not to pursue patent infringement

claims related to those Services.  The parties' use of a form agreement similarly does not provide

sufficient basis to discount the clear language of the contract.  That the agreement was a form

agreement did not stop the parties from altering their agreement multiple times since 2010.  (*See*

D.I. 162-1, Ex. 4; D.I. 179-1, Exs. 54–56).   Boeing, a Fortune 500 company, had the ability to

negotiate the contract terms if it so desired.

I find the non-assertion clause is susceptible to only one reasonable interpretation.  *Hall*

*v. Custom Craft Fixtures, Inc.*, 87 Wash. App. 1, 9 (1997) ("[S]ummary judgment is proper if the

parties' written contract, viewed in light of the parties' other objective manifestations, has only

one reasonable meaning.").  The clause is not limited to patent infringement claims based on

infringing use resulting from Boeing's own use of Defendant's Services.

### d.  Failure to Produce the 2022 Amendment

Plaintiff argues Defendant should be precluded from relying on the 2010 Agreement

because Defendant failed to produce the 2022 Amendment or any discovery relevant to

abandonment.[7]  (D.I. 161 at 9).  Plaintiff effectively seeks discovery sanctions at the summary

judgment phase.  Plaintiff should have made this request earlier—it is too late to do so now.[8]

---

[7] I note that Plaintiff never filed a motion to strike; its position is only detailed in its answering
brief to Defendant's motion.

[8] Plaintiff claims it became aware of the 2022 Amendment after receiving the summary judgment
papers and because Plaintiff's counsel also served as counsel for Boeing.  (Hearing Tr. at 26:16–
25).  Assuming that Plaintiff's counsel could not have obtained these agreements earlier even
with proper due diligence, that suggests Plaintiff found the 2022 Amendment, at the latest, by
mid-June when it filed its answering brief.  September 23rd, the date trial is scheduled to begin,
was still three months away.  Plaintiff could have, and should have, raised the discovery issue to
the Court when there was still plenty of time to pursue any necessary remedial actions.

Furthermore, I do not think Defendant's nondisclosure of the 2022 Amendment was improper.  Plaintiff's request was for "[a]ll Documents, communications and things relating to Your defenses of . . . express or implied license . . . and other equitable defenses." (D.I. 162-1, Ex. 6, at 73).  As stated above, I agree that the 2022 Amendment, which was executed eight years after the patents were sold to Plaintiff, provides no support for abandonment of the non-assertion clause.  Plaintiff has not demonstrated Defendant failed to properly respond to the production request.

### e.  Usage of Defendant's Services

#### i.  Relevant Usage Under the Non-Assertion Clause

Plaintiff maintains that only usage of Defendant's Services by Boeing, as opposed to usage by Boeing affiliates, triggers the non-assertion clause.  (D.I. 161 at 12).  The non-assertion clause bars infringement actions related to "any Services that Company elects to use." (D.I. 149-1, Ex. 3 § 7.6).  Plaintiff argues that because "Company" is defined as "The Boeing Company," rather than "The Boeing Company and Boeing Affiliates," only Boeing's usage is relevant. (Hearing Tr. at 15:20–19:15, 36:13–37:2).

On March 1, 2013, Plaintiff and Boeing executed "Amendment No. 1 to AWS Enterprise Customer Agreement" ("the March 2013 Amendment") which added a new section to the 2010 Agreement:

> **2.6 Affiliates.** Any Company Affiliate (as defined below) AWS Account covered under Exhibit 2.6 to this Agreement may use the Service Offerings under the terms of this Agreement.  Company represents and warrants that it has the full power and authority to enter into this Agreement and legally bind each Company Affiliate to the terms of this Agreement.  Each Company Affiliate will be deemed to have entered into a separate agreement with AWS under the same terms and conditions as this Agreement and, for purposes of this separate agreement (other than this Section 2.6 and Section 9.1(d)), will be considered "Company." If, at any time during the term of this Agreement, a Company Affiliate no longer meets the definition of "Company Affiliate", that Company Affiliate and that Company

17

Affiliate's AWS accounts will no longer be covered under this Agreement (in the absence of any other agreement between the former Company Affiliate and AWS, any accounts of such former Company Affiliate will be governed by the AWS Customer Agreement). Company and each Company Affiliate will be joint and severally liable under this Agreement and the separate agreement between AWS and the Company Affiliate.  For purposes of this Section 2.6, the defined term "Company Affiliate" means any entity that directly or indirectly controls, is controlled by or is under common control with Company.[9]

(D.I. 171-1, Ex. 54 § 1).

Plaintiff maintains that "Company" only covers Boeing affiliates for purposes of the "separate agreements."  (D.I. 195 at 2 of 5).  Plaintiff argues that Boeing therefore does not have any obligations under the non-assertion clause based on affiliate use.  (*Id.*).  Plaintiff also argues that, because Boeing was the owner of the asserted patents up until the sale to Plaintiff, the separate contracts had no impact on Boeing's ability to enforce the asserted patents.  (*Id.*).

Defendant notes that the amendment (1) allows Boeing affiliates to use Defendant's Services under the terms of the 2010 Agreement, (2) legally binds Boeing affiliates to the terms of the agreement, (3) states Boeing and Boeing affiliates are to be jointly and severally liable for

---

[9] Plaintiff notes that Defendant did not identify the amendment as part of its license defense in its interrogatory responses.  (D.I. 195 at 3 of 5).  Plaintiff argues that, because of Defendant's failure to identify the March 2013 Amendment in its interrogatory response, neither party conducted any discovery into the March 2013 Amendment.  (*Id.*).  Plaintiff also notes that Defendant did not cite to the March 2013 Amendment in its original briefing.  (*Id.*).  I do not agree that Defendant's failure to cite to the amendment demonstrates that it "viewed [the March 2013 Amendment] as notable in not impacting its license defense." (*Id.* (emphasis omitted)).  The March 2013 Amendment appears to be relevant only as a response to Plaintiff's rebuttal of the non-assertion clause defense.  Defendant, in writing its opening brief or in drafting its interrogatory response, is not required to anticipate and preemptively respond to every single one of Plaintiff's responsive arguments.  The argument based on the March 2013 Amendment is not an "undisclosed ground" for Defendant's defense.  In addition, Plaintiff's answering brief addresses the issue in a rather cursory manner near the end of a section focused on whether Defendant's proffered spreadsheets are admissible as business records.  (*See* D.I. 161 at 11–12).  I do not think it unfair to allow Defendant to rely on the March 2013 Amendment.  In any event, I think consideration of the March 2013 Amendment imposes minimal prejudice on Plaintiff as it was previously produced to Plaintiff and the parties have been given an opportunity to present arguments through supplemental letter briefing.  (*See* D.I. 191, 194, 195).

both the 2010 Agreement and any separate agreement, and (4) that Exhibit 2.6 to the March 2013 Amendment provides for "Company Affiliate AWS Accounts" which are governed by the terms of the 2010 Agreement.  (D.I. 194 at 1; *see* D.I. 171-1, Ex. 54 §§ 1–2; *id.* at Ex. 2.6).  Defendant argues that this language demonstrates that the terms of the 2010 Agreement apply to both Boeing and Boeing affiliates.  (D.I. 194 at 1).

I believe the contract language is ambiguous.  On its face, the contract language only defines "Company" to refer to each Boeing affiliate for the purposes of the separate agreements. Several lines in Section 2.6 suggest, however, that Boeing and Defendant intended Boeing affiliates gain the benefits and obligations provided for under the 2010 Agreement.

Neither party cites to any extrinsic evidence to support construing the 2013 Amendment. "Interpreting a contract provision is a question of law when … the interpretation does not depend on the use of extrinsic evidence."  *Spectrum Glass Co. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 129 Wash. App. 303, 311 (2005).  I therefore take on the role of interpreting the contract terms.

I agree with Plaintiff's reading of the 2013 Amendment.  Section 2.6 makes clear that that "Company" refers to each Boeing affiliate for the purposes of the separate agreements.  The provision is silent on alterations to the definition of "Company" in the 2010 Agreement, suggesting the meaning of "Company" in the 2010 Agreement was not modified to incorporate Boeing affiliates.  Furthermore, the 2013 Amendment creates separate agreements to govern Defendant's relationship with each Boeing affiliate "under the same terms and conditions as this Agreement."  It therefore would be generally redundant for each Boeing affiliate also to qualify as part of "Company" under the terms of the 2010 Agreement.

The remainder of Section 2.6 can be reconciled with this reading.  Boeing and Boeing affiliates' joint and several liability and Boeing's representation that it can legally bind each affiliate merely serve to guarantee accountability under the contract.  The 2013 Amendment's recognition of Company Affiliate AWS Accounts likewise does not indicate whether the 2010 Agreement or the separate agreements govern Defendant's relationship with each Boeing affiliate.  I do not think that Section 2.6's statement that Boeing affiliates will be permitted to "use the Service Offerings under the terms of this Agreement" demonstrates that the Boeing affiliates fall within the definition of "Company" in the 2010 Agreement.  Rather, this sentence appears to describe the purpose of the newly added provision.  That purpose is served through the recognition of the separate agreements between Boeing affiliates and Defendant which allow Boeing affiliates to use Defendant's Services under the same terms set forth in the 2010 Agreement.

I conclude that the meaning of "Company" in the 2010 Agreement is not altered by the 2013 Amendment.  It follows that the 2010 Agreement's non-assertion clause does not bar infringement actions based on Boeing affiliates' uses of Defendant's Services.[10]  Only Boeing's own use of Defendant's Services triggers the non-assertion clause.  I note this conclusion is consistent with the law's wariness of exculpatory clauses.  *See Mentor*, 1996 WL 509559, at *2.

### ii.    Evidence Demonstrating Usage

Defendant relies on spreadsheets, which purportedly summarize data pulled from its financial system, and testimony regarding those spreadsheets as its evidence to prove usage of

---

[10] It appears undisputed that Boeing owned all asserted patents prior to the 2014 sale to Plaintiff. (*See* D.I. 148 at 4; D.I. 195 at 2 of 5).

VPC, EC2, and CloudFront by Boeing in the relevant timeframe.[11]   (*See* D.I. 148 at 4 n. 8 (citing D.I. 149-1, Exs. 5–8)).   Plaintiff argues that Defendant does not have admissible evidence to demonstrate usage because Defendant's spreadsheets were "created solely for the purpose of this litigation" and do not establish that Boeing, as opposed to Boeing affiliates, used Defendant's Services.[12]   (D.I. 161 at 11–12).

The parties do not dispute that Defendant has financial information that would be admissible pursuant to the business records exception.   *See* FED. R. EVID. 803(6).   They do dispute whether the spreadsheets qualify as business records or are otherwise admissible.   (*See id.*; D.I. 170 at 2–3; Hearing Tr. at 6:20–8:15, 17:19–20:13).   Defendant asserts that the

---

[11] Defendant does not assert that Boeing used any of the other accused products.  (D.I. 148 at 8).  I agree with Defendant that the non-assertion clause would nevertheless also bar infringement claims against Lambda, EKS, GameLift, and Luna as they are accused of infringement based solely on their use of VPC.  (*See infra* Section III.A.6.a).

[12] At oral argument, Plaintiff's counsel also argued that what Defendant's records labelled as "VPC" could be different from the "VPC" accused of infringement because the technology evolved over time.  (Hearing Tr. at 19:19–20:13).  More specifically, he argued that "what Boeing was using in 2010, 2011 before the infringement even started, before the product was changed and began infringing" is different from the accused "VPC."  (*Id.*).  Defendant's spreadsheets, however, include usage well past the alleged date of first infringement in 2011; such recorded usage would be of the "evolved VPC" containing the allegedly infringing functionality.  (*See* D.I. 149-1, Exs. 5–6; *see* D.I. 211-1, Sch. A ¶ 22, at 2 of 200 (noting, as a joint statement of admitted fact, that "[t]he hypothetical negotiation would have occurred in August 2011, which is the date Acceleration Bay contends AWS's infringement began")).  Furthermore, Plaintiff's counsel did not identify any evidence in the record supporting his assertion at oral argument, nor am I aware of any.  Plaintiff's answering and supplemental letter briefing did not raise this assertion and therefore also did not identify any supporting evidence.  Plaintiff's assertion that the accused "VPC" is different from the "VPC" in Defendant's records appears to be mere attorney argument.  *See Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony."); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1562 (Fed. Cir. 1995) ("There must be sufficient substance, other than attorney argument, to show that the issue requires trial.").

deposition testimony of Mr. Gasper, Defendant's Finance Director, authenticates the spreadsheets as business records.  (D.I. 170 at 2–3 (citing D.I. 171-1, Ex. 51); Hearing Tr. at 7:3–15; *see* D.I. 149-1, Exs. 5–6).  After reviewing the deposition testimony available in the record, I conclude that Defendant has not established the admissibility of the records at issue.[13]

In addition, I agree with Plaintiff that Defendant has not produced evidence that links the account IDs in Defendant's spreadsheets to particular companies within the Boeing family.  (D.I. 161 at 12; *see* D.I. 149-1, Exs. 5–6).  I conclude a genuine dispute exists as to whether Defendant has demonstrated that Boeing, as opposed to one of its affiliates, used Defendant's Services.

For both of the reasons stated, I cannot find that Boeing used VPC, EC2, and CloudFront in the relevant timeframe.  *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n. 1 (3d Cir. 1996).  ("Courts may only consider evidence 'capable of being admissible at trial' in adjudicating a motion for summary judgment.").  I therefore cannot find that Plaintiff is barred from enforcing the asserted patents against VPC, EC2 and CloudFront by the 2010 Agreement's non-assertion clause.

### 3.   Relevant Damages Period

Defendant maintains that Plaintiff should be limited to damages from July 6, 2022, the date that it filed its Complaint, onwards.  (D.I. 148 at 11).  Plaintiff submits it is entitled to damages starting from March 13, 2019 based on its sending Defendant the 2019 Letter.  (D.I. 161 at 13; D.I. 149-1, Ex. 9, at 337 of 506). The parties dispute whether the 2019 Letter provides actual notice of Defendant's alleged infringement.

---

[13] My conclusion is based on the record before me at summary judgment.  I express no opinion regarding the admissibility of the spreadsheets at trial.  I expect to discuss this topic at the pretrial conference.

"[T]he purpose of the actual notice requirement is met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice may be an infringer." *SRI Int'l, Inc. v. Advanced Tech. Lab'ys, Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997). Actual notice "is satisfied when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *Id.* "Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994).

This standard does not require the patentee to make an "unqualified charge of infringement." *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1345–46 (Fed. Cir. 2001). "It is not controlling whether the patentee threatens suit, demands cessation of infringement, or offers a license under the patent." *SRI*, 127 F.3d at 1470. "Under this standard, general letters referring to the patent and including an admonishment not to infringe do not constitute actual notice" while "letters that specifically identify a product and offer a license for that product do constitute actual notice." *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1376 (Fed. Cir. 2008) (citing *Amsted*, 24 F.3d at 187; *Gart*, 254 F.3d at 1346).

The 2019 letter reads:

Our analysis of our patent portfolio and Amazon.com & Amazon Web Service's CloudFront Content Delivery Network (CDN) indicates direct use of Acceleration Bay patented technologies.

At minimum, Amazon requires a license to US 6,714,966 entitled Information Delivery Service and the other patented technologies in the table below [which is titled "Patents Infringed by Amazon, Amazon Web Services, AWS CloudFront" and which includes the '966, '147, '634, and '069 patents] . . . .
. . . .
According to http://aws.amazon.com/CloudFront:

23

Amazon CloudFront is a fast content delivery network (CDN) service that securely delivers data, videos, applications, and APIs to customers globally with low latency, high transfer speeds, all within a developer-friendly environment. CloudFront is integrated with AWS – both physical locations that are directly connected to the AWS global infrastructure, as well as other AWS services.



Furthermore, Amazon operates the Amazon CloudFront Global Edge Network to deliver content to end users with lower latency, Amazon CloudFront uses a global network of 166 Points of Presence (155 Edge Locations and 11 Regional Edge Caches) in 65 cities across 29 countries.

. . . .

We believe Amazon's CloudFront Content Networks Delivery services are utilizing Acceleration Bay's patented technologies.

. . . .

We look forward to your working with Amazon on a business solution, and we thank you in advance for your prompt attention to this matter.

(D.I. 149-1, Ex. 9, at 337–339 of 506).  It appears undisputed that the letter does not identify the

'344 patent.  (*See* D.I. 148 at 11; D.I. 161 at 13–16).

### a.  Accused Products

Defendant argues the 2019 Letter fails to identify specific accused products aside from

CloudFront.  (D.I. 148 at 11).  Plaintiff claims the 2019 Letter "makes clear that AWS'

infringement goes beyond CloudFront, referencing AWS as a whole, including through its integration 'with AWS—both physical locations that are directly connected to the AWS global infrastructure, as well as other AWS services.'"  (D.I. 161 at 13 (quoting D.I. 149-1, Ex. 9 at 338 of 506)).  Plaintiff points to the letter "listing the family of Asserted Patents as 'infringed by Amazon, Amazon Web Services, [and] AWS CloudFront" and to the diagram of CloudFront, which it argues "identifies the underlying structure supporting CloudFront's content delivery," as providing notice that it was accusing the VPC products.  (D.I. 161 at 14).

Plaintiff's position that it can accuse products by "referencing AWS as a whole" would render the requirement to identify "specific accused products" meaningless.  Furthermore, no reasonable jury could find that Plaintiff has identified VPC as an accused product.  VPC is only mentioned, in barely legible font,[14] in the diagram that functions as part of Plaintiff's recitation of CloudFront's functionality and its importance within Defendant's ecosystem of products.  In contrast to the letter's repeated insistence that CloudFront utilizes Plaintiff's patented technologies, there is no indication that CloudFront's underlying infrastructure or VPC are also independently accused of infringement.

Plaintiff's argument appears to be based on the position that "[w]hen an Amazon engineer looks at that diagram, they know that that's talking about VPC Peering."  (Hearing Tr. at 73:19–21).  Plaintiff's position runs afoul of established case law.[15]  "It is irrelevant . . . whether the defendant knew of the patent or knew of his own infringement."  *Amsted*, 24 F.3d at 187.  "The correct approach to determining notice under section 287 must focus on the action of

---

[14] I cannot accurately reproduce the degree of legibility.

[15] Plaintiff's assumption that an Amazon engineer would have understood that VPC (and Transit Gateway) were being accused based on the diagram also seems dubious.

the patentee, not the knowledge or understanding of the infringer." *Id.*; *see also Gart v. Logitech, Inc.*, 254 F.3d 1334, 1346 (Fed. Cir. 2001) ("[W]hether or not the alleged infringer subjectively believed that the patentee's letter was a charge of infringement has no bearing on the adequacy of notice."). Plaintiff's failure to properly identify accused products cannot be salvaged by what it claims Defendant's engineers would have understood from a diagram in the letter. The 2019 Letter fails to identify VPC as a specific accused product and fails to affirmatively communicate a specific charge of infringement against VPC.

Plaintiff argues the letter identifies Transit Gateway because "Transit Gateway is an additional way to connect VPCs." (Hearing Tr. at 75:4–18). This claimed identification of Transit Gateway is even more attenuated than that of VPC. The connection is made even weaker by the fact that Plaintiff does not allege that CloudFront infringes through the use of Transit Gateway. (*See* D.I. 149-1, Ex. 1 at 3). The 2019 Letter fails to name Transit Gateway as an accused product and fails to affirmatively communicate a specific charge of infringement against Transit Gateway.

### b. Specific Charge of Infringement

Defendant maintains the 2019 Letter did not make any specific charge of infringement against CloudFront. (D.I. 148 at 13).

I start by addressing Defendant's argument that Plaintiff is estopped from arguing that the 2019 Letter makes a specific charge of infringement. (*Id.* at 14). As a result of receiving a similar letter from Plaintiff, Epic Games filed an action seeking declaratory judgment of noninfringement. (*See* D.I. 149-2, Ex. 27; *Epic Games, Inc. v. Acceleration Bay LLC*, No. 19-cv-4133 (N.D. Cal.)). Plaintiff moved to dismiss, arguing that its letters were "superficial communications" that did not explain "what claims Epic allegedly infringes, or which patents or

26

claims are supposedly infringed by each of the games named in the letters."  (D.I. 149-2, Ex. 28 at 6).  Defendant argues that Plaintiff should be estopped from taking the opposing position with respect to the 2019 Letter.  (D.I. 148 at 14).  Defendant's arguments fail as a matter of law because the court in *Epic Games* declined to dismiss the case.  (*See* D.I. 149-2, Ex. 29; *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) ("[I]n our Circuit judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position.")).

The 2019 Letter claims that CloudFront uses Plaintiff's patented technologies, includes a table listing "Patents Infringed by . . . CloudFront," and states that "Amazon requires a license" to the patents listed in that table.  The letter provides sufficient notice that CloudFront faces accusations of infringement.

For the reasons stated, I find the 2019 Letter provides actual notice of infringement of the '966, '147, '634, and '069 patents by CloudFront.  The 2019 Letter fails to provide actual notice of infringement by the other accused products and for infringement of the '344 patent.  Where actual notice was not given, Plaintiff is limited to seeking damages from July 6, 2022 onwards.

### 4. Willful Infringement

Defendant moves for summary judgment of no willful infringement.

"A finding of willful infringement requires knowledge of both the patent and its infringement of the patent."  *Intuitive Surgical, Inc. v. Auris Health, Inc.*, 549 F. Supp. 3d 362, 377–78 (D. Del. 2021).  A determination of willfulness requires a finding of "deliberate or intentional" infringement.  *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021), *cert. denied*, 142 S.Ct. 2732 (2022); *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020).  A finding of "subjective willfulness," proof that the

defendant acted in the face of a risk of infringement that was "either known or so obvious that it should have been known to the accused infringer," can satisfy this standard. *WesternGeco LLC v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) (quoting *Halo Elecs. Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 101 (2016)) (internal quotations omitted), *rev'd on other grounds*, 585 U.S. 407 (2018).

Plaintiff's willful infringement claim relies on the 2019 Letter. (*See* D.I. 161 at 18). Given my findings on the notice provided by the 2019 Letter, I grant summary judgment of no willful infringement as to the non-CloudFront products and for the '344 patent. The 2019 Letter provides actual notice of infringement of the other four patents by CloudFront. Viewing the 2019 Letter and the other evidence in the light most favorable to Plaintiff, as I must, I believe a triable issue as to willfulness exists. I deny Defendant's motion with respect to CloudFront's infringement of the '966, '147, '634, and '069 patents.

### 5. BigMac and HyperPlane Damages Theories

Plaintiff accuses VPC of infringement based on "VPC Peering," a feature that enables connections between VPCs, and based on "BigMac," an underlying network service. (*See* D.I. 161 at 20; D.I. 149-1, Exs. 12, 15). Plaintiff accuses Transit Gateway of infringement based on "HyperPlane," an underlying network service.[16] (*See* D.I. 161 at 20; D.I. 149-1, Ex. 21).

Defendant seeks to preclude Plaintiff from presenting damages theories based on BigMac or HyperPlane (but not VPC Peering) on the basis that Plaintiff's apportionment expert, Dr.

---

[16] In its supplemental letter briefing, Plaintiff asserts that HyperPlane is a different name for Transit Gateway. (D.I. 192 at 2–3 of 4). As Plaintiff and Defendant both described HyperPlane as intertwined but separate services in the original briefing, I will treat them as such. (*See* D.I. 148 at 7; D.I. 151 at 5–6; D.I. 161 at 20, 27–30; D.I. 170 at 12; *see also* D.I. 193 at 2). This distinction ultimately does not affect my conclusion.

Cole, did not apportion the value of BigMac or HyperPlane from VPC and Transit Gateway respectively.  (D.I. 148 at 29).  Defendant notes that, during his deposition, Dr. Cole testified that he did not attempt to isolate the value of Big Mac or HyperPlane.  (*Id.* (citing D.I. 149-1, Ex. 39 at 176:15–18, 213:16–21)).  Plaintiff argues that Dr. Cole did apportion damages based on the functionality of the infringing technologies.  (D.I. 161 at 30).  Plaintiff maintains that Dr. Cole identified these infringing functionalities based on Dr. Medvidović's analysis of BigMac and HyperPlane.  (*Id.* at 30–31).

"Where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citing *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)).  "When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features."  *Id.*

While Plaintiff's position regarding Hyperplane is difficult to pin down, I understand Plaintiff's position to be that all the accused functionality for Transit Gateway is attributable, in its entirety, to HyperPlane.  (*See* D.I. 161 at 30–31; D.I. 192 at 2–3 of 4).  This position appears consistent with Dr. Medvidović's analysis of the accused features.  (D.I. 162-1, Ex. 18 ¶¶ 201–07 (naming "HyperPlane Top-Top Forwarding," "Multicast on HyperPlane," and "HyperPlane's Health Layer" as the accused features)).  It follows that Dr. Cole's reliance on Dr. Medvidović's opinion inherently apportions HyperPlane features from other Transit Gateway features.  (*See* D.I. 149-2, Ex. 43 ¶¶ 163–74 (listing "Routing," "Multicast," and "Network Monitoring and Health Management" as the infringing functionality categories)).  I conclude that Plaintiff has disclosed a damages theory that apportions for the value of HyperPlane.

29

In regard to VPC, Plaintiff stated that "the value of the four [infringing] functions identified by Dr. Cole comes from both VPC Peering and BigMac."[17]  (D.I. 192 at 3 of 4).  Dr. Cole's identification of infringing functions therefore does not inherently separate BigMac features from other VPC features.  Dr. Cole testified that he did not independently isolate BigMac's value from the rest of VPC.  (D.I. 149-1, Ex. 39 at 176:15–18).  Plaintiff does not argue otherwise and does not identify any other point at which such apportionment might have occurred.  I find that Plaintiff's damages theory does not apportion for the value of BigMac.

This conclusion does not mean that Plaintiff's VPC damages theory, to the extent that it involves BigMac, should necessarily be excluded.  As Plaintiff claims the infringing functionality is entirely attributable to VPC Peering and BigMac (and Defendant does not suggest otherwise in its briefing), the apportionment principle is still satisfied if VPC is found to infringe based on both VPC Peering and BigMac.  Thus, preclusion is only proper in the scenario where one, but not the other, of these services is found to be a basis for infringement.  The matter of how the parties' arguments and witness testimony should be presented to a jury should be a topic for later discussion.

### 6.  Mr. Gunderson's Damages Opinion

#### a.  Revenue of non-VPC and non-Transit Gateway Products

Defendant seeks to exclude Mr. Gunderson's damages calculations for CloudFront, Lambda, EC2, EKS, and GameLift for relying on revenue unrelated to infringement.

---

[17] Defendant contends that Plaintiff's assertion "that the value of each function is 'simultaneously' attributable to both VPC and BigMac" is a new theory first disclosed in its supplemental letter briefing and unsupported by its experts' reports.  (D.I. 193 at 1).  Defendant argues that Plaintiff's experts should not be permitted to present this theory at trial.  (*Id.*).  While Defendant can reraise this issue at an appropriate time, I decline to address it now as it does not affect my conclusion regarding the motion at hand.  I also believe additional information and argument from the parties on the matter would be helpful.

Defendant tracks both "external revenue" and "internal revenue" generated by its products. External revenue comes from external users of Defendant's products. (Hearing Tr. at 112:5–114:12). Internal revenue is tracked, as a matter of accounting practice, based on the internal usage of VPC and Transit Gateway by Defendant's products and the products of its affiliates, such as Amazon. (*Id.*). Defendant argues that Mr. Gunderson, by relying on the external revenue of CloudFront, Lambda, EC2, EKS, and GameLift, fails to limit his damages calculation to those products' infringement through their internal use of VPC and/or Transit Gateway, which is already tracked through the internal revenue of VPC and Transit Gateway.[18] (D.I. 148 at 36).

The parties' dispute has little to do with Mr. Gunderson's analysis and instead centers on a disagreement over the infringement theories Plaintiff has timely disclosed. The parties agree that Plaintiff has alleged infringement based on Defendant's VPC and Transit Gateway products. (*See id.*; D.I. 161 at 36). Defendant maintains that Dr. Medvidović's opening report limited his allegations against CloudFront, Lambda, EC2, EKS, and GameLift to infringement through their use of VPC and/or Transit Gateway. (D.I. 148 at 36). Plaintiff maintains Dr. Medvidović opined that these five products infringe both through their use of VPC and/or Transit Gateway and based on independent functionality. (D.I. 161 at 36).

I agree with Defendant that Dr. Medvidović first alleges independent infringement by CloudFront, Lambda, EC2, EKS, and GameLift in his reply report. (*See* D.I. 162-1, Ex. 39 ¶¶ 200–212). While Dr. Medvidović's reply report cites back to sections of his opening report, the

---

[18] The parties initially framed this issue as one of double counting of damages. (*See* Hearing Tr. at 114:15–124:14). This dispute appears to go beyond double counting to encompass whether Mr. Gunderson calculates damages for functionality that falls outside Plaintiff's infringement theory. (*See id.* at 124:15–126:16). Regardless, these issues deal with the same underlying disagreement over Dr. Medvidović's disclosed infringement theories.

paragraphs cited do not disclose a theory of independent infringement.  Plaintiff's counsel

identified paragraph 195 of Dr. Medvidović's opening report as a representative example.

(Hearing Tr. at 129:15–130:4 (arguing that paragraph 195 shows "GameLift's infringement goes

beyond this internal use of VPC.  GameLift provides infringing 'gaming application services and

broadcast channels for gaming applications.'")).  The relevant portion of paragraph 195 reads:

> As another example, GameLift also uses VPCs peering directly and to provide
> gaming application services and broadcast channels for gaming applications.  AB-
> AWS_011654-973 at 11814-818 (explaining, *inter alia*, that GameLift can "use
> [VPC] peering connections to enable [customer] game services to communicate
> directly and privately with [the customer's] other AWS resources"); Byskal Tr. at
> 17:4-17:16 ("GameLift will create – for every deployment . . . what we call . . . a
> VPC").

(D.I. 162-1, Ex. 18 ¶ 195 (alterations in original)).  This sentence does not show that Dr.

Medvidović opined that GameLift has non-VPC related functionality that allows it to "provide

gaming application services and broadcast channels for gaming applications."  Rather, Dr.

Medvidović opines that GameLift uses VPC Peering directly, but also uses VPC Peering to

provide the other described services.  That the referenced functionality is a product of VPC

Peering is confirmed by the citation parentheticals.  Plaintiff's position is further undermined by

its infringement contentions which only describe the accused products as infringing through the

use of VPC and/or Transit Gateway.  (D.I. 149-1, Ex. 1 at 3).

The only infringement theories that Dr. Medvidović disclosed in his opening report, and

that Plaintiff will be permitted to rely on at trial, are those based on use of VPC and/or Transit

Gateway.  *See HSM Portfolio LLC v. Elpida Mem., Inc.*, 2016 WL 552543, at *2 (D. Del. Feb.

11, 2016) ("Plaintiffs should not be permitted to advance a new infringement theory in their

reply report." (citing Fed. R. Civ. P. 26(a)(2)(D)(ii); *MobileMedia Ideas, LLC v. Apple, Inc.*,

2012 WL 6019305, at *1 (D. Del. Dec. 3, 2012))).  Plaintiff raises no other arguments in

response to Defendant's challenge to Mr. Gunderson's damages theory.  I will exclude Mr. Gunderson's opinion to the extent that it relies on the external revenues of CloudFront, Lambda, EC2, EKS, or GameLift.

### b.   Reliance on Jury Verdict

Mr. Gunderson issued a supplemental report which discusses the damages awarded in a recent trial between Plaintiff and a different defendant.  (*See* D.I. 149-2, Ex. 49; *Acceleration Bay LLC v. Activision Blizzard Inc.*, C.A. No. 16-453, D.I. 858 (D. Del. May 3, 2024)). Defendant moves to exclude Mr. Gunderson's report on the basis that its reliance on this jury verdict was improper.  (D.I. 148 at 39).  For the reasons stated at oral argument, I agree that Mr. Gunderson's supplemental report should be excluded, as the probative value of the recent jury verdict, if any, is substantially outweighed by the risk of unfair prejudice.  (Hearing Tr. at 110:10–11:3).

### 7.   Dr. Cole's Apportionment Opinion

Defendant moves to exclude the opinion of Plaintiff's apportionment expert, Dr. Cole. Defendant argues that Dr. Cole based his opinions on accused products' features that existed only after the end of the damages period and that Dr. Cole failed to apply his own stated methodology.

Dr. Cole relied on documentation from Defendant's website to determine the features that were present in the accused products.  (D.I. 148 at 30; D.I. 161 at 33; D.I. 149-2, Ex. 39 at 185:4–7).  Defendant argues that Dr. Cole relied on document versions that existed after the damages period ended in 2022.  (D.I. 148 at 30–31).  Plaintiff does not dispute Dr. Cole's reliance on such documents.  (D.I. 161 at 33).  Plaintiff instead maintains that there were no relevant changes in functionality after the damages period expired, noting that Dr. Cole testified

that he saw no evidence of material changes in functionality based on his review of the record, including technical documents, deposition testimony, and source code.  (*Id.* (citing D.I. 162-1, Ex. 25 at 188:5–14, 333:9–18)).  The primary debate appears to be over an underlying factual dispute about whether certain features existed during the relevant damages period.[19]  I believe the proper path forward is for the parties to present the factual dispute to the jury and allow for Defendant to cross examine Dr. Cole on his "assumption."  *See Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 2023 WL 6316418, at *2 (D. Del. Sept. 28, 2023) ("[Q]uestions regarding the factual underpinnings of the expert witness's opinion affect the weight and credibility of the witness's assessment, not its admissibility." (quoting *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017))).

Defendant argues that Dr. Cole inconsistently applied his own stated methodology.  (D.I. 148 at 34).  Dr. Cole states in his report, "In determining the relative importance of the functions of the Accused Products, I took into account [seven] technical considerations."  (D.I. 149-2 ¶ 131).  Defendant's critique appears to be twofold: (1) that he did not address several of these factors, and (2) that he does not have sufficient factual support for his opinions.  (*See* D.I. 148 at 34; D.I. 170 at 17).  Defendant focuses on Dr. Cole's factors 1, 2, and 6: (1) whether the function is standard in the industry; (2) the cost to develop a particular function; and (6) whether a feature drives consumer demand.  (D.I. 148 at 34; D.I. 170 at 17; *see* D.I. 149-2 ¶ 131).

As an initial matter, Dr. Cole's list of factors does not appear to represent a set of factors that he believes must be discussed with respect to every allegedly infringing functionality.  For

---

[19] Defendant's reply brief "confirms the feature lists on its website changed during the damages period," pointing to the EKS and VPC webpages as examples.  (D.I. 170 at 16 (citing D.I. 171-2, Exs. 61, 66)).  Defendant's opening brief did not identify any functionality changes.  (D.I. 161 at 33 (citing D.I. 162-1, Ex. 25 at 332:19–333:8)).  This issue was not discussed at the oral argument and Plaintiff never had an opportunity to address this argument.

instance, his discussion of some functions is limited to a single paragraph.  (*See, e.g.*, D.I. 149-2, Ex. 43 ¶ 154).  I understand that Defendant's criticism is not that Dr. Cole should have discussed every factor for each functionality, but rather that some factors are not discussed in relation to any of the accused functionality.

Contrary to Defendant's assertion, Dr. Cole does appear to discuss factors 1 and 6 to some degree.[20]  (*See, e.g.*, D.I. 149-2, Ex. 43 ¶¶ 154, 159).  Dr. Cole fails to discuss the second factor, but I am not convinced this necessitates exclusion of his opinions.  To be clear, Dr. Cole will not be permitted to provide testimony that goes beyond his expert report and Defendant can cross-examine him on his failure to discuss certain factors.  However, the failure to discuss one factor that he lists among the relevant set of factors considered does not undermine Dr. Cole's overall methodology, which involved a review of the source code, specification documents, deposition testimony, and other materials (*id.* ¶¶ 123–134), and whether that methodology was reliably applied.

Defendant argues Dr. Cole's opinions are not based on sufficient facts or data, noting that he did not review customer services or speak with users to analyze factor 6 or review any documents regarding Defendant's competitor products to analyze factor 1.  (D.I. 148 at 34; D.I. 170 at 17).  I agree with Plaintiff that Dr. Cole's "technical expertise and industry experience in developing, marketing, and valuing products" appears sufficient to support his opinions.  (D.I. 149-2, Ex. 43 ¶¶ 123).  I am not convinced that it was necessary for Dr. Cole, in order to provide helpful and reliable opinions on these factors, to consider the particular types of data and evidence suggested by Defendant.

---

[20] The parties appear to agree that paragraphs 141–59 of Dr. Cole's opening report are representative of his analysis.  (*See* D.I. 161 at 34; D.I. 170 at 17).

Defendant raises arguments regarding Dr. Cole's attribution of value for products that rely on other allegedly infringing products.  (D.I. 148 at 35–36).  Given my determination of the infringement theories Dr. Medvidović has disclosed and my disposition of Defendant's motion to exclude Mr. Gunderson's damages opinion, I understand these arguments now to be moot.

For the stated reasons, I will not exclude Dr. Cole's apportionment opinion.

## B. Plaintiff's Motions

### 1. Infringement

Plaintiff maintains it is entitled to partial summary judgment of infringement regarding whether Defendant's Transit Gateway product satisfies the m-regular and incomplete limitations of the asserted claims.  (D.I. 151 at 2).  I believe a genuine dispute exists regarding whether the accused products meet these claim limitations.  I deny the motion for partial summary judgment of infringement.

### 2. Invalidity

#### a. Anticipation

Plaintiff moves for summary judgment of no anticipation.  (D.I. 151 at 13).  As Defendant has now dropped its anticipation defense (D.I. 159 at 18 n. 84), I grant Plaintiff's motion.

#### b. Inherency

The opinion of Defendant's invalidity expert, Mr. Greene, repeatedly states that, to the extent any limitation of the asserted claims is not explicitly disclosed, it is inherently disclosed. (*See generally* D.I. 152-1, Ex. 15–20; D.I. 152-2, Ex. 21–24).  Plaintiff argues Mr. Greene's opinion is conclusory and unsupported and should be excluded.  (D.I. 151 at 15–17).  As stated at oral argument, I agree that Mr. Greene's expert report does not contain sufficient disclosure to

support an inherency theory.  (Hearing Tr. at 46:25–48:19).  Mr. Greene will not be permitted to testify at trial on inherent disclosure of any of the claim elements.

### c. Obviousness

Plaintiff maintains that Mr. Greene's obviousness opinion should be excluded as unreliable and that, as a result, it is entitled to summary judgment of no obviousness.  Plaintiff argues Mr. Greene failed to explain why a person of ordinary skill in the art ("POSA") would have been motivated to combine the asserted prior art references.  (D.I. 151 at 17–22). "[O]bviousness concerns whether a skilled artisan not only could have made but would have been motivated to make the combinations or modifications of prior art to arrive at the claimed invention."  *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015).

Defendant agrees that paragraph 149 of Mr. Greene's report was "representative of all the motivation to combine analysis that Mr. Greene has."  (Hearing Tr. at 50:3–23).  This paragraph reads:

> As those charts show, ATT Maxemchuk builds upon '882 Maxemchuk and informs a POSITA of additional details related to '882 Maxemchuk's grid-based mesh network.  A POSITA would be motivated to combine these references for several reasons.  Both references are in the network architecture field and are directed to improving mesh networks.  Both teach the simplification of routing of data that arises from the grid-based mesh network.  And both disclose the same grid-based mesh network.  In addition, ATT Maxemchuk includes additional implementation details for the grid-based mesh network that '882 Maxemchuk describes.

(D.I. 152-1, Ex. 14 ¶ 149).

Mr. Greene "fails to explain why a person of ordinary skill in the art would have combined elements from specific references in the way the claimed invention does." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (citing *KSR*, 550 U.S. at 418).  His opinion does nothing more than explain why the prior art references are analogous to each other and to the claimed invention.  *See Comaper Corp. v.*

*Antec, Inc.,* 596 F.3d 1343, 1351 (Fed. Cir. 2010) ("Two criteria are relevant in determining whether prior art is analogous: '(1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.'" (quoting *In re Clay,* 966 F.2d 656, 658–59 (Fed. Cir. 1992))); *In re GPAC Inc.*, 57 F.3d 1573, 1577–78 (Fed. Cir. 1995) ("[T]he prior art relevant to an obviousness determination necessarily encompasses not only the field of the inventor's endeavor but also any analogous arts.").  Plaintiff's "assertions that the references were analogous art, . . . without more, is an insufficient articulation for motivation to combine."[21]  *Sisvel Int'l S.A. v. Sierra Wireless, Inc.*, 82 F.4th 1355, 1364 (Fed. Cir. 2023).

As Defendant's invalidity contentions rely on Mr. Greene's testimony, Mr. Greene's failure to opine on a POSA's motivation to combine the asserted prior art references proves fatal to Defendant's obviousness theory.  I grant summary judgment of nonobviousness as to all asserted obviousness defenses.

---

[21] Despite indicating paragraph 149's representativeness, Defendant maintains that other paragraphs of Mr. Greene's report, such as paragraph 151, and claim charts cited in the report "go beyond" paragraph 149.  (Hearing Tr. at 51:22–54:9 (referencing D.I. 152-1, Ex. 14 ¶¶ 139–70; D.I. 152–1, Ex. 15–20; D.I. 152-2, Ex. 21–24)).  These paragraphs add nothing in terms of demonstrating motivation to combine.  The paragraphs that come closest to discussing motivation to combine refer to "common problems and challenges addressed by the references" or "improvement[s] described in one of these references [that] can be readily applied to the operation of another reference's description."  (D.I. 152-1, Ex. 14 ¶¶ 141–43).  These generic and unspecified motivations are insufficient.  *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 797 (Fed. Cir. 2021) (noting that motivations to combine are legally insufficient where they are asserted in a generic, conclusory manner).  The claim charts, which do little more than identify relevant portions of each prior art reference, likewise do not describe any motivation to combine the references.  (*See* D.I. 152–1, Ex. 15–20; D.I. 152-2, Ex. 21–24).

### 3.   Ms. Sultanik's and Ms. Kindler's Non-Infringing Alternatives Opinions

Plaintiff moves to exclude the opinions of Defendant's experts, Ms. Sultanik and Ms. Kindler, on non-infringing alternatives ("NIAs").

Plaintiff's primary critique of Ms. Sultanik's opinion is that she does not provide any independent opinion on NIAs as her expert report is nearly a word-for-word copy of Defendant's November 2023 interrogatory response.[22]  (D.I. 151 at 22; Hearing Tr. at 82:18–86:9; *Compare* D.I. 152-1, Ex. 10 ¶¶ 715–24 *with* D.I. 152-2, Ex. 27 at 23–27).  Defendant contends Ms. Sultanik's reliance on the interrogatory response was not improper because the response was prepared with the assistance of Mr. MacCárthaigh, Defendant's Rule 30(b)(6) witness on NIAs. (D.I. 159 at 27–28).  Defendant argues Plaintiff's failure to question him about the topic at his deposition was its own fault.  (*Id.* at 28; Hearing Tr. at 86:16–88:19).  Plaintiff argues that they did not depose Mr. MacCárthaigh about NIAs because he was not identified in Defendant's interrogatory response as a person knowledgeable about NIAs.  (D.I. 172 at 13; Hearing Tr. at 83:2–85:9).

At oral argument, I granted Plaintiff the opportunity to take an additional deposition of Mr. MacCárthaigh regarding the topic of NIAs.  (Hearing Tr. at 87:23–99:21).  This deposition[23] should, in theory, resolve the dispute between the parties regarding the factual basis upon which

---

[22] While Plaintiff focused on questioning whether Ms. Sultanik's opinions were her own at oral argument, Plaintiff's briefing also includes several arguments attacking Ms. Sultanik's analysis as conclusory.  (*See* D.I. 151 at 23–26).  Setting aside the issue of the independence of Ms. Sultanik's analysis, the report presents a substantial amount of discussion to support Ms. Sultanik's conclusions.  (*See* D.I. 152-1, Ex. 10 ¶¶ 715–24).  Any gaps appear to be of the type that a POSA would reasonably be able to fill in based on their "own experience coding and revising code."  (*Id.* ¶ 717).  To the extent that Plaintiff was confused about Ms. Sultanik's reasoning regarding particular conclusions, it could have raised these questions at her deposition.

[23] The docket does not yet reflect any notice of deposition of Mr. MacCárthaigh.

Defendant's experts formed their opinions. I deny the motion to exclude Ms. Sultanik's NIA opinion, but grant Plaintiff leave to raise the issue again in the event that Mr. MacCárthaigh's testimony substantially deviates from Defendant's interrogatory responses. Plaintiff's objection to Ms. Kindler's NIA opinion is based on her dependence on Ms. Sultanik's opinion. (*See* D.I. 151 at 26; Hearing Tr. at 82:22–83:3). The motion to exclude Ms. Kindler's NIA opinion is similarly denied, with leave to raise the issue again.

### 4. Ms. Kindler's Damages Opinion

Plaintiff moves to exclude Ms. Kindler's damages opinion as arbitrary and unreliable. Plaintiff's criticisms all boil down to arguing that Ms. Kindler's evasiveness at her deposition demonstrates that her opinions are unreliable. As an example, Ms. Kindler's report discusses license agreements and settlement agreements which, as Plaintiff acknowledges, appear to support the $1.5 million and $3 million bounds of her reasonable royalty range. (D.I. 151 at 31 (citing D.I. 152-2, Ex. 29 ¶¶ 10, 67–72, 88–99, 112–16); *see also* D.I. 152-2, Ex. N ¶¶ 70, 104, 107, 170). When Ms. Kindler was asked at her deposition what evidence formed the basis for this range, she generally referred to "all of the evidence and economic analysis presented in [her] report." (D.I. 152-2, Ex. 30 at 38:2–18; *see also id.* at 37:5–38:1, 40:9–41:5). Ms. Kindler also testified that her opinion would not change even if she were not permitted to rely on certain agreements. (D.I. 152-2, Ex. 30 at 38:19–40, 129:14–130:22, 146:25–147:10, 157:13–158:14). Plaintiff argues that these deposition responses demonstrate that Ms. Kindler's reasonable royalty opinion was "inherently unreliable." (D.I. 151 at 30).

I agree with Defendant that Ms. Kindler's conclusions, which purportedly rely on multiple data points, are not shown to be arbitrary and unsupported based on her testimony that elimination of one data point does not affect her conclusion. (D.I. 159 at 31). Ms. Kindler's

evasiveness during her deposition is not grounds to categorically exclude Ms. Kindler's opinion. *TQ Delta, LLC v. 2Wire, Inc.*, 2021 WL 2954356, at *3 (D. Del. July 14, 2021).  Unlike critiques challenging, for example, the scientific validity of an expert's opinion or the methodology an expert used, those challenging an expert witness's evasiveness raise issues of credibility, not reliability.[24]  *Id.*  District courts are gatekeepers for the reliability of expert opinions, *Schneider*, 320 F.3d at 405, but the "question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court."  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).  Plaintiff will be able to address Ms. Kindler's credibility through cross examination at trial.  *Daubert*, 509 U.S. at 596.

Plaintiff seeks exclusion of Ms. Kindler's damages opinions on the basis that Ms. Kindler improperly assumed Plaintiff's infringement case was limited to products infringing "through the use" of VPC and/or Transit Gateway.  (D.I. 151 at 36–37).  As discussed, Plaintiff's infringement theory is so limited.

For the reasons above, I will not exclude Ms. Kindler's opinions.

## IV.   CONCLUSION

An appropriate order will issue.

---

[24] Plaintiff's briefing does contain phrasing claiming, for example, that Ms. Kindler's opinions "lack[] any cognizable methodology."  (D.I. 151 at 29–30).  It is clear, however, that Plaintiff's arguments are all based on Ms. Kindler's deposition testimony and accusations of evasiveness. (*See* D.I. 151 at 28–35; D.I. 172 at 16–17).